# Exhibit A

<u>Print This Docket</u>                                        <u>Back</u>

**2018CV02231**        **STARK COUNTY COMMISSIONERS ET AL VS CARDINAL HEALTH INC**

| | |
|---|---|
| **Type Of Action :** | OTHER CIVIL MISCELLANEOUS CIVIL |
| **Judge :** | HEATH, TARYN L. |
| **Case Status :** | open |
| **Filed On:** | 11/14/2018 |

## PARTIES

| Name | Type |
|---|---|
| AMERISOURCEBERGEN DRUG CORPORATION, | DEFENDANT |
| CARDINAL HEALTH INC, | DEFENDANT |
| CVS HEALTH CORPORATION, | DEFENDANT |
| CVS INDIANA LLC, | DEFENDANT |
| CVS PHARMACY INC, | DEFENDANT |
| DOES 1 - 50, JANE | DEFENDANT |
| MCKESSON CORPORATION, | DEFENDANT |
| OHIO CVS STORES LLC, | DEFENDANT |
| STARK COUNTY BOARD OF COMMISSIONERS, | PLAINTIFF |
| STATE OF OHIO EX REL, | PLAINTIFF |
| WALGREEN CO, | DEFENDANT |
| WALGREENS BOOTS ALLIANCE, | DEFENDANT |

## DOCKET ENTRIES

| | | |
|---|---|---|
| 11-14-2018 | JURY DEMAND - PLAINTIFF | $25.00 |
| 11-14-2018 | DESIGNATION FORM FILED | $.00 |
| 11-14-2018 | COMPLAINT FILED INSTRUCTIONS FOR SERVICE FILED. SUMMONS AND COPIES OF COMPLAINT SENT TO CARDINAL HEALTH INC BY CERTIFIED MAIL (###432192018CV02231000!!!); MCKESSON CORPORATION BY CERTIFIED MAIL (###432152018CV02231001!!!); AMERISOURCEBERGEN DRUG CORPORATION BY CERTIFIED MAIL (###432192018CV02231002!!!); WALGREENS BOOTS ALLIANCE DBA WALGREEN CO BY CERTIFIED MAIL (###432152018CV02231003!!!); CVS HEALTH CORPORATION CORPORATION TRUST COMPANY CORPORATION TRUST CENTER BY CERTIFIED MAIL (###198012018CV02231004!!!); CVS INDIANA LLC BY CERTIFIED MAIL (###462042018CV02231005!!!); CVS PHARMACY INC BY CERTIFIED MAIL (###441142018CV02231006!!!); OHIO CVS STORES LLC BY CERTIFIED MAIL (###432192018CV02231007!!!); | $108.00 |
| 11-27-2018 | SERVICE COMPLETE FOR SERVICE ISSUED 11-14-2018 CERTIFIED MAIL TO AMERISOURCEBERGEN DRUG CORPORATION C/O CT CORPORATION SYSTEM 4400 EASTON COMMONS SUITE 125 COLUMBUS OH 43219 ON 11-19-2018 | |
| 11-27-2018 | SERVICE COMPLETE FOR SERVICE ISSUED 11-14-2018 CERTIFIED MAIL TO MCKESSON CORPORATION C/O CORPORATION SERVICE COMPANY 50 WEST BROAD ST SUITE 1330 COLUMBUS OH 43215 ON 11-20-2018 | |
| 11-27-2018 | SERVICE COMPLETE FOR SERVICE ISSUED 11-14-2018 CERTIFIED MAIL TO CARDINAL HEALTH INC C/O CT | |

| | | |
|---|---|---|
| | CORPORATION SYSTEM 4400 EASTON COMMONS SUITE 125 COLUMBUS OH 43219 ON 11-19-2018 | |
| 11-27-2018 | SERVICE COMPLETE FOR SERVICE ISSUED 11-14-2018 CERTIFIED MAIL TO OHIO CVS STORES LLC CT CORPORATION SYSTEM 4400 EASTON COMMONS WAY SUITE 125 COLUMBUS OH 43219 ON 11-19-2018 | |
| 11-27-2018 | SERVICE COMPLETE FOR SERVICE ISSUED 11-14-2018 CERTIFIED MAIL TO CVS HEALTH CORPORATION CORPORATION TRUST COMPANY CORPORATION TRUST CENTER 1209 ORANGE ST WILMINGTON DE 19801 ON 11-20-2018 | |
| 11-27-2018 | SERVICE COMPLETE FOR SERVICE ISSUED 11-14-2018 CERTIFIED MAIL TO WALGREENS BOOTS ALLIANCE DBA WALGREEN CO PRENTICE HALL CORPORATION SYSTEM INC 50 WEST BROAD ST SUITE 1330 COLUMBUS OH 43215 ON 11-20-2018 | |
| 11-28-2018 | NOTICE OF APPEARANCE FILED BY ATTORNEY BRIAN J LALIBERTE AND VINCENT I. HOLZHALL FOR MCKESSON CORPORATION WITH PROOF OF SERVICE. | $.00 |
| 12-04-2018 | DISTRIBUTOR DEFENDANTS CONSENT MOTION FOR EXTENSION OF TIME TO ANSWER COMPLAINT - WITH PROOF OF SERVICE FILED | $.00 |
| 12-07-2018 | ORDER - GRANTING - DEFENDANTS CONSENT MOTION FOR EXTENSION OF TIME TO ANSWER COMPLAINT UNTIL AND INCLUDING 2-15-19 | $12.00 |
| 12-10-2018 | NOTICE OF APPEARANCE FILED BY ATTORNEY BRENT MICHAEL BUCKLEY AND HUNTER GORDON CAVELL FOR WALGREENS BOOTS ALLIANCE WITH PROOF OF SERVICE. | $.00 |
| 12-17-2018 | NOTICE OF FAILURE OF SERVICE | $.00 |
| 12-17-2018 | SERVICE FAILED FOR SERVICE ISSUED 11-14-2018- CERTIFIED - CVS PHARMACY INC - : RETURN TO SENDER- UNABLE TO FORWARD | $3.48 |

Print This Docket                                                    Back

IN THE COURT OF COMMON PLEAS
STARK COUNTY, OHIO

CIVIL COVER SHEET

**PURSUANT TO LOCAL RULE 9.02, THIS FORM MUST BE FILLED OUT IN ITS ENTIRETY**

CASE NUMBER  2 0 1 8 C V 0 2 2 3 1

JUDGE  Heath

STARK COUNTY, OHIO BOARD OF COUNTY
COMMISSIONERS, et al.,

      Plaintiffs,

vs.

CARDINAL HEALTH, INC.,

      Defendants.

2018 NOV 14  AM 11: 59

CLERK OF COURTS
STARK COUNTY, OHIO

Has this case been previously filed and dismissed? ___Yes _X_ No.  If yes, list case no. and judge.

_____

List all related pending case(s) including case no. and judge. _____

### CIVIL CATEGORIES:  Place (X) in ONE CATEGORY ONLY

| | | | | | |
|---|---|---|---|---|---|
| [] | A. | Professional Tort | [] | E. | Foreclosure |
| | | [] Medical Malpractice | [] | F. | Administrative Appeal |
| | | [] Dental Malpractice | | | |
| | | [] Optometric Malpractice | [] | G. | Complex Litigation Classification |
| | | [] Chiropractic Malpractice | | | Requested |
| | | [] Legal Malpractice | | | |
| | | [] Other Malpractice | [X] | H. | Other Civil |
| [] | B. | Product Liability | | | [] Contract Care |
| | | | | | [X] Miscellaneous Civil |
| [] | C. | Other Tort | | | [] Real Property |
| | | [] Personal Injury | | | [] Consumer Sales Practices Act |
| | | [] Personal Injury - Auto | | | |
| | | [] Miscellaneous | | | |
| [] | D. | Workers Compensation | | | |

**Brief Factual Summary:** Opioid litigation distributor.

**Description of damages including all special damages to date:** N/A.

**Do you think this case should be referred to the Court Mediation Program at this time?** __ Yes _X_ No
**Reasons:**

**Is this case based on a violation of the Ohio Mortgage Broker Act (ORC 1322)?** ___ Yes _X_ No

Stark County Prosecutor's Office
Firm Name (Print or Type)

110 Central Plaza South, Ste. 510
Address

(330) 451-7882

John D. Ferrero/Stephan P. Babik
Attorney of Record   (Print or Type)

John D. Ferrero
Signature

0018590/0080165

FILTERED BY 7



LOUIS P. GIAVASIS
CLERK OF COURTS
STARK COUNTY, OHIO

IN THE COURT OF COMMON PLEAS
STARK COUNTY, OHIO

2018 NOV 14  AM 11: 59

| | |
|---|---|
| STARK COUNTY, OHIO BOARD OF COUNTY COMMISSIONERS<br>110 Central Plaza South, Suite 240,<br>Canton, Ohio 44702 | Case No.:  **2 0 1 8 C V 0 2 2 3 1**<br><br>Judge  **Heath** |

And

THE STATE OF OHIO *EX REL.*
PROSECUTING ATTORNEY OF STARK
COUNTY, JOHN D. FERRERO, 110
Central Plaza South, Suite 510,
Canton, Ohio 44702,

        Plaintiffs,

    vs.

CARDINAL HEALTH, INC.
c/o CT Corporation System
4400 Easton Commons
Suite 125
Columbus, OH 43219

And

MCKESSON CORPORATION
c/o Corporation Service Company
50 West Broad Street
Suite 1330
Columbus, OH 43215

And

AMERISOURCEBERGEN DRUG
CORPORATION
c/o CT Corporation System
4400 Easton Commons
Suite 125
Columbus, OH 43219

AND

                                        **Complaint**

                  **(Jury Demand Endorsed Hereon)**

ENTERED BY 7

WALGREENS BOOTS ALLIANCE
d/b/a WALGREEN CO
The Prentice-Hall Corporation System, Inc.
50 West Broad Street
Suite 1330
Columbus, OH 43215

And

CVS HEALTH CORPORATION
The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

And

CVS INDIANA, L.L.C.
C T Corporation System
150 West Market Street, Suite 800
Indianapolis, IN, 46204, USA


And

CVS PHARMACY, INC.
C T Corp.
1300 E. 9th Street
Cleveland, OH 441140000

And

OHIO CVS STORES LLC
CT Corporation System
4400 Easton Commons Way
Suite 125
Columbus, OH 43219

And

JANE DOES 1 – 50

                              Defendants.
_____

2

## PRELIMINARY STATEMENT

1.      Plaintiff County of Stark, Ohio, by and through the Stark County Prosecutor's Office (the "County") brings this action to redress AmerisourceBergen Drug Corporation's, Cardinal Health, Inc.'s, McKesson Corporation's, CVS Health Corporation's, CVS Indiana, LLC's, CVS Pharmacy, Inc.'s, Ohio CVS Stores, LLC's and Walgreens Boots Alliance d/b/a Walgreen Co.'s (together "Defendants") unfettered and unlawful distribution of opioids into the County.

2.      Prescription opioids are narcotics.  They are derived from and possess properties similar to opium and heroin and they are regulated as controlled substances.  While opioids can dampen the perception of pain, they also can create an addictive, euphoric high.  At higher doses, they can slow the user's breathing, causing potentially fatal respiratory depression.  Because the medical community recognized these dangers, they originally used opioids cautiously and sparingly, typically only for short-term acute pain—where brief use limited the need for escalating doses and the risk of addiction—or for palliative (end-of-life) care.[1]  Consequently, the prescribing of opioids was sharply constrained.

3.      In the mid-1990s, however, pharmaceutical companies (which the County is suing in a separate action) aggressively and deceptively marketed opioids for common chronic conditions like back pain, migraines, and arthritis.  By the mid-2000s, chronic opioid therapy— the prescribing of opioids long-term to treat chronic pain—became widespread and the use of opioids skyrocketed.  Their deceptive marketing scheme also increased the comfort level of doctors and patients in converting opioids prescribed for acute pain—surgery or injuries, for

---

[1] In this Complaint, "chronic pain" means non-cancer pain lasting three months or longer.

3

example—to long-term use by patients who experienced or reported ongoing pain.  According to the CDC, opioid prescriptions, as measured by number of prescriptions and morphine milligram equivalent ("MME") per person, tripled from 1999 to 2015.  In 2015, on an average day, more than 650,000 opioid prescriptions were dispensed in the U.S.

4.      Taking advantage of this mass market, Defendants flooded many communities with opioids, without conducting the due diligence required by law to prevent the diversion of opioids to an illicit market for these drugs that predictably developed, and that Defendants helped to create, expand, and maintain.

5.      Stark County is no exception.  Quite the opposite, according to data from the CDC, the County had more opioid prescriptions than people each year from 2007 to 2015.  The prescription rate remained shockingly high —— 92.6 opioid prescriptions for every 100 people (including children) in the County — in 2016.

6.      All told, Stark County, with an average population from 2010 to 2017 of approximately 375,000, received a total of 203,604,737 retail doses of opioid analgesics, with a high of 27,679,927 in 2013.  This amounted to 135 doses per opioid patient.

7.      Nationwide, Defendants AmerisourceBergen Drug Corporation, Cardinal Health, Inc., and McKesson Corporation account for approximately 90% of all revenues from prescription drug distribution.  Known colloquially as the "Big Three," the Wholesaler Defendants dominate the wholesale drug distribution market, including, upon information and belief, in the County.  During the relevant time period, CVS Health Corporation, CVS Indiana, LLC, CVS Pharmacy, Inc., Ohio CVS Stores, Inc., and Walgreens Boots Alliance, Inc. a/k/a Walgreen Co. (the "Chain Pharmacies") filled two positions on the opioid supply chain: distributor, delivering opioids to their own pharmacies, and dispenser, filling prescriptions of opioids through their own pharmacies and

4

delivering opioids to the ultimate consumers. From these positions, the "Big Three" and the Chain pharmacies had unique information and insight into likely diversion of the drugs they supplied and/or dispensed.

8.     Defendants have common law and statutory duties to provide adequate controls against diversion. Each Defendant is legally mandated to monitor for, report, and reject suspicious orders of controlled substances into the County. Such orders include, for example, orders of opioids that exceed reasonable volume, are of an unusual frequency, or that raise other red flags. The Chain Pharmacies are also required to assess the legitimacy of prescriptions before filling them and to maintain effective controls against diversion. Yet, Defendants shipped or filled orders that they knew or should have known were being diverted or used other than for legitimate medical purposes.

9.     Sales and distribution data available to Defendants, as well as their own observations, would, or should, have put them on notice of potential diversion. Yet, upon information and belief, Defendants consistently failed to report or suspend these illicit orders, deepening the crisis of opioid abuse, addiction, and death in the County. Defendants had financial incentives to continue to supply opioids to pill mills (doctors, clinics, or pharmacies that prescribe or dispense opioids inappropriately or for non-medical reasons) because they may entitle them to volume-based rebates and discounts that they may then leverage to further increase their sales volumes and profits. The Chain Pharmacies also had financial incentives to fill prescriptions, even is suspicious of diversion, which increased their overall profit. Defendants have supplied opioids in quantities that they knew or should have known exceeded any legitimate market for opioids— even the wider market for chronic pain—and, upon information and belief, ignored red flags of suspicious orders of these drugs in Stark County.

5

10.     As a direct and foreseeable result of Defendants' conduct, the nation and Stark County are now swept up in what the Centers for Disease Control and Prevention ("CDC") has called a "public health epidemic" and what the U.S. Surgeon General has deemed an "urgent health crisis."[2]  In 2015, an estimated 2 million Americans were addicted to prescription opioids and 591,000 to heroin.  From 1999 to 2016, more than 200,000 people died in the U.S. from overdoses related to prescription opioids—more than the number of Americans who died in the Vietnam War.  In 2016, the CDC reported that, in contrast to other developed countries, and despite having some of the world's highest spending on medical care, our nation saw life expectancy at birth decline for the second straight year, with the increasing number of people who died of overdoses representing the most significant factor in this alarming trend.

11.     The careless, even reckless distribution of opioids into the County correlates directly to skyrocketing addiction, overdose, and death; black markets for diverted prescription opioids; and a concomitant rise in heroin and fentanyl abuse by individuals who could no longer legally acquire—or simply could not afford—prescription opioids.  Prescription opioids at the molecular level and in their effect, closely resemble heroin.  Prescription opioids are synthesized from the same plant as heroin, have similar molecular structures, and bind to the same receptors in the human brain.

12.     As many as 1 in 4 patients who receive prescription opioids long-term for chronic pain in primary care settings struggles with addiction.  And, the link between prescription narcotic painkiller abuse and subsequent and/or simultaneous heroin abuse continues to grow.  Across the country, **80% of recent heroin users** have previously used prescription opioids non-medically.

---

[2] CDC, *Examining the Growing Problems of Prescription Drug and Heroin Abuse* (Apr. 29, 2014), available at http://www.cdc.gov/washington/testimony/2014/t20140429.htm;. Vivek H. Murthy, *Letter from the Surgeon General*, August 2016, available at http://turnthetiderx.org.

As the American Society of Addiction Medicine has explained, four out of five new heroin users started with prescription painkillers.  In fact, people who are addicted to prescription opioids are 40 times more likely to become addicted to heroin, and the Centers for Disease Control and Prevention ("CDC") identified addiction to prescription opioids as the strongest risk factor for heroin addiction.

13.     This transition became even more dangerous in recent years, as increasingly powerful synthetic opiates began entering communities.  Heroin may be combined with fentanyl—a powerful opioid prescribed for cancer pain or in hospital settings that, in synthetic form, has made its way into Ohio communities, including Stark County.

14.     Not only has the opioid epidemic been described as the deadliest drug crisis in American history, drug overdoses rose to become the leading cause of death for Americans under 50 years old, eclipsing guns or car accidents or accidents.  Overdoses have been killing people at a pace faster than the H.I.V. epidemic did at its peak.  According to Robert Anderson, who oversees death statistics at the CDC, "'I don't think we've ever seen anything like this. Certainly not in modern times.'"[3]

15.     Ohio is among the states hardest hit by the opioid epidemic.  As a recent report from The Ohio State University summarizes, "[o]pioid addiction, abuse, and overdose deaths have become the most pressing public health issue facing Ohio."[4]  The rapid rise in overdose deaths in Ohio and the United States as a whole is unprecedented.  Ohio now "leads the country in drug

_____

[3] Associated Press, *Drug Overdoses Killed 50,000 in U.S., More than Car Crashes*, (Dec. 9, 2016), https://www.nbcnews.com/health/health-news/drug-overdoses-killed-50-000-u-s-more-car-crashes-n694001

[4] C. William Swank Program in Rural-Urban Policy, Taking Measure of Ohio's Opioid Crisis, The Ohio State University (Oct. 2017) at 1.

overdose deaths per capita, a rate that continues to rise, overwhelming families, communities, and local governments across the state."[5] Overdose deaths have become the leading cause of death for Ohioans under the age of 55, and across all ages, more than two and a half times as many people die from drug overdoses as from car accidents.  Most of the overdose fatalities in Ohio involved opioids.

16.     Stark County is among the communities hardest hit by the opioid epidemic.  In just six-years, from 2012 to 2018, opiate-related overdoses have claimed the lives of more than 685 people in the County.

17.     The loss of each of these individuals cannot be adequately conveyed by statistics, nor can the depth and breadth of the impact on those who survive.  Because the addictive pull of opioids is so strong, relapse is more common than with other drugs.  Hundreds of people have been rushed to County emergency rooms or revived by EMS or community members trained to administer Narcan — an antidote to overdose.  In the first five months of 2018 alone, County emergency rooms treated 275 drug overdoses.  The epidemic does not discriminate, but has effected every part of the community.

18.     The damage inflicted cuts across ages and generations.   Children are being displaced from their homes and raised by relatives or placed in the County's care due to parents' addiction.  Young children have lost loved ones and risk becoming the direct victims of overdoses themselves after coming into contact with opiates.

19.     This human tragedy cannot be calculated or compensated.  But the financial burden to the County is staggering.  The County has expanded its own services and worked collaboratively with the community to confront this public health epidemic.  Narcan administration has saved the

---

[5] *Id.*

8

lives of hundreds of its residents.  The County has supported and developed programs to help combat the crisis.  It would further expand these efforts, but the unprecedented epidemic exceeds its budget capacity and has stretched existing programs thin.  The County is also faced with increased costs of drug crimes and other public services because of the opioid epidemic. Meanwhile, Defendants have not changed their ways or corrected their past misconduct, but instead are continuing to fuel the crisis.

20.     Defendants' conduct has violated, and continues to violate, the Ohio Corrupt Practices Act ("OCPA"), R.C. § 2923.31 *et seq.*, and R.C. § 2307.60, which provides civil liability for injuring another through criminal acts.  Additionally, Defendants' conduct constitutes a public nuisance, civil conspiracy, negligence, and unjust enrichment.

21.     Accordingly, the County brings this action to hold Defendants accountable for their conduct and seeks abatement, damages, and any other injunctive and equitable relief within this Court's powers to redress and halt these unlawful practices.

### PARTIES

1.     Plaintiffs

22.     The County of Stark, Ohio ("the County") is a County organized under the laws of the State of Ohio. The County has its seat of government in Canton, Ohio.  The Stark County Prosecutor's Office is located at 110 Central Plaza South, Suite 510, Canton, Ohio 44702. The County provides many services for its residents, including public assistance, law enforcement services, criminal justice services, addiction and mental health services, and services for families and children.

9

23.    This action is also brought on behalf of the State of Ohio, by and through Stark County Prosecutor John D. Ferrero with regard to the claim for statutory public nuisance in the name of the State of Ohio under R.C. § 3767.03 and R.C. § 4729.35.

2.    Defendants

24.    Cardinal Health, Inc. ("Cardinal") describes itself as a "global, integrated health care services and products company," and is the fifteenth largest company by revenue in the U.S., with annual revenue of $121 billion in 2016.  Cardinal distributes pharmaceutical drugs, including opioids, throughout the country.  Cardinal is an Ohio corporation and is headquartered in Dublin, Ohio.  Cardinal has been licensed as a wholesale distributor of dangerous drugs in Ohio since 1990.  Based on Defendant Cardinal's own estimates, one of every six pharmaceutical products dispensed to U.S. patients travels through the Cardinal Health network.

25.    McKesson Corporation ("McKesson") is fifth on the list of Fortune 500 companies, ranking immediately after Apple and ExxonMobil, with annual revenue of $191 billion in 2016. McKesson is a wholesaler of pharmaceutical drugs that distributes opioids throughout the country. McKesson is incorporated in Delaware, with its principal place of business in San Francisco, California.  McKesson has been licensed as a wholesale distributor of dangerous drugs in Ohio since 1996.  McKesson operates a warehouse in Washington Court House, Ohio.

26.    In January 2017, McKesson paid a record $150 million to resolve an investigation by the U.S. Department of Justice ("DOJ") for failing to report suspicious orders of certain drugs, including opioids.  In addition to the monetary penalty, the DOJ required McKesson to suspend sales of controlled substances from distribution centers in Ohio and three other states.  The DOJ

10

described these "staged suspensions" as "among the most severe sanctions ever agreed to by a [Drug Enforcement Administration] registered distributor."[6]

27.     AmerisourceBergen Drug Corporation ("AmerisourceBergen") is a wholesaler of pharmaceutical drugs that distributes opioids throughout the country. AmerisourceBergen is the eleventh largest company by revenue in the United States, with annual revenue of $147 billion in 2016. AmerisourceBergen's principal place of business is located in Chesterbrook, Pennsylvania, and it is incorporated in Delaware. AmerisourceBergen has been licensed as a wholesale distributor of dangerous drugs in Ohio since 1988. AmerisourceBergen operates a warehouse in Lockbourne, Ohio. A division of AmerisourceBergen, Besse Medical Services, Inc., operates a warehouse in West Chester, Ohio.

28.     Walgreens Boots Alliance d/b/a Walgreen Co ("Walgreens") is a Delaware corporation with its headquarters in Deerfield, Illinois. Walgreens for years included a captive distributor that supplied pharmaceutical drugs and opioids to Walgreens pharmacies in Stark County and throughout the country. Walgreens also operates pharmacy locations dispensing prescriptions, including opioids, in the County. Nationwide, Walgreens is the second-largest pharmacy store chain in the United States behind CVS, with annual revenue of more than $118 billion. According to its website, Walgreens operates more than 8,100 retail locations and filled 990 million prescriptions on a 30-day adjusted basis in fiscal year 2017.

29.     Upon information and belief, Walgreens has traditionally served as a distributor of generic pharmaceutical products, like generic oxycodone and hydrocodone, to its own stand-alone

---

[6] Department of Justice, "McKesson Agrees to Pay Record $150 Million Settlement for Failure to Report Suspicious Orders of Pharmaceutical Drugs, (Jan. 17, 2017) https://www.justice.gov/opa/pr/mckesson-agrees-pay-record-150-million-settlement-failure-report-suspicious-orders.

pharmacy locations, known as "Well Experience" locations. Walgreens also contracted with outside pharmaceutical wholesale distributors, including upon information and belief, Cardinal and AmerisourceBergen, to distribute branded pharmaceutical products, including opioids, to Well Experience locations.

30.     Walgreens represented 30% of AmerisourceBergen's revenue and was its largest customer in 2017.[7]    As a part of the agreement, Walgreens gained purchase rights to AmerisourceBergen equity, allowing it to further participate in the prescription drug shipment boom in America. Walgreens subsequently exercised these purchase rights, ultimately owning approximately 26% of AmerisourceBergen.

31.     This equity ownership in AmerisourceBergen provided Walgreens even more information about the rampant problem of suspicious opioid shipments in the County. As part of the transaction, Walgreens has the ability to nominate up to two members of the Board of Directors of AmerisourceBergen.[8]   Currently, Walgreen's Co-Chief Operating Officer, who oversees Walgreens' business operation, including distribution, sits on the AmerisourceBergen Board of Directors.[9]

32.     Defendant CVS Health Corporation ("CVS Health") is a Delaware corporation with its principal place of business in Rhode Island.  CVS has a vertically integrated business model,

---

[7] Walgreens Has Made Takeover Approach to AmerisourceBergen, Feb. 12, 2018, https://www.reuters.com/article/us-amerisourcebergn-m-a-walgreens-boots/walgreens-in-talks-to-buy-amerisourcebergen-wsj-idUSKBN1FX02B

[8]      AmerisourceBergen    2018    Proxy    Statement    at    p.    8, http://investor.amerisourcebergen.com/static-files/6e4bbeea-86a2-4ed1-9e75-bb039e628731

[9]      AmerisourceBergen    Board    of    Directors    Roster, http://investor.amerisourcebergen.com/5836/ornella-barra

operating as both a wholesale distributor of prescription opioids to pharmacy customers and its

own pharmacy stores and pharmacy locations dispensing opioids. CVS, through its various DEA

registrant subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor.

CVS Health describes itself as "a pharmacy innovation company helping people on their path to

better health, including "[t]hrough its 9,700 retail locations, more than 1,100 walk-in medical

clinics, a leading pharmacy benefits manager with nearly 90 million plan members, a dedicated

senior pharmacy care business serving more than one million patients per year," among other

services. CVS Health touts what it describes as its "unique integrated model" as "increas[ing]

access to quality care, deliver[ing] better health outcomes and lower[ing] overall health care costs."

Defendant CVS Indiana, LLC is an Indiana limited liability company with its principal place of

business in Indianapolis, Indiana. Defendant CVS Pharmacy, Inc. is a Rhode Island corporation

with its principal place of business in Rhode Island, and is registered to do business in Ohio.

Defendant Ohio CVS Stores, LLC is an Ohio corporation registered to do business in Ohio.

Defendants CVS Health Corporation, CVS Indiana, LLC are collectively referred to as "CVS."

33.     At all times relevant to this Complaint, CVS distributed prescription opioids

throughout the United States, including in Ohio. CVS also has a numerous pharmacies stores in

Ohio, including pharmacies in the County.

34.     Defendants include the above referenced entities as well as their predecessors,

successors, affiliates, subsidiaries, partnerships and divisions to the extent that they are engaged

in the distribution, sale and/or dispensing of opioids.

35.     For Defendant Jane Does 1 – 50, the County lacks sufficient information to

specifically identify the true names or capacities, whether individual, corporate, or otherwise, of

13

these Defendants.  The County will amend this Complaint to show their true names when they are ascertained.

36.      All of the actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, and/or done by Defendants' officers, agents, employees, or other representatives while actively engaged in the management of Defendants' affairs within the course and scope of their duties and employment, and/or with Defendants' actual, apparent, and/or ostensible authority.

## JURISDICTION AND VENUE

37.      This Court has jurisdiction over this matter pursuant to R.C. § 2305.01.

38.      No federal court has jurisdiction over this action, which asserts exclusively state law claims.

39.      This Court has personal jurisdiction over all Defendants under R.C. § 2307.382 because the causes of action alleged in this Complaint arise out of each Defendants' transacting business in Ohio, contracting to supply services or goods in this state, causing tortious injury by an act or omission in this state, causing tortious injury in Ohio and because the Defendants regularly do or solicit business or engage in a persistent course of conduct or deriving substantial revenue from goods used or consumed or services rendered in this state.  Defendants have purposefully directed their actions towards Ohio and/or have the requisite minimum contacts with Ohio to satisfy any statutory or constitutional requirements for personal jurisdiction.

40.      The damages sought in this action exceed the amount of the exclusive original jurisdiction of the municipal courts.

41.      The venue for this claim is proper in the Court of Common Pleas of Stark County under Ohio Civ. R. 3(B)(3), (6), and (7).

## A.  DEFENDANTS DELIBERATELY DISREGARDED THEIR DUTIES TO REPORT AND TERMINATE SUSPICIOUS ORDERS.

### 1.  Defendants have a duty to report suspicious orders and not to ship those orders unless due diligence disproves their suspicions.

42.    By the mid-2000s, the medical community had abandoned its prior caution, and opioids were entrenched as an appropriate—and often the first—treatment for chronic pain conditions.  This created both a vastly and dangerously larger market for opioids in Stark County and a lucrative opportunity for Defendants, who compounded this harm by failing to maintain effective controls against diversion and instead facilitating the supply of far more opioids that could have been justified to serve that market and supplying opioids they knew or should have known were being abused or diverted.  Defendants' failure to investigate, report, and terminate orders that they knew or should have known were suspicious breached both their statutory and common law duties.

43.    First, under the common law, the Defendants had a duty to exercise reasonable care in delivering dangerous narcotic substances.  By flooding Stark County with more opioids than could be used for legitimate medical purposes and by filling and failing to report orders that they knew or should have realized were likely being diverted for illicit uses, Defendants breached their duty to exercise reasonable care in delivering narcotic substances and both created and failed to prevent a foreseeable risk of harm to the County.  As the supply of opioids and the evidence of addiction to and abuse of these drugs grew, Defendants were again reminded of both the nature and harms of opioid exposure and use.

44.    Second, each Defendant assumed a duty, when speaking publically about opioids and their efforts and commitment regarding diversion of prescription opioids, to speak accurately and truthfully.

45.    Third, Defendants violated their statutory obligations under Ohio law, which also incorporates the federal Controlled Substances Act ("CSA"), 21 U.S.C. § 801 *et seq.* and its implementing regulations. *See* Ohio Administrative Code §§ 4729-9-16(L) and 4729-9-28(I) (mandating that "[w]holesale drug distributors shall operate in compliance with applicable federal, state, and local laws and regulations").

46.    Each of the Defendants was required to obtain a license from the state (as well as to register with the DEA) to distribute Schedule II controlled substances. *See* R.C. §§ 4729.52-53 21 U.S.C. § 823(a)-(b), (e); 28 C.F.R. § 0.100. Federal regulations issued under the CSA and incorporated into Ohio law pursuant to Ohio Administrative Code §§ 4729-9-16(L) and 4729-9-28(I) further mandate that, as registrants, distributors "design and operate a system to disclose to the registrant suspicious orders of controlled substances." 21 U.S.C. § 823(a)-(b); 21 C.F.R. § 1301.74(b).

47.    Recognizing a need for greater scrutiny over controlled substances due to their potential for abuse and danger to public health and safety, the United States Congress enacted the CSA in 1970. The CSA and its implementing regulations created a closed-system of distribution for all controlled substances and listed chemicals. Congress specifically designed the closed chain of distribution to prevent the diversion of legally produced controlled substances into the illicit market. Congress was concerned with the diversion of drugs out of legitimate channels of distribution and acted to halt the "widespread diversion of [controlled substances] out of legitimate channels into the illegal market."[10] Moreover, the closed-system was specifically designed to ensure that there are

---

[10] Statement of Joseph T. Rannazzisi, U.S. House Committee on Energy and Commerce Subcommittee on Health, Improving Predictability and Transparency in DEA and FDA Regulation (April 7, 2014) (quoting H.R. Rep. No. 91-1444, 1979 U.S.C.C.A.N. at 4572), https://www.dea.gov/pr/speeches-testimony/2014t/04072014t.pdf

16

multiple ways of identifying and preventing diversion through active participation by registrants within the drug delivery chain. All registrants – which includes all distributors of controlled substances -- must adhere to the specific security, recordkeeping, monitoring and reporting requirements that are designed to identify or prevent diversion. When registrants fail to fulfill their obligations, the necessary checks and balances collapse. The result is the scourge of addiction that has occurred.

48.     As explained above, the CSA requires distributors of Schedule II substances like opioids to register to distribute opioids, maintain effective controls against diversion of the controlled substances that they distribute; and design and operate a system to identify suspicious orders of controlled substances, halt such unlawful sales, and report them to the DEA.

49.     Federal regulations issued under the CSA mandate that all registrants "design and operate a system to disclose to the registrant suspicious orders of controlled substances." 21 C.F.R. § 1301.74(b). Registrants are not entitled to be passive (but profitable) observers, but rather "shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant." *Id.* Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency. *Id.* Other red flags may include, for example, ordering the same controlled substance from multiple distributors.

50.     These criteria are disjunctive and are not all inclusive. For example, if an order deviates substantially from a normal pattern, the size of the order does not matter and the order should be reported as suspicious. Likewise, a distributor need not wait for a normal pattern to develop over time before determining whether a particular order is suspicious. The size of an order alone, regardless of whether it deviates from a normal pattern, is enough to trigger the responsibility to report the order as suspicious. The determination of whether an order is suspicious

depends not only on the ordering patterns of the particular customer but also on the patterns of the entirety of the customer base and the patterns throughout the relevant segment of the industry. For this reason, identification of suspicious orders serves also to identify excessive volume of the controlled substance being shipped to a particular region.

51.     As explained above, Defendants also have independent duties under Ohio law.  The Ohio Administrative Code imposes obligations and duties upon "licensees" and "registrants," including wholesale distributors and pharmacies, to "provide effective and approved controls and procedures to deter and detect theft and diversion of dangerous drugs." *Ohio Adm. Code* § 4729-9-05(A).  These duties extend to manufacturers, wholesalers, and pharmacies alike.  Under Ohio law, manufacturers, as a condition of their licensure, must demonstrate that "[a]dequate safeguards are assured to prevent the sale of dangerous drugs other than in accordance with section 4729.51 of the Revised Code.  R.C. § 4729.53.  Further, Ohio law requires, as a condition of licensure by the State Board of Pharmacy, that a wholesaler assure adequate safeguards to prevent the sale of dangerous drugs other than in accordance with section 4729.51 of the Revised Code."  R.C. § 4729.52.

52.     Under Ohio law, distributors also have a duty to detect, investigate, refuse to fill, and report suspicious orders of opioids.  To that end, the Ohio Pharmacy Board requires that drug wholesalers "shall establish and maintain inventories and (records of all transactions regarding the receipt and distribution or other disposition of dangerous drugs," and that, as a minimum requirement of wholesale distribution in this State, "[a] system *shall be designed and operated to disclose orders* for controlled substances and other dangerous drugs subject to abuse." Ohio Administrative Code ("O.A.C.")§ 4729-9-16(H) (emphasis added); R.C. § 4729.52 (requiring licensed wholesale distributors to comply with Ohio Board of Pharmacy security regulations);

18

*accord* 21 U.S.C. § 823; 21 C.F.R. 1301.74 (imposing duty to monitor, detect, investigate, refuse

to fill, and report suspicious orders under federal law).[11]

     53.    Ohio regulations further mandate that suspicious orders, defined as unusual in size

*or* frequency *or* deviation from buying patterns, be reported to the Ohio Board of Pharmacy: "The

wholesaler shall inform the state board of pharmacy of suspicious orders for drugs when discovered.

Suspicious orders are those which, in relation to the wholesaler's records as a whole, are of unusual

size, unusual frequency, *or* deviate substantially from established buying patterns." O.A.C.§ 4729-

9-16(H)(1)(e) *et seq.* (emphasis added); *see also* O.A.C.§§ 4729-9-12(G) & 4729-9-28(E).  Any

of the red flags identified by law trigger a duty to report; however, this list is not exclusive.  Other

factors—such as whether the order is skewed toward high dose pills, or orders that are skewed

towards drugs valued for abuse, rather than other high-volume drugs, such as cholesterol medicines,

also should alert distributors to potential problems.

     54.    To comply with the law, Distributors also have a duty to know their customers and

the communities they serve.  To the extent that, through this process of customer due diligence, a

distributor observes suspicious circumstances—such as cash transactions or young and seemingly

healthy patients filling prescriptions for opioids at a pharmacy they supply– can trigger reasonable

suspicion.  A single order can warrant scrutiny, or it may be a pattern of orders, or an order that is

unusual given the customer's history or its comparison to other customers in the area.

---

    [11] *See also* Letter from Joseph T. Rannazzisi, Deputy Assistant Adm'r, Office of Diversion
Control, Drug. Enf't Admin., U.S. Dep't of Justice, to Cardinal Health (Sept. 27, 2006), filed in
*Cardinal Health, Inc. v. Holder*, No. 1:12-cv-00185-RBW (D.D.C. Feb. 10, 2012), ECF No. 14-
51 (hereinafter "2006 Rannazzisi Letter"); Letter from Joseph T. Rannazzisi, Deputy Assistant
Adm'r, Office of Diversion Control, Drug. Enf't Admin., U.S. Dep't of Justice, to Cardinal Health
(Dec. 27, 2007), filed in *Cardinal Health, Inc. v. Holder*, No. 1:12-cv-00185-RBW (D.D.C. Feb.
10, 2012), ECF No. 14-8 (hereinafter "2007 Rannazzisi Letter").

55.     The Chain Pharmacies, like manufacturers and other distributors, are registrants under the CSA. 21 C.F.R. § 1301.11. Under the CSA, pharmacy registrants are required to "provide effective controls and procedures to guard against theft and diversion of controlled substances." *See* 21 C.F.R. § 1301.71(a). In addition, 21 C.F.R. § 1306.04(a) states, "[t]he responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription."  Pharmacists must ensure that prescriptions of controlled substances are "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a). Because pharmacies themselves are registrants under the CSA, the duty to prevent diversion lies with the pharmacy entity, not the individual pharmacist alone.

56.     In addition, Ohio regulations require pharmacists to exercise care in this regard and are no less stringent than federal law.  *See* O.A.C. § 4729-5-20(G) ("Based upon information obtained during a prospective drug utilization review, a pharmacist shall use professional judgment when making a determination about the legitimacy of a prescription. A pharmacist is not required to dispense a prescription of doubtful, questionable, or suspicious origin."); O.A.C. § 4729-5-21(A) ("A prescription, to be valid, must be issued for a legitimate medical purpose by an individual prescriber acting in the usual course of his/her professional practice. The responsibility for the proper prescribing is upon the prescriber, but a corresponding responsibility rests with the pharmacist who dispenses the prescription. An order purporting to be a prescription issued not in the usual course of bona fide treatment of a patient is not a prescription and the person knowingly dispensing such a purported prescription, as well as the person issuing it, shall be subject to the penalties of law."); O.A.C. § 4729-5-30(A) (same).

57.     Although the obligation to "provide effective and approved controls and procedures to deter and detect theft and diversion of dangerous drugs" under O.A.C. § 4729-9-05(A), is imposed upon the actual pharmacy, that duty is carried out through its store-level pharmacist and other staff. *Ohio Adm. Code* § 4729-9-11 ("[a] pharmacist, prescriber, and responsible person … shall provide supervision and control of dangerous drugs as required in division (B) of section 4729.55 of the Revised Code, and adequate safeguards to ensure that dangerous drugs are being distributed in accordance with all state and federal laws"). The Tenth Appellate District of the Court of Appeals of Ohio has determined that the Ohio Administrative Code "places the ultimate responsibility upon the 'registrant' … to provide effective and approved controls and procedures to deter and detect theft and diversion of dangerous drugs." *Linden Med. Pharm. v. Ohio State Bd. of Pharm.*, 2001 Ohio App. LEXIS 2041, at *24 (Ohio Ct. App. 11th Dist. May 8, 2001) (explaining that licensees electing to operate a business through employees are responsible to the licensing authority for their conduct").

58.     Suspicious pharmacy orders include orders of unusually large size, orders that are disproportionately large in comparison to the population of a community served by the pharmacy, orders that deviate from a normal pattern and/or orders of unusual frequency and duration, among others. "Pattern prescribing," where multiple individuals present prescriptions for the same drugs, for the same or similar quantities, and from the same prescriber, is likewise a red flag. Distance anomalies, when the patient and prescriber are in different locations, or non-residents of the community presenting prescriptions from the same prescriber are another warning signal. Other common red flags include shared addresses by customers receiving the same or similar prescriptions from the same prescriber on the same day, or family members receiving controlled substances prescriptions from the same prescriber, patients other than designated caregivers

21

presenting prescriptions with another person's name, patients presenting prescriptions that the pharmacist knows or reasonably believes another pharmacy refused to fill, or patients who have health insurance paying for a controlled substances prescription with cash.  Although these lists are non-exhaustive, additional types of suspicious orders include: (1) prescriptions written by a doctor who writes significantly more prescriptions (or in larger quantities or higher doses) for controlled substances compared to other practitioners in the area; (2) prescriptions which should last for a month in legitimate use, but are being refilled on earlier; (3) prescriptions for antagonistic drugs, such as depressants and stimulants, at the same time; (4) prescriptions with quantities or doses that differ from usual medical usage; (5) prescriptions that do not comply with standard abbreviations and/or contain no abbreviations; (6) photocopied prescriptions; or (7) prescriptions containing different handwriting or handwriting that is too legible. Most of the time, these attributes are not difficult to detect and should be easily recognizable by pharmacies.

59.    Suspicious pharmacy orders are red flags for if not direct evidence of diversion.

60.    Other signs of diversion can be observed through data gathered, consolidated, and analyzed by the Chain Pharmacies themselves. That data allows them to observe patterns or instances of dispensing that are potentially suspicious, of oversupply in particular stores or geographic areas, or of prescribers or facilities that seem to engage in improper prescribing. Pharmacies, at a corporate level, may observe, for example, many customers paying with cash, many customers receiving the same strength of prescription, and many customers with the same diagnosis code, as well as increases in the number of controlled substances prescriptions being presented to a given pharmacy.

61.    According to industry standards, if a pharmacy finds evidence of prescription diversion, the local Board of Pharmacy and DEA must be contacted.

62.     Pharmacies are "often the last major line of defense in the movement of legal pharmaceutical controlled substances from legitimate channels into the illicit market and it is "incumbent upon pharmacies to ensure that controlled substances are only dispensed pursuant to valid prescriptions issued for legitimate medical purposes in the usual course of professional practice."[12] Further, "[p]harmacists many times have more experience concerning the dangers of drugs than man treating physicians who do not undergo extensive training with regard to pharmacology." *Thompson v. Knoblech*, 2016 Ohio Misc., LEXIS 6369, *10 Case Mo. 14 CVA05-4879, Ct. of Common Pleas, Franklin County (May 11, 2016).  Their experience and training enables them to anticipate when "a prescription for a patient could have catastrophic consequences." *Id.*  And, they fulfill an important role in "act[ing] as another layer of safety for the patient." *Id.*[13]

63.     In sum, Defendants, due to the position of special trust and responsibility afforded them by their status as registrants in the distribution chain of controlled substances, have several responsibilities with respect to suspicious orders of opioids.  First, they must set up a system designed to detect such orders.  That would include reviewing their own data, relying on their observations of prescribers and pharmacies, and following up on reports or concerns of potential diversion.  All flagged orders must be reported to relevant enforcement authorities.  Further, they

---

[12] Declaration of Joseph Rannazzisi, *Holiday CVS, LLC d/b/a CVS/Pharmacy Nos. 5195/219 v. Eric Holder, Jr. et al.*, No. 1:12-cv-191, Doc. 19-6 ¶ 10 (D.D.C. Feb. 24, 2012).

[13] The Chain pharmacies have promoted themselves as filling that role.  Helena Foulkes, President, CVS Pharmacy, said that "[a]t CVS Pharmacy we know pharmacists play an important role in providing our patients with timely and relevant information about their prescription medications."  Similarly, Alex Gourlay, Co-Chief Operating Officer of Walgreens Boots Alliance and President of Walgreens, touted the network as "recogniz[ing] that pharmacists do more than dispense medications – they are key members of the patient care teams . . . ."

must also stop shipment of any order which is flagged as suspicious and only ship orders which

were flagged as potentially suspicious if, after conducting due diligence, they can determine that

the order is not likely to be diverted into illegal channels.[14]

64.    These statutes and regulations reflect a standard of conduct and care below which

reasonably prudent distributors would not fall.  Together, these laws and industry guidelines make

clear that wholesalers and manufacturers of controlled substances alike possess, and are expected

to possess, specialized and sophisticated knowledge, skill, information, and understanding of both

the market for scheduled prescription narcotics and of the risks and dangers of the diversion of

prescription narcotics when the distribution chain is not properly controlled.

65.    Further, these laws and industry guidelines make clear that Defendants have a duty

and responsibility to exercise their specialized and sophisticated knowledge, information, skill,

and understanding to prevent the oversupply of prescription opioids and minimize the risk of their

diversion into an illicit market.

66.    All Defendants have a duty to, and are expected, to be vigilant in deciding whether

a prospective customer can be trusted to deliver controlled substances only for lawful purposes.

### 2.    Defendants understood the importance of their reporting and due diligence obligations.

67.    As explained above, the reason for the reporting rules is to create a "closed" system

intended to reduce the diversion of these drugs out of legitimate channels into the illicit market,

while at the same time providing the legitimate drug industry with a unified approach to narcotic

---

[14] *See Southwood Pharm., Inc.*, 72 Fed. Reg. 36,487, 36,501 (Drug Enf't Admin. July 3, 2007) (applying federal requirements no less stringent than those of Ohio); *Masters Pharmaceutical, Inc. v. Drug Enforcement Administration*, 861 F.3d 206 (D.C. Cir. 2017) (same).

and dangerous drug control.[15]  Both because wholesale distributors handle such large volumes of controlled substances, and because they are uniquely positioned, based on their knowledge of their customers and orders, as the first line of defense in the movement of legal pharmaceutical controlled substances from legitimate channels into the illicit market, distributors' obligation to maintain effective controls to prevent diversion of controlled substances is critical. Should a distributor deviate from these checks and balances, the closed system of distribution, designed to prevent diversion, collapses.[16]

68.    Defendants were well aware they had an important role to play in this system, and also knew or should have known that their failure to comply with their obligations would have serious consequences.  In fact, trade organizations to which Defendants belong have acknowledged that wholesale distributors such as Defendants have been responsible for reporting suspicious orders for more than 40 years.[17] The Healthcare Distribution Management Association ("HDMA," now known as the Healthcare Distribution Alliance ("HDA")), a trade association of pharmaceutical distributors to which Defendants AmerisourceBergen, Cardinal, and McKesson, belong, has long taken the position that distributors have responsibilities to "prevent diversion of controlled prescription drugs" not only because they have statutory and regulatory obligations do

---

[15] *See* 1970 U.S.C.C.A.N. 4566, 4571-72.

[16] *See* Rannazzisi Decl. ¶ 10, filed in *Cardinal Health, Inc. v. Holder*, No. 1:12-cv-00185-RBW (D.D.C. Feb. 10, 2012), ECF No. 14-2.

[17] *See* Brief for Healthcare Distribution Management Association and National Association of Chain Drug Stores as Amici Curiae in Support of Neither Party, *Masters Pharmaceuticals, Inc. v. Drug Enforcement Administration*, 2012 WL 1321983, at *4 (D.C. Cir. Apr. 4, 2016) (stating that regulations "in place for more than 40 years require distributors to report suspicious orders of controlled substances to DEA . . .") (emphasis omitted).

so, but "as responsible members of society."[18]  Guidelines established by the HDA also explain

that distributors, "[a]t the center of a sophisticated supply chain . . . are uniquely situated to perform

due diligence in order to help support the security of the controlled substances they deliver to their

customers."[19]

69.     The FTC, too, has recognized the unique role of wholesale distributors.  Since their

inception, Defendants have continued to integrate vertically by acquiring businesses that are

related to the distribution of pharmaceutical products and health care supplies.  In addition to the

actual distribution of pharmaceuticals, as wholesalers, these Defendants also offer their pharmacy,

or dispensing, customers a broad range of added services. For example, Defendants, as distributors,

offer their pharmacies sophisticated ordering systems and access to an inventory management

system and distribution facility that allows customers to reduce inventory carrying costs.

Defendants are also able to use the combined purchase volume of their customers to negotiate the

cost of goods with generic manufacturers and offer services that include software assistance and

other database management support.  *See Fed. Trade Comm'n v. Cardinal Health, Inc.*, 12 F. Supp.

2d 34, 41 (D.D.C. 1998) (granting the FTC's motion for preliminary injunction and holding that

the potential benefits to customers did not outweigh the potential anti-competitive effect of a

proposed merger between Cardinal Health, Inc. and Bergen Brunswig Corp.).  As a result of their

acquisition of a diverse assortment of related businesses within the pharmaceutical industry, as

---

[18] *See Amicus Curiae* Br. of Healthcare Distribution Management Association (HDMA) in Support of Cardinal Health, Inc.'s Motion for Injunction Pending Appeal, No. 12-5061 (D.C. Cir. Mar. 7, 2012), Doc. No. 1362415 at 4; Brief for Healthcare Distribution Management Association and National Association of Chain Drug Stores as Amici Curiae in Support of Neither Party, *Masters Pharmaceuticals, Inc. v. Drug Enforcement Administration*, 2012 WL 1321983, at *2 (D.C. Cir. Apr. 4, 2016).

[19] Healthcare Distribution Management Association (HDMA) *Industry Compliance Guidelines: Reporting Suspicious Orders and Preventing Diversion of Controlled Substances*, filed in *Cardinal Health, Inc. v. Holder*, No. 12-5061 (D.C. Cir. Mar. 7, 2012), Doc. No. 1362415 (App'x B at 1).

well as the assortment of additional services they offer, wholesale distributors have a unique insight into the ordering patterns and activities of their dispensing customers.

70.     As national pharmacy chains, as well as distributors, the Chain Pharmacies have especially deep knowledge of their retail stores' orders, prescriptions, and customers.  This is underscored by the fact that Walgreens is able to sell the contents of its patients' prescriptions to data-mining companies such as IMS Health, Inc.  In 2010, for example, Walgreen's fiscal year 2010 SEC Form 10-K disclosed that it recognizes "purchased prescription files" as "intangible assets" valued at $749,000,000.

71.     The DEA also repeatedly has made clear that Defendants' obligations under federal law, mirrored in and incorporated by Ohio law, *see infra* Section A.1, obligate them to report and decline to fill suspicious orders.  Responding to the proliferation of pharmacies operating on the internet that arranged illicit sales of enormous volumes of opioids to drug dealers and customers, the DEA began a major push to remind distributors of their obligations to prevent these kinds of abuses and educate them on how to meet these obligations.  Since 2007, the DEA has hosted at least five conferences that provided registrants with updated information about diversion trends and regulatory changes.  The DEA has also briefed wholesalers regarding legal, regulatory, and due diligence responsibilities since 2006. During these briefings, the DEA pointed out the red flags wholesale distributors should look for to identify potential diversion.

72.     The DEA also, for example, advised in a September 27, 2006 letter to every commercial entity registered to distribute controlled substances (which included Defendants) that they are "one of the key components of the distribution chain. If the closed system is to function properly . . . distributors must be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes. This responsibility is critical, as . . .  the

27

illegal distribution of controlled substances has a substantial and detrimental effect on the health and general welfare of the American people."[20]  The DEA's September 27, 2006 letter also expressly reminded them that registrants, *in addition* to reporting suspicious orders, have a "statutory responsibility to exercise due diligence to avoid filling suspicious orders that might be diverted into other than legitimate medical, scientific, and industrial channels."[21]

73.    The DEA sent another letter to distributors and manufacturers alike on December 27, 2007, reminding them that, as registered manufacturers and distributors of controlled substances, they share, and must each abide by, statutory and regulatory duties to "maintain effective controls against diversion" and "design and operate a system to disclose to the registrant suspicious orders of controlled substances."[22]  The DEA's December 27, 2007 letter reiterated the obligation to detect, report, and not fill suspicious orders and provided detailed guidance on what constitutes a suspicious order and how to report (*e.g.*, by specifically identifying an order as suspicious, not merely transmitting data to the DEA).  Finally, the letter references the Revocation of Registration issued in *Southwood Pharmaceuticals, Inc.*, 72 Fed. Reg. 36,487-01 (July 3, 2007), which discusses the obligation to report suspicious orders and "some criteria to use when determining whether an order is suspicious."[23]

---

[20] *See* 2006 Rannazzisi Letter ("This letter is being sent to every commercial entity in the United States registered with the Drug Enforcement Agency (DEA) to distribute controlled substances. The purpose of this letter is to reiterate the responsibilities of controlled substance distributors in view of the prescription drug abuse problem our nation currently faces.").

[21] *Id.*

[22] 2007 Rannazzisi Letter.

[23] *Id.*

74.     Through presentations at industry conferences and on its website, the DEA

provided detailed guidance to distributors on what to look for in assessing their customers'

trustworthiness.  For example, DEA published "Suggested Questions a Distributor Should Ask

Prior to Shipping Controlled Substances,[24] which suggests that distributors examine:

- What is the pharmacy's ratio of controlled vs. non-controlled orders?

- Does the pharmacy order a full variety of controlled substances and are they fairly evenly dispersed? If not, why the disparity?

- What are the hours of operation of the pharmacy?

- Does the pharmacy offer a full assortment of goods to its customers (e.g., over-the-counter drugs, snacks, cosmetics, etc.)?

- Does the pharmacy have security guards on the premises?

- What methods of payment does the pharmacy accept (cash, insurance, Medicaid, and in what ratios)?

- Does the pharmacy order from other suppliers as well? If so, why and what controlled substances?

- If this is a new account, why does the pharmacy want you to be their supplier?

- If you are not the only supplier, what controlled substances will the pharmacy be ordering from you, in what quantities, in what time frame, and will they be ordering these same products from other suppliers?

- What ratio will you be supplying compared to other suppliers?

---

[24] U.S. Dept. of Justice DEA, Diversion Control Division website, Pharmaceutical Industry Conference (Oct 14 & 15, 2009), https://www.deadiversion.usdoj.gov/mtgs/pharm_industry/14th_pharm/; *Suggested Questions a Distributor should ask prior to shipping controlled substances*, Drug Enforcement Administration (*available* *at* https://www.deadiversion.usdoj.gov/mtgs/pharm_industry/14th_pharm/levinl_ques.pdf); Richard Widup, Jr., Kathleen H. Dooley, Esq., *Pharmaceutical Production Diversion: Beyond the PDMA,* Purdue Pharma and McGuireWoods LLC, (*available at* https://www.mcguirewoods.com/news-resources/publications/lifesciences/product_diversion_beyond_pdma.pdf).

- Does the pharmacy serve out of state customers?

- Does it serve pain clinics?

- Are there particular practitioners who constitute most of the prescriptions it fills and who are these practitioners

- Does the pharmacy have any exclusive contracts, agreements, arrangements, etc., with any particular practitioner, business group, investors, etc.? If so, explain those arrangements and/or obtain copies of those agreements.

75. The DEA, among others, also has provided extensive guidance to pharmacies concerning their duties to the public. The guidance advises pharmacies how to identify suspicious orders and other evidence of diversion. The Ohio Board of Pharmacy similarly has provided guidance, highlighting that pharmacists have an obligation to exercise professional judgment to determine the legitimacy of a prescription.[25]

### 3. Despite repeated admonitions, Defendants have repeatedly violated their reporting and due diligence obligations.

76. Defendants have faced repeated enforcement actions for their failure to comply with their obligations to report and decline suspicious orders, making clear both that they were repeatedly reminded of their duties, and that they frequently failed to meet them.

77. Governmental agencies and regulators have confirmed (and in some cases Defendants have admitted) that Defendants did not meet their obligations, and have uncovered especially blatant wrongdoing.

---

[25] State of Ohio Board of Pharmacy, *Sometimes We Just Say to Say No*, available at https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=1&cad=rja&uact=8&ve d=2ahUKEwiS9eSu0rXdAhULeKwKHfReAGYQFjAAegQIBhAC&url=https%3A%2F%2Fww w.pharmacy.ohio.gov%2FDocuments%2FLawsRules%2FRuleChanges%2FOARRSRules%2FS ometimes%2520We%2520Just%2520Have%2520to%2520Say%2520No%2520- %2520Flier.pdf&usg=AOvVaw1vf4EAyKP-9L4ivyKt2iHT

78.     In May 2014, the United States Department of Justice, Office of the Inspector
General, Evaluation and Inspections Divisions, reported that the DEA issued final decisions in 178
registrant actions between 2008 and 2012.   These included a number of actions against
AmerisourceBergen, Cardinal, and McKesson:

a.     On April 24, 2007, the DEA issued an *Order to Show Cause and
Immediate Suspension Order* against the AmerisourceBergen Orlando, Florida
distribution center ("Orlando Facility") alleging failure to maintain effective
controls against diversion of controlled substances. On June 22, 2007,
AmerisourceBergen entered into a settlement that resulted in the suspension of its
DEA registration;

b.     On November 28, 2007, the DEA issued an *Order to Show Cause
and Immediate Suspension Order* against the Cardinal Health Auburn, Washington
Distribution Center ("Auburn Facility") for failure to maintain effective controls
against diversion of hydrocodone;

c.     On December 5, 2007, the DEA issued an *Order to Show Cause and
Immediate Suspension Order* against the Cardinal Health Lakeland, Florida
Distribution Center ("Lakeland Facility") for failure to maintain effective controls
against diversion of hydrocodone;

d.     On December 7, 2007, the DEA issued an *Order to Show Cause and
Immediate Suspension Order* against the Cardinal Health Swedesboro, New Jersey
Distribution Center ("Swedesboro Facility") for failure to maintain effective
controls against diversion of hydrocodone;

e.     On January 30, 2008, the DEA issued an *Order to Show Cause*
against the Cardinal Health Stafford, Texas Distribution Center ("Stafford
Facility") for failure to maintain effective controls against diversion of
hydrocodone;

f.     On May 2, 2008, McKesson Corporation entered into an
*Administrative Memorandum of Agreement* ("2008 McKesson MOA") with the
DEA which provided that McKesson would "maintain a compliance program
designed to detect and prevent the diversion of controlled substances, inform DEA
of suspicious orders required by 21 C.F.R. § 1301.74(b), and follow the procedures
established by its Controlled Substance Monitoring Program";

g.     On September 30, 2008, Cardinal Health entered into a *Settlement
and Release Agreement and Administrative Memorandum of Agreement* with the
DEA related to its Auburn, Lakeland, Swedesboro and Stafford Facilities. The
document also referenced allegations by the DEA that Cardinal failed to maintain

effective controls against the diversion of controlled substances at its distribution facilities located in McDonough, Georgia ("McDonough Facility"), Valencia, California ("Valencia Facility") and Denver, Colorado ("Denver Facility");

      h.    On February 2, 2012, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health's Lakeland Facility for failure to maintain effective controls against diversion of oxycodone; and

      i.    On December 23, 2016, Cardinal Health agreed to pay a $44 million fine to the DEA to resolve the civil penalty portion of the administrative action taken against its Lakeland, Florida Distribution Center.

79.    CVS, too, is a repeat offender and recidivist: the company has paid fines totaling over $40 million as the result of a series of investigations by the DEA and the United States Department of Justice ("DOJ"). It nonetheless treated these fines as the cost of doing business and has allowed its pharmacies to continue dispensing opioids in quantities significantly higher than any plausible medical need would require, and to continue violating its recordkeeping and dispensing obligations under the CSA.

80.    As recently as June 2018, CVS Pharmacy, Inc. agreed to pay $1.5 to settle civil penalty claims stemming from a DEA investigation of CVS pharmacy stores in Nassau and Suffolk Counties on Long Island. The DEA's investigation revealed that these pharmacies failed to timely report the loss or theft of controlled substances, including hydrocodone, one of the most commonly diverted controlled substances.

81.    This fine was preceded by numerous others throughout the country.

82.    Just last year, in July 2017, CVS entered into a $5 million settlement with the U.S. Attorney's Office for the Eastern District of California regarding allegations that its pharmacies failed to keep and maintain accurate records of Schedule II, III, IV, and V controlled substances.

83.     In February 2016, CVS paid $8 million to settle allegations made by the DEA and the DOJ that from 2008-2012, CVS stores and pharmacists in Maryland violated their duties under the CSA and filled prescriptions with no legitimate medical purpose.

84.     In October 2016, CVS paid $600,000 to settle allegations by the DOJ that stores in Connecticut failed to maintain proper records in accordance with the CSA.

85.     In September 2016, CVS entered into a $795,000 settlement with the Massachusetts Attorney General wherein CVS agreed to require pharmacy staff to access the state's prescription monitoring program website and review a patient's prescription history before dispensing certain opioid drugs.

86.     In June 2016, CVS agreed to pay the DOJ $3.5 million to resolve allegations that 50 of its stores violated the CSA by filling forged prescriptions for controlled substances—mostly addictive painkillers—more than 500 times between 2011 and 2014.

87.     In August 2015, CVS entered into a $450,000 settlement with the U.S. Attorney's Office for the District of Rhode Island to resolve allegations that several of its Rhode Island stores violated the CSA by filling invalid prescriptions and maintaining deficient records. The United States alleged that CVS retail pharmacies in Rhode Island filled a number of forged prescriptions with invalid DEA numbers, and filled multiple prescriptions written by psychiatric nurse practitioners for hydrocodone, despite the fact that these practitioners were not legally permitted to prescribe that drug.    Additionally, the government alleged that CVS had recordkeeping deficiencies.

88.     In May 2015, CVS agreed to pay a $22 million penalty following a DEA investigation that found that employees at two pharmacies in Sanford, Florida, had dispensed prescription opioids, "based on prescriptions that had not been issued for legitimate medical

33

purposes by a health care provider acting in the usual course of professional practice. CVS acknowledged that its retail pharmacies had a responsibility to dispense only those prescriptions that were issued based on legitimate medical need."

89.    In September 2014, CVS agreed to pay $1.9 million in civil penalties to resolve allegations it filled prescriptions written by a doctor whose controlled-substance registration had expired.

90.    In August 2013, CVS was fined $350,000 by the Oklahoma Pharmacy Board for improperly selling prescription narcotics in at least five locations in the Oklahoma City metropolitan area.

91.    Dating back to 2006, CVS retail pharmacies in Oklahoma and elsewhere intentionally violated the CSA by filling prescriptions signed by prescribers with invalid DEA registration numbers.

92.    CVS saw huge increases in the quantity of oxycodone it dispensed in Florida from 2006 to 2010. Starting with an already high baseline, a single CVS ordered approximately four times the amount of oxycodone a typical pharmacy orders in one year in 2006. By 2010, the same pharmacy's 10-month history showed quantities more than thirty times the amount of oxycodone a typical pharmacy orders in one year, and the pharmacy's supervisor could not explain why the volume was so high. During that time, Cardinal was the pharmacy's main distributor, and two of CVS's Florida pharmacies were among Cardinal's top four retail pharmacy customers, dispensing a staggering amount of oxycodone compared to Cardinal's other Florida customers. Interviews with employees of these pharmacies revealed that they routinely observed red flags and obvious signs that they were filling illegitimate prescriptions. One set a daily limit of oxycodone 30mg prescriptions the pharmacy would fill each day, basing the limit on the amount in stock that day,

34

so as to ensure that the "real pain patients" could get their prescriptions filled.[26]  The pharmacy usually reached its limit by lunchtime each day, and at times within 30 minutes of opening. Customers, aware that prescriptions were first come, first serve, would line up outside the store as early as 7:45 AM.  An employee acting as "bouncer" included escorting off the premises customers who were "hooked" on opioids and became belligerent if their prescriptions were refused among his job duties.[27]  Although  CVS/Caremark, Inc. had in place dispensing guidelines for controlled substances prescriptions, these guidelines were not followed at these stores.  Rather, they controlled substances dispensed prescriptions despite the existence of "warning signs" in the guidelines.[28]

93.     CVS acknowledged in 2012 that it was "aware of the pill mill and/or pain clinic situation and the diversion of controlled substances, primarily oxycodone, in Florida," and was advised by the DEA of typical red flags.[29]  CVS's and Cardinal's failure to take action to report or halt the distribution of these opioids reflect systemic failure in their compliance and also would have permitted the migration of these opioids to other jurisdictions, including Ohio.

94.     Walgreens also has been penalized for serious and flagrant violations of the CSA. On February 12, 2012, the DEA issued an Order to Show Cause and Immediate Suspension of Registration against Defendant Walgreens' Jupiter, Florida distribution center, ("Jupiter Center") for failure to maintain effective controls against the diversion of opioids.  The DEA found, among

---

[26] Declaration of Joseph Rannazzisi, *Holiday CVS, LLC d/b/a CVS/Pharmacy Nos. 5195/219 v. Eric Holder, Jr. et al.*, No. 1:12-cv-191, Doc. 19-6 ¶¶ 38-41 (D.D.C. Feb. 24, 2012).

[27] *Id.* ¶ 41.d.

[28] *Id.* ¶¶ 48 & 56.

[29] Declaration of Joseph Rannazzisi, *Holiday CVS, LLC d/b/a CVS/Pharmacy Nos. 5195/219 v. Eric Holder, Jr. et al.*, No. 1:12-cv-191, Doc. 19-6 ¶¶ 27-28 (D.D.C. Feb. 24, 2012).

other things, that the Jupiter Center failed to conduct adequate due diligence and should have known that the Walgreens pharmacies were dispensing controlled substances, including opioids, for other than legitimate medical purposes.

95.    In June 2013, Walgreens agreed to the largest settlement in DEA history at the time—$80 million—to resolve allegations that it committed an unprecedented number of recordkeeping and dispensing violations of the CSA at the Jupiter Center and six Walgreens retail pharmacies in Florida, including negligently allowing controlled substances such as oxycodone and other prescription painkillers to be diverted for abuse and illegal black market sales.    The Department of Justice, in describing the settlement, explained that the conduct at issue included Walgreens' "alleged failure to sufficiently report suspicious orders was a systematic practice that resulted in at least tens of thousands of violations and allowed Walgreens' retail pharmacies to order and receive at least three times the Florida average for drugs such as oxycodone."[30]

96.    Walgreens' Florida operations at issue in this settlement highlight its egregious conduct regarding diversion of prescription opioids.    Walgreens' Florida pharmacies each allegedly ordered more than one million dosage units of oxycodone in 2011—more than ten times the average amount. In addition to the monetary payment, the Jupiter, Florida distribution center lost its authority to distribute or dispense controlled substances, including opioids, for two years.  This revocation ended in 2014.

97.    The Jupiter Center supplied prescription opioids to two Walgreens pharmacies in Oviedo, Florida, one of which increased its oxycodone prescriptions from 6,600 dosage units in

---

[30] Press Release, U.S. Attorney's Office S. Dist. of Fla., *Walgreens Agrees To Pay A Record Settlement Of $80 Million For Civil Penalties Under The Controlled Substances Act*, U.S. Dep't of Just. (June 11, 2013), https://www.justice.gov/usao-sdfl/pr/walgreens-agrees-pay-record-settlement-80-million-civil-penalties-under-controlled.

June 2010 to 169,780 dosage units in June 2011.  Multiple arrests at the Oviedo Walgreens for illicit sales prompted the local chief of police to write letters to the Chairman and CEO of Walgreens and asked for their assistance in fighting the prescription drug epidemic.  In the letter, the police chief reported that at both locations drugs were "sold, distributed as payment, crushed, and snorted, liquefied and injected, or multiple pills swallowed while in the parking lot of your pharmacies."[31]

98.     Defendant Walgreens' Jupiter Center continued to supply prescription opioids to the Oviedo pharmacies, and increased its quantities of 30 mg oxycodone from 73,300 tablets in February 2011, to 145,300 dosage units in July 2011.  The Jupiter Center nearly doubled its distribution of oxycodone to one of these pharmacies within a six-month period.

99.     The Jupiter Center, along with Defendant Walgreens' headquarters, ignored warnings and concerns from its own employees about large shipments of opioids.  In January 2011, the Center's Function Manager, who was responsible for all Schedule II drug operations (including opioids), sent an email to the manager of Walgreens' drug stores at its headquarters about the suspiciously "large quantity," of oxycodone that was being ordered by three stores in Florida.[32] The Jupiter Center continued to supply opioids to these locations, and provided a Walgreens' pharmacy in a town of less than 3,000 people, 285,800 30 milligram doses of oxycodone in January 2011. Despite the warning from an employee, Defendant Walgreens did not report any of these orders as suspicious.

100.    Instead, Walgreens corporate officers turned a blind eye to these abuses. In fact, corporate attorneys at Walgreens suggested, in reviewing the legitimacy of prescriptions coming

---

[31] In the Matter of Walgreens Co. *Order to Show Cause*, September 13, 2012.
[32] *Id.*

from pain clinics, that "if these are legitimate indicators of inappropriate prescriptions perhaps we should consider not documenting our own potential noncompliance,"[33] underscoring Walgreens' attitude that profit outweighed compliance with the CSA or the health of communities.

101.    According to the Order to Show Cause, Defendant Walgreens' corporate headquarters pushed to increase the number of oxycodone sales to Walgreens' Florida pharmacies, and provided bonuses for pharmacy employees based on number of prescriptions filled at the pharmacy in an effort to increase oxycodone sales. In July 2010, Defendant Walgreens ranked all of its Florida stores by number of oxycodone prescriptions dispensed in June of that year, and found that the highest-ranking store in oxycodone sales sold almost 18 oxycodone prescriptions per day. All of these prescriptions were filled by the Jupiter Center.

102.    Walgreens' misconduct was not limited to Florida.  The Massachusetts Attorney General's Medicaid Fraud Division found that, from 2010 through most of 2015, multiple Walgreens stores across the state failed to monitor the opioid use of some Medicaid patients who were considered high-risk—despite the context of soaring overdose deaths in Massachusetts. Walgreens agreed to pay $200,000 and follow certain procedures for dispensing opioids.

103.    More recently, Defendant McKesson admitted to breach of its duties to monitor, report, and prevent suspicious orders.  Pursuant to an Administrative Memorandum of Agreement entered into between McKesson and the DEA in January 2017, McKesson admitted that, at various times during the period from January 1, 2009 through the effective date of the Agreement (January 17, 2017) it "did not identify or report to [the] DEA certain orders placed by certain pharmacies which should have been detected by McKesson as suspicious based on the guidance contained in

---

[33] *Id.*

the DEA Letters."[34]  Further, the 2017 Agreement specifically finds that McKesson "distributed controlled substances to pharmacies even though those McKesson Distribution Centers should have known that the pharmacists practicing within those pharmacies had failed to fulfill their corresponding responsibility to ensure that controlled substances were dispensed pursuant to prescriptions issued for legitimate medical purposes by practitioners acting in the usual course of their professional practice, as required by 21 C.F.R § 1306.04(a)."[35]  McKesson admitted that, during this time period, it "failed to maintain effective controls against diversion of particular controlled substances into other than legitimate medical, scientific and industrial channels by sales to certain of its customers in violation of the CSA and the CSA's implementing regulations, 21 C.F.R. Part 1300 *et seq.*, at the McKesson Distribution Centers" including the McKesson Distribution Center located in Washington Court House, Ohio.  Due to these violations, McKesson agreed to a partial suspension of its authority to distribute controlled substances from the Washington Court House, Ohio facility (among other facilities).[36]  Upon information and belief, the McKesson facility located in Washington Courthouse Ohio supplied opioids to Stark County.

---

[34] Settlement Agreement and Release between the U.S. and McKesson Corp., at 5 (Jan. 17, 2017) [hereinafter "2017 Settlement Agreement and Release"] ("McKesson acknowledges that, at various times during the Covered Time Period [2009-2017], it did not identify or report to DEA certain orders placed by certain pharmacies, which should have been detected by McKesson as suspicious, in a manner fully consistent with the requirements set forth in the 2008 MOA."), available at https://www.justice.gov/opa/press-release/file/928471/download.

[35] *Id.*

[36] Other facilities included McKesson's distribution centers in Aurora, CO; Aurora, IL; Delran, NJ; LaCrosse, WI; Lakeland, FL; Landover, MD; La Vista, NE; Livonia, MI; Methuen, MA; Santa Fe Springs, CA; and West Sacramento, CA.

104. As the *Washington Post* and *60 Minutes* recently reported, DEA staff recommended a much larger penalty, as much as a billion dollars, and delicensing of certain facilities.[37] A DEA memo outlining the investigative findings in connection with the administrative case against the 12 McKesson distribution centers included in the 2017 Settlement stated that McKesson "[s]upplied controlled substances in support of criminal diversion activities"; "[i]gnored blatant diversion"; had a "[p]attern of raising thresholds arbitrarily"; "[f]ailed to review orders or suspicious activity"; and "[i]gnored [the company's] own procedures designed to prevent diversion."[38] The Washington Court House distribution center was among the warehouses investigators found "were supplying pharmacies that sold to criminal drug rings."[39]

105. Even the far lessor-than recommended civil penalty against McKesson, a $150 million fine, was record breaking. In addition to the monetary penalty, the DOJ required McKesson to suspend sales of controlled substances from distribution centers in four different states. Though this penalty too, was far less severe than investigators had recommended, as the DOJ explained, these "staged suspensions" are nevertheless "among the most severe sanctions ever agreed to by a [Drug Enforcement Administration] registered distributor."[40]

106. Following the 2017 settlement, McKesson shareholders made a books and records request of the company. According to a separate action pending on their behalf, the Company's records show that the Company's Audit Committee failed to monitor McKesson's information

---

[37] Lenny Bernstein and Scott Higham, "'*We Feel Like Our System Was Hijacked': DEA Agents Say a Huge Opioid Case Ended in a Whimper*, Washington Post (Dec. 17, 2017).

[38] *Id.*

[39] *Id.*

[40] Department of Justice, "McKesson Agrees to Pay Record $150 Million Settlement for Failure to Report Suspicious Orders of Pharmaceutical Drugs, (Jan. 17, 2017) https://www.justice.gov/opa/pr/mckesson-agrees-pay-record-150-million-settlement-failure-report-suspicious-orders.

reporting system to assess the state of the Company's compliance with the CSA and McKesson's 2008 Settlements. More particularly, the shareholder action alleges that the records show that in October 2008, the Audit Committee had an initial discussion of the 2008 Settlements and results of internal auditing, which revealed glaring omissions; specifically:

    a.    some customers had "not yet been assigned thresholds in the system to flag large shipments of controlled substances for review";

    b.    "[d]ocumentation evidencing new customer due diligence was incomplete";

    c.    "documentation supporting the company's decision to change thresholds for existing customers was also incomplete"; and

    d.    Internal Audit "identified opportunities to enhance the Standard Operating Procedures."

107. Yet, instead of correcting these deficiencies, after that time, for a period of more than four years, the Audit Committee failed to address the CSMP or perform any more audits of McKesson's compliance with the CSA or the 2008 Settlements, the shareholder action's description of McKesson's internal documents reveals. During that period of time, McKesson's Audit Committee failed to inquire whether the Company was in compliance with obligations set forth in those agreements and with the controlled substances regulations more generally.

108. In short, McKesson, was "neither rehabilitated nor deterred by the 2008 [agreement],'" as a DEA official working on the case noted.[41] Quite the opposite, "'their bad acts continued and escalated to a level of egregiousness not seen before.'"[42] According to statements of "DEA investigators, agents and supervisors who worked on the McKesson case" reported in the *Washington Post*, "the company paid little or no attention to the unusually large and frequent orders

---

[41] *Id.* (alteration in original).

[42] *Id.* (quoting a March 30, 2015 DEA memo).

41

placed by pharmacies, some of them knowingly supplying the drug rings."[43]  "Instead, the DEA

officials said, the company raised its own self-imposed limits, known as thresholds, on orders from

pharmacies and continued to ship increasing amounts of drugs in the face of numerous red flags."[44]

109.    Further, in a *60 Minutes* interview last fall, former DEA agent Joe Rannazzisi

described Defendants' industry as "out of control," stating that "[w]hat they wanna do, is do what

they wanna do, and not worry about what the law is.  And if they don't follow the law in drug

supply, people die. That's just it. People die. "[45]  He further explained that:

> JOE RANNAZZISI: The three largest distributors are Cardinal Health, McKesson, and
> AmerisourceBergen.  They control probably 85 or 90 percent of the drugs going
> downstream.

> [INTERVIEWER]: You know the implication of what you're saying, that these big
> companies knew that they were pumping drugs into American communities that were
> killing people.

> JOE RANNAZZISI: That's not an implication, that's a fact. Thats exactly what they did.[46]

110.    Another DEA veteran similarly stated that these companies failed to make even a

"good faith effort" to "do the right thing."[47]  He further explained that "I can tell you with 100

percent accuracy that we were in there on multiple occasions trying to get them to change their

behavior. And they just flat out ignored us."[48]

---

[43] *Id.*

[44] *Id.*

[45] Bill Whitaker, *Ex-DEA Agent : Opioid Crisis Fueled by Drug Industry and* Congress,
CBS News (Oct. 17, 1017), https://www.cbsnews.com/news/ex-dea-agent-opioid-crisis-fueled-
by-drug-industry-and-Congress

[46] *Id.*

[47] *Id.*

[48] *Id.*

111.    At a hearing before the House of Representatives' Energy and Committee Subcommittee on Oversight and Investigations on May 8, 2018, the chief executives of McKesson and Cardinal, among others, testified regarding their anti-diversion programs and their roles in the opioid epidemic.  The Chairman of Miami-Luken alone acknowledged, in response to questions, that his company failed in the past to maintain effective controls to prevent diversion and that its actions contributed to the opioid crisis.  He also testified that Miami-Luken had severed relationships with many customers that continue to do business with other distributors.  Despite the frequent prior enforcement actions described above, neither McKesson nor Cardinal admitted any deficiencies in their compliance.  In fact, both executives' answers confirmed gaps and breakdowns in past and current practices.

112.    For example, Cardinal's former Executive Chairman, George Barrett, denied that "volume in relation to size of population" is a "determining factor" in identifying potentially suspicious orders.  Despite regulatory and agency direction to identify, report, and halt suspicious *orders*, Cardinal focused on whether a pharmacy was legitimate, not whether its orders suggested evidence of diversion.  Despite a Cardinal employee flagging an especially prolific pharmacy as a potential pill mill in 2008, the Subcommittee found no evidence that Cardinal took any action in response.  In addition, Cardinal increased another pharmacy's threshold twelve times, but could not explain what factors it applied or how it made decisions to increase thresholds.

113.    According to records produced to the Subcommittee, McKesson's due diligence file on one of the pharmacies in West Virginia that it supplied with a massive volume of opioids consisted of a single page.  Despite McKesson's claim that it (a) reviewed every single customer for high volume orders of certain drugs; (b) set a threshold of 8,000 pills per month; and (c)

43

examined and documented every order over that threshold, the company still shipped 36 times the monthly threshold to one pharmacy—9,500 pills *per day.*

114.    The above violations reflect a pervasive pattern and practice over the last decade of failing to report and stop suspicious orders from which Defendants' operations in Ohio and the supply of opioids into Stark County would not have been exempt.  In addition, these violations of federal law and regulations also constituted violations of Ohio law.

4.  Defendants worked together to sustain their market and boost their profits.

115.    As explained above, Defendants, as leading wholesale distributors, had close financial relationships with both manufacturers and customers, for whom they provide a broad range of value added services that render them uniquely positioned to obtain information and control against diversion, and which, in the case of Walgreens, were part of the same corporate family.  These services often otherwise would not be provided by manufacturers to their downstream customers who ultimately dispense the drugs and would be difficult and costly for the dispenser to reproduce.  For example, "[w]holesalers have sophisticated ordering systems that allow customers to electronically order and confirm their purchases, as well as to confirm the availability and prices of wholesalers' stock." *Fed. Trade Comm'n v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 41 (D.D.C. 1998).  Through their generic source programs, wholesalers are also able "to combine the purchase volumes of customers and negotiate the cost of goods with manufacturers."  Wholesaler distributors also offer marketing programs, patient services, and other software to assist their dispensing customers.

116.    Defendants had financial incentives from manufacturers to distribute higher volumes, and thus to refrain from reporting or declining to fill suspicious orders.  Wholesale drug distributors acquire pharmaceuticals, including opioids, from manufacturers at an established

44

wholesale acquisition cost. Discounts and rebates from this cost may be offered by manufacturers based on market share and volume. As a result, higher volumes may decrease the cost per pill to distributors. Decreased cost per pill in turn, allows wholesale distributors to offer more competitive prices, or alternatively, pocket the difference as additional profit. Either way, the increased sales volumes result in increased profits.

117. Upon information and belief, each of the Defendants also worked together through trade or other organizations, such as the HDA, the National Association of Chain Drugstores ("NACDS"),[49] and the Pain Care Forum ("PCF"), to safeguard the market for opioids and the distribution of opioids.

118. Although the entire HDA membership directory is private, the HDA website confirms that Defendants AmerisourceBergen, Cardinal, and McKesson, were members.

119. The closed meetings of the HDA's councils, committees, task forces and working groups provided Defendants with the opportunity to work closely with each other and with pharmaceutical companies, confidentially, to develop and further their common purpose and interests.

120. HDA members were eligible to participate on councils, committees, task forces and working groups, including:

> a. Industry Relations Council: "This council, composed of distributor and manufacturer members, provides leadership on pharmaceutical distribution and supply chain issues."

---

[49] The National Association of Chain Drug Stores is a national trade association that represents traditional drug stores, supermarkets, and mass merchants with pharmacies—from regional chains with four stores to national companies. Walgreen Company and CVS Health are members and/or have representatives on the Board of Directors of NACDS.

b.     Business Technology Committee: "This committee provides guidance to HDA and its members through the development of collaborative e-commerce business solutions. The committee's major areas of focus within pharmaceutical distribution include information systems, operational integration and the impact of e-commerce." Participation in this committee includes distributors and manufacturer members.

c.     Logistics Operation Committee: "This committee initiates projects designed to help members enhance the productivity, efficiency and customer satisfaction within the healthcare supply chain. Its major areas of focus include process automation, information systems, operational integration, resource management and quality improvement." Participation in this committee includes distributors and manufacturer members.

d.     Contracts and Chargebacks Working Group: "This working group explores how the contract administration process can be streamlined through process improvements or technical efficiencies. It also creates and exchanges industry knowledge of interest to contract and chargeback professionals." Participation in this group includes manufacturer and distributor members.[50]

121.   HDA also offers a multitude of conferences, including annual business and leadership conferences. HDA advertises these conferences as "bring[ing] together high-level executives, thought leaders and influential managers . . . to hold strategic business discussions on the most pressing industry issues."[51]  These conferences provided HDA members "unmatched opportunities to network with [their] peers and trading partners at all levels of the healthcare distribution industry"[52] and an opportunity for Defendants to work together.

122.   Defendants also worked together through joint efforts of the HDA and NACDS. The respective CEOs of the HDA and NACDS have spoken with one voice, with respect to portraying their members as committed to safeguarding the integrity of the supply chain when

---

[50]   Councils and Committees, Healthcare Distribution Alliance, *available at* https://www.healthcaredistribution.org/about/councils-and-committees

[51]   2017 Business and Leadership Conference, Healthcare Distribution Alliance, *available at* https://www.healthcaredistribution.org/events/2017-business-and-leadership-conference.

[52]   *Id.*

46

opposing efforts to promote the importation of prescription drugs as a means of mitigating the escalating costs of medications. These statements support the inference that Defendants worked together in other ways as well to mislead the public regarding their commitment to complying with their legal obligations and safeguarding against diversion.

123.    Defendants also coordinated in other ways, including, according to articles published by the Center for Public Integrity and the Associated Press, the Pain Care Forum—whose members include, upon information and belief, the HDA—which has been lobbying on behalf of opioid manufacturers and distributors for "more than a decade."[53] This coordination in their lobbying further supports an inference that Defendants worked together in other ways, including through the enterprise described in this Complaint.

124.    Taken together, the interaction and length of the relationships between and among the Defendants reflect a deep level of interaction and cooperation between two groups in a tightly knit industry. The Defendants were not operating in isolation or groups forced to work together in a closed system. They operated together as a united entity, working together on multiple fronts, to engage in the unlawful sale of prescription opioids.

125.    The HDA, NACDS, and the Pain Care Forum are examples of the overlapping relationships and concerted joint efforts to accomplish common goals, and demonstrate that the leaders of each of the Defendants were in communication and cooperation.

---

[53] Matthew Perrone, Pro-Painkiller echo chamber shaped policy amid drug epidemic, The Center for Public Integrity (Sept. 19, 2017), available at https://www.publicintegrity.org/2016/09/19/20201/pro-painkiller-echo-chamber-shaped-policy-amid-drug-epidemic; PAIN CARE FORUM 2012 Meetings Schedule, (last updated Dec. 2011) (showing Covidien, Mallinckrodt LLC's parent company until mid-2013, as a member in 2012), available at https://assets.documentcloud.org/documents/3108982/PAIN-CARE-FORUM-Meetings-Schedule-amp.pdf

126.    Publications and guidelines issued by the HDA confirm that Defendants utilized their membership in the HDA to form agreements.  Specifically, in the fall of 2008, the HDA published the Industry Compliance Guidelines:  Reporting Suspicious Orders and Preventing Diversion of Controlled Substances (the "Industry Compliance Guidelines") regarding diversion. As the HDA explained in an *amicus* brief, the Industry Compliance Guidelines were the result of "[a] committee of HDMA members contribut[ing] to the development of this publication" beginning in late 2007.[54]

127.    Defendants were also a part of a decision-making scheme seeking to increase sales through a systematic refusal to maintain effective controls against diversion and identify suspicious orders and report them to the DEA.

128.    Defendants worked to control the flow of information and influence state and federal governments to pass legislation that supported the use of opioids and limited the authority of law enforcement to rein in illicit or inappropriate prescribing and distribution.  They did this through their participation in the PCF and HDA.

129.    Defendants thus knew that their own conduct could be reported by other distributors and that their failure to report suspicious orders they filled could be brought to the DEA's attention. As a result, Defendants had an incentive to communicate with each other about the reporting of suspicious orders to ensure consistency in their dealings with DEA.

130.    The desired consistency was achieved.  As described below, Defendants failed to report suspicious orders and the flow of opioids continued unimpeded.

---

[54] *See Amicus Curiae* Br. of Healthcare Distribution Management Association (HDMA) in Support of Cardinal Health, Inc.'s Motion for Injunction Pending Appeal, No. 12-5061 (D.C. Cir. Mar. 7, 2012), Doc. No. 1362415 at 5.

5. Defendants ignored red flags of abuse and diversion.

131. The data that reveals and/or confirms the identity of each wrongful opioid distributor is hidden from public view in the DEA's confidential ARCOS database.[55] The data necessary to identify with specificity the transactions that were suspicious is in possession of the Defendants, but has not been disclosed to the public.

132. Yet, publicly available information confirms that Defendants funneled far more opioids into Stark County than could have been expected to serve legitimate medical use, and ignored other red flags of suspicious orders. This information, along with the information known only to Defendants, would have alerted them to potentially suspicious orders of opioids in and affecting Stark County.

133. The County's information and belief rests upon the following facts:

(a) Defendants have access to detailed transaction-level data on the sale and distribution of opioids, which can be broken down by zip code, prescriber, and pharmacy and includes the volume of opioids, dose, and the distribution of other controlled and non-controlled substances;

(b) distributors regularly visit pharmacies and doctors to promote and provide their products and services, which allows them to observe red flags of diversion;

(c) pharmacies have access to the prescriptions themselves and detailed prescription and transaction histories, as well as the opportunity to observe patients who come in to their stores;

(d) upon information and belief, Defendants were the primary source of prescription opioids in the County, and each plays such a large part in the distribution of opioids that its own volume provides a ready vehicle for measuring the overall flow of opioids into a pharmacy or geographic area;

(e) Walgreens and CVS have been penalized for their illegal prescription opioid practices, and the widespread nature of these violations suggests they are the product of national policies and practices, including the performance metrics and prescription quotas adopted for their retail stores;

---

[55] *See Madel v. USDOJ*, 784 F.3d 448 (8th Cir. 2015).

(f) According to testimony by a Cardinal former Executive Chairman of the Board at a hearing before the House of Representatives' Energy and Committee Subcommittee on Oversight and Investigations on May 8, 2018, a distributor has the ability to request drug dispensing reports, which include all drugs dispensed by a pharmacy, not only those by Cardinal, and had requested such reports in the past. Upon information and belief, other wholesale distributors could request similar reports.

134. At all relevant times, Defendants were in possession of data or information that allowed them to track prescribing patterns over time. For example, Defendants developed "know your customer" questionnaires and files. This information, compiled pursuant to comments from the DEA in 2006 and 2007, was intended to help Defendants identify suspicious orders or customers who were likely to divert prescription opioids. The "know your customer" questionnaires informed Defendants of the number of pills that the pharmacies sold, how many non-controlled substances were sold compared to controlled substances, whether the pharmacy buys from other distributors, the types of medical providers in the area, including pain clinics, general practitioners, hospice facilities, cancer treatment facilities, among others, and these questionnaires put the recipients on notice of suspicious orders.

135. In addition to their own data from shipping prescription drugs to customers, Defendants also have national, regional, state, and local prescriber-level data that allowed them to track the prescribing of opioids. They obtained prescription data from various companies that collect and sell such data, such as IQVIA (formerly IMS), Wolters Kluwer, and Verispan. This information would have allowed distributors to analyze and track their competitors' sales and to determine their relative market shares (and thus the total supply of opioids in an area).[56] In fact,

---

[56] A Verispan representative testified that the Defendants use the prescribing information to "drive market share." *Sorrell v. IMS Health Inc.*, 2011 WL 661712, *9-10 (Feb. 22, 2011).

an expert for a data vendor testified in an unrelated proceeding that this information could be used to track and report suspicious orders of controlled substances.[57]

136.    Pharmacies such as those operated by CVS and Walgreens have particularly detailed information that would have alerted them to red flags of abuse and diversion.  And, as noted above, both CVS and Walgreens would have had detailed information due to the integration of their operations at different levels of the supply chain.  Walgreens describes its Ohio distribution center as having "a very sophisticated computer-driven automated storage and retrieval system" and high tech "inventory management system" that "connects [its] stores and [its] distribution centers."[58]  Accordingly, upon information and belief, Walgreens possessed real-time data that fully and accurately depicted the exact amounts of pills, pill type, and anticipated "customer" order threshold for its own stores. It is conceivable that such data monitoring systems could, and likely did, track and/or record facially suspicious orders.

137.    Upon information and belief, Walgreens utilized Central Pharmacy Operations that provided "central fill" services to its "Well Experience" locations for a period of time beginning as early as 2009. As described herein, these Central Pharmacy Operations locations served as both distributors and dispensaries of opioids.  Central Pharmacy Operation centers first existed in select states, but later spread nationwide. They currently provide pharmacy support services including data entry, patient and provider review, data verification, and telephonic customer counseling.

---

[57] In *Sorrell*, expert Eugene "Mick" Kolassa testified that "a firm that sells narcotic analgesics was able to use prescriber-identifiable information to identify physicians that seemed to be prescribing an inordinately high number of prescriptions for their product." *Id*; *see also* Joint Appendix in *Sorrell v. IMS Health Inc.*, 2011 WL 687134, at *204 (Feb. 22, 2011).

[58] *$135 million Walgreen distribution center targeted*, As published in Toledo Business Journal - Sept. 1, 2000, http://www.toledobiz.com/Files/major_stories/tbj_featured0009walgreens.html

138.    The use of "central fill" practices allowed the company to break down the face-to-face relationship between the patient and pharmacist by outsourcing things like bottling, labeling, prescription review, and data verification. Thus, the Central Pharmacy Operation centers acted as both distributors and dispensaries by providing the Well Experience locations medications to dispense, and also as a dispensing pharmacy, mailing the medication to the Well Experience locations to be given to the customer. In addition to the above, Walgreens is known to have traditional distribution centers, one of which is in Perrysburg, Ohio. Upon information and belief, Walgreens acted as a wholesale distributor of opioids to its own free-standing Well Experience locations from these distribution centers as well.

139.    At the pharmacy level, these pharmacies would have been able to observe customers, including, for example, customers with insurance coverage making cash payments. They could also identify customers filling prescriptions at multiple pharmacy branches or from different doctors, or patterns of unusual or suspicious prescribing from a particular medical provider. Moreover, CVS Health president and CEO Larry Merlo has described the company as "America's front door to health care with a presence in nearly 10,000 communities across the country," and this position as allowing it to "see firsthand the impact of the alarming and rapidly growing epidemic of opioid addiction and misuse."

140.    CVS and, upon information and belief, Walgreens, used performance metrics related to their own profits, which would rely, in part, upon the number of prescriptions dispensed. By 2010, CVS had implemented performance metrics that remain publicly available online. CVS's metrics system lacked any measurement for pharmacy accuracy or customer safety. They did, however, prioritize speed and volume, including through efforts to encourage patients to pick up initial prescriptions that might otherwise be returned to stock. Moreover, the bonuses for

pharmacists are calculated, in part, on how many prescriptions that pharmacist fills within a year. These policies remained in place even as the epidemic raged.

141.    Former pharmacists at both Walgreens and CVS alike have publically complained about pressure to put speed ahead of safety.  One former Walgreens pharmacist described management critiques for "not going fast enough" in dispensing prescriptions, and believed "[t]hey'd like you to fill one a minute if you could."  She recalled there was even a timer to alert her if she was falling behind, and threats of reduced hours or a move to a different store or location.[59]  Concerning the metrics at CVS, one pharmacist commented that "You get stressed, and it takes your mind away from the actual prescriptions."  Another former CVS pharmacist recalled that "[e]very prescription [wa]s timed," and a backlog would pop up in color on pharmacists computer screens if they fell behind.[60]  Additionally, CVS has faced discrimination complaints alleging that the company's "Metrics" system set unobtainable goals — or at least, goals that could not be obtained without violating the laws and practice rules governing pharmacists' professional responsibilities, edging out older pharmacists.

142.    Without describing individual pharmacies, a nationally-known expert and teacher of pharmacology commented in the media that the pace and pressure of prescription quotas appeared to be having an impact on accuracy.  He described data from the FDA's Adverse Event

---

[59] *Are Business Tactics at Some Pharmacies Risking Your Health?* (Nov. 8, 2017), https://reachmd.com/news/are-business-tactics-at-some-pharmacies-risking-your-health/1610793/

[60] Sam Roe, Ray Long, and Karisa King, Contract Reporters, *Pharmacies Miss Half of Dangerous Drug Combinations*, Dec. 15, 2016, http://www.chicagotribune.com/news/watchdog/druginteractions/ct-drug-interactions-pharmacy-met-20161214-story.html

Reporting System as showing a 450% increase in reported medication errors since 2010. Anecdotally, he also "heard some pharmacists say, 'It's a blur as to what happened during the day and I can only pray I didn't make any serious mistakes.'"[61]

143.    This pressure and focus on profits not only leads to mistakes, it also would necessarily deter pharmacists from carrying out their obligations to report and decline to fill suspicious orders and to exercise due care in ascertaining whether a prescription is legitimate. Indeed, a survey by the Institute for Safe Medication Practices (ISMP) revealed that 83% of the pharmacists surveyed believed that distractions due to performance metrics or measured wait times contributed to dispensing errors, as well as that 49% felt specific time measurements were a significant contributing factor."[62]   In 2013, the National Association of Boards of Pharmacy (NABP), passed a resolution which cited this survey and additionally stated that "performance metrics, which measure the speed and efficiency of prescription work flow by such parameters as prescription wait times, percentage of prescriptions filled within a specified time period, number of prescriptions verified, and number of immunizations given per pharmacist shift, may distract pharmacists and impair professional judgment" and "the practice of applying performance metrics or quotas to pharmacists in the practice of pharmacy may cause distractions that could potentially

---

[61] ReachMd, *Are Business Tactics at Some Pharmacies Risking Your Health?* (Nov. 8, 2017), https://reachmd.com/news/are-business-tactics-at-some-pharmacies-risking-your-health/1610793/

[62] NAPB, Performance Metrics and Quotas in the Practice of Pharmacy (Resolution 109-7-13) (June 5, 2013), https://nabp.pharmacy/performance-metrics-and-quotas-in-the-practice-of-pharmacy-resolution-109-7-13/

decrease pharmacists' ability to perform drug utilization review, interact with patients, and maintain attention to detail, which could ultimately lead to unsafe conditions in the pharmacy."[63]

144.    Given this, and the additional red flags described below, Defendants should have been on notice that the diversion of opioids was likely occurring in and around Stark County, should have investigated, ceased filling orders for opioids, and reported potential diversion to law enforcement.

145.    Stark County had an opioid prescription rate exceeding its population from 2007 to 2015 (meaning a rate equating to more than one prescription for every man, woman, and child in the County), and that rate has remained high — an average of nearly 92.6 prescriptions per 100 people—thereafter.    Stark County's supply of opioids even exceeded statewide figures—an already high baseline given Ohio's unfortunate placement at the epicenter of the opioid crisis.

146.    As discussed above, all told, Stark County, with an average population from 2010 to 2017 of approximately 375,000, received a total of 203,604,737 retail doses of opioid analgesics, with a high of 27,679,927 in 2013.    This amounted to 135 doses per opioid patient.    The volume of opioids distributed in Stark County is so high as to raise a red flag that not all of the prescriptions being ordered could be for legitimate medical uses.

147.    Further, as recently as February 2018, a Stark County doctor was indicted on more than 270 charges of running a pill mill after two people died of drug overdoses from drugs obtained in his practice.    The doctor, who worked at a family practice, was charged with involuntary manslaughter, Medicaid fraud, drug trafficking, grand theft, and other offenses.    Upon information

---

[63] NAPB, Performance Metrics and Quotas in the Practice of Pharmacy (Resolution 109-7-13) (June 5, 2013), https://nabp.pharmacy/performance-metrics-and-quotas-in-the-practice-of-pharmacy-resolution-109-7-13/

and belief, this prescriber, and the pharmacies at which the providers' patients filled prescriptions for opioids, yielded orders of unusual size, frequency, or deviation, or raised other warning signs that should have alerted Defendants not only to an overall oversupply in Stark County, but specific instances of diversion.  In Ohio, physicians or clinics engaged in illicit prescribing have been found to frequently team with particular pharmacies to distribute prescription opioids.[64]

148.    In addition, the crisis of fatal overdoses from prescription opioids in Ohio communities has been widely publicized for years.  Stark County, is unfortunately, among the communities hardest hit by the opioid epidemic.  The County has seen a dramatic rise in fatal drug overdoses.  Many of these deaths are attributable to prescription opioids, and increasingly, to illicit opiates, to which people who have become addicted to prescription opioids often transition.  The CDC estimates that for every opioid-related death, there are 733 non-medical users.  Defendants thus had every reason to believe that illegal diversion was occurring in Stark County.

149.    Not only were prescription opioids diverted within the County, upon information and belief, they were being diverted into Stark County from pill mills further south in Ohio, that, upon information and belief, these Defendants also failed to report or cease supplying.  An epidemiological report from the Ohio Governor's Cabinet opiate action team cited the shutdown of southern Ohio pill mills as one of the chief factors in an increase throughout Ohio in heroin overdose rates (which, as explained below, is the drug turned to by prescription opioid users when those drugs are no longer available or too expensive).  Consistent with the observed statewide trend, Stark County has seen a spike in heroin overdoses and lives lost to synthetic opiates, such as fentanyl.

---

[64] Decl. of DEA Diversion Investigator Christopher Kresnak, *KeySource Medical Inc. v. Holder*, No. 1:11-cv-00393, Doc. 9-2 (S.D. Ohio June 30, 2011).

150.    In addition, upon information and belief, the Defendants would have known that Ohio's crack-down on pill mills within the state did not prevent suspicious orders from being placed in the state and ultimately diverted to illicit use in Ohio communities. For example, opioid manufacturer Mallinckrodt found in November 2010 that 68% of the purchases by one of its distributors, Cincinnati-based KeySource Medical, Inc., were for prescription opioids, and that 91% of this customer's purchasers were sent to Florida. During that time, Florida lacked a prescription drug monitoring program similar to Ohio, and traffickers would recruit others to travel to Florida to pick up the drugs Mallinckrodt, through wholesale distributors, had shipped there, and bring them back to Ohio, a route that became known as the "Florida Pipeline" or "OxyContin Express."[65] According to the *Washington Post*, an internal summary of a federal case against Mallinckrodt, described above, showed that "Mallinckrodt's response was that 'everyone knew what was going on in Florida but they had no duty to report it.'"[66]

151.    Upon information and belief, Defendants would have been aware that as Ohio cracked down on opioid suppliers, out-of-state dispensaries filled the gaps, directly impacting Stark County. As described above, Florida in particular assumed a prominent role, as its lack of regulatory oversight created a fertile ground for pill mills. Residents of other states would simply drive to Florida, stock up on pills from a pill mill, and transport them back to home to sell. The practice became so common that authorities dubbed these individuals "prescription tourists."

---

[65] Decl. of DEA Diversion Investigator Christopher Kresnak, *KeySource Medical Inc. v. Holder*, No. 1:11-cv-00393, Doc. 9-2 ¶ 3 (S.D. Ohio June 30, 2011).

[66] The Government's Struggle to Hold Opioid Manufacturers Accountable: Sixty-six percent of all oxycodone sold in Florida came from this company. But the DEA's case against it faltered,    *Washington    Post*,    (Apr.    2,    2017), https://www.washingtonpost.com/graphics/investigations/dea-mallinckrodt/?utm_term=.256b39de1578

152.    The facts surrounding numerous criminal prosecutions illustrate the common practice.  For example, one man from Warren County, Ohio, sentenced to four years for transporting prescription opioids from Florida to Ohio, explained that he could get a prescription for 180 pills from a quick appointment in West Palm Beach, and that back home, people were willing to pay as much as $100 a pill—ten times the pharmacy price.  In Columbus, Ohio, a DEA investigation led to the 2011 prosecution of sixteen individuals involved in the "oxycodone pipeline between Ohio and Florida."[67]  When officers searched the Ohio home of the alleged leader of the group, they found thousands of prescriptions pills, including oxycodone and hydrocodone, and $80,000 in cash.  In 2015, another Columbus man was sentenced for the same conduct— paying couriers to travel to Florida and bring back thousands of prescription opioids, and, in the words of U.S. district judge Michael Watson, contributing to a "pipeline of death."[68]

153.    Outside of Atlanta, Georgia, four individuals pled guilty in 2015 for operating a pill mill; the U.S. attorney's office found that most of the pain clinic's customers came from other states, including Ohio. Another investigation in Atlanta led to the 2017 conviction of two pharmacists who dispensed opioids to customers of a pill mill across from the pharmacy; many of those customers were from other states, including Ohio.

154.    In yet another case, defendants who operated a pill mill in south Florida were tried in eastern Kentucky based on evidence that large numbers of customers transported oxycodone back to the area for both use and distribution by local drug trafficking organizations. As explained

---

[67] *16 charged in 'pill mill' pipeline*, Columbus Dispatch (June 7, 2011), http://www.dispatch.com/content/stories/local/2011/06/07/16-charged-in-pill-mill-pipeline.html.

[68] *Leader of Ohio pill-mill trafficking scheme sentenced*, Star Beacon (July 16, 2015), http://www.starbeacon.com/news/leader-of-ohio-pill-mill-trafficking-scheme-sentenced/article_5fb058f5-deb8-5963-b936-d71c279ef17c.html.

by the Sixth Circuit in its decision upholding the venue decision, "[d]uring its existence, the clinic generated over $10 million in profits. To earn this sum required more business than the local market alone could provide. Indeed, only about half of the PCB's customers came from Florida. Instead, the clinic grew prosperous on a flow of out-of-state traffic, with prospective patients traveling to the clinic from locations far outside Ft. Lauderdale, including from Ohio[.]"[69]

155.    The route from Florida and Georgia to Kentucky, Ohio, and West Virginia was so well traveled that it became known as the Blue Highway, a reference to the color of the 30mg oxycodone pills manufactured by Mallinckrodt. Eventually, as police began to stop vehicles with certain out-of-state tags cruising north on I-75, the prescription tourists adapted. They rented cars just over the Georgia state line to avoid the telltale out-of-state tag. If they were visiting multiple pill mills on one trip, they would stop at FedEx between clinics to mail the pills home and avoid the risk of being caught with multiple prescriptions if pulled over.

156.    Further, the County forms part of the Ohio High Intensity Drug Trafficking Area ("HIDTA") designated by the U.S. Department of Justice National Drug Intelligence Center ("NDIC"). This designating requires, among other things, that an area be a "significant center of illegal drug production, manufacturing, importation, or distribution," that "State, local, and tribal law enforcement agencies have committed resources to respond to the drug trafficking problem in the area, thereby indicating a determination to respond aggressively to the problem," and that "Drug-related activities in the area are having a significant harmful impact in the area and in other areas of the country."

157.    In 2011, the NDIC described the overall drug threat in the Ohio HIDTA as increased, "particularly from increased trafficking and abuse of heroin and prescription opioids."

---

[69] *United States v. Elliott*, 876 F.3d 855, 858 (6th Cir. 2017).

The report specifically recognized that, "prescription opioid diversion and abuse are increasing, resulting in a significant overall threat from prescription and illicit opioid abuse within the HIDTA region." Moreover, the "already high" availability of diverted prescription opioids was increasing.

158. By 2015, with the reduction of pill mills in Southern Ohio and low cost of heroin, heroin had become the major drug of concern in the Ohio HIDTA region. At the same time, "[p]rescription opioid diversion and abuse remain[ed] high and seizures continue[d] to grow."[70]

159. Based upon all of these red flags, it can be fairly inferred that Defendants had information about suspicious orders that they did not report, and also failed to exercise due diligence before filling orders from which drugs were diverted into illicit uses in Stark County.

### B. DEFENDANTS HID THEIR LACK OF COOPERATION WITH LAW ENFORCEMENT AND FALSELY CLAIMED TO BE ACTIVELY WORKING TO PREVENT DIVERSION.

160. When a wholesaler does not report or stop suspicious orders, prescriptions for controlled substances may be written and dispensed to individuals who abuse them or who sell them to others to abuse. This, in turn, fuels and expands the illegal market and results in opioid-related overdoses. Without reporting by those involved in the supply chain, law enforcement may be delayed in taking action – or may not know to take action at all.

161. After being caught failing to comply with particular obligations at particular facilities, Defendants made broad promises to change their ways and insisted that they sought to be good corporate citizens. As part of McKesson's 2008 Settlement with the DEA, McKesson claimed to have "taken steps to prevent such conduct from occurring in the future," including specific measures delineated in a "Compliance Addendum" to the Settlement. Yet, in 2017,

---

[70] Executive Office of the President, Office of National Drug Control Policy, High Intensity Drug Trafficking Areas Program 2015 Report to Congress, at 104.

McKesson paid $150 million to resolve an investigation by the U.S. DOJ for again failing to report suspicious orders of certain drugs, including opioids.

162.    More generally, the Defendants publically portrayed themselves as committed to working with law enforcement, opioid manufacturers, and others to prevent diversion of these dangerous drugs.  For example, Cardinal claims that: "We challenge ourselves to best utilize our assets, expertise and influence to make our communities stronger and our world more sustainable, while governing our activities as a good corporate citizen in compliance with all regulatory requirements and with a belief that doing 'the right thing' serves everyone."  Defendant Cardinal likewise claims to "lead [its] industry in anti-diversion strategies to help prevent opioids from being diverted for misuse or abuse."  Along the same lines, it claims to "maintain a sophisticated, state-of-the-art program to identify, block and report to regulators those orders of prescription controlled medications that do not meet [its] strict criteria."  Defendant Cardinal also promotes funding it provides for "Generation Rx," which funds grants related to prescription drug misuse. A Cardinal executive recently claimed that Cardinal uses "advanced analytics" to monitor its supply chain; Cardinal assured the public it was being "as effective and efficient as possible in constantly monitoring, identifying, and eliminating any outside criminal activity."

163.    Along the same lines, Defendant McKesson publicly claims that its "customized analytics solutions track pharmaceutical product storage, handling and dispensing in real time at every step of the supply chain process," creating the impression that McKesson uses this tracking to help prevent diversion.  Its website offers assurances that the company's Controlled Substances Monitoring Program ("CSMP") "uses sophisticated algorithms designed to monitor for suspicious

orders, and block the shipment of controlled substances."[71] McKesson has also publicly stated

that it has a "best-in-class controlled substance monitoring program to help identify suspicious

orders," and claimed it is "deeply passionate about curbing the opioid epidemic in our country."

164.   AmerisourceBergen, too, has taken the public position that it is "work[ing]

diligently to combat diversion and [is] working closely with regulatory agencies and other partners

in pharmaceutical and healthcare delivery to help find solutions that will support appropriate

access while limiting misuse of controlled substances." A company spokeswoman also provided

assurance that: "At AmerisourceBergen, we are committed to the safe and efficient delivery of

controlled substances to meet the medical needs of patients." Another AmerisourceBergen

representative has claimed publically, on behalf of the company that, "[a]s a supply chain partner,

we are committed to finding comprehensive solutions to mitigate the opioid epidemic impacting

our communities, and we understand the important role we play in helping to combat medication

diversion and abuse[.]"

165.   Walgreens, too, publicly portrays itself as committed to working diligently to

prevent diversion of these dangerous drugs and curb the opioid epidemic, including through

installation of safe-disposal kits at Walgreens pharmacies and plans to make Naloxone available

without a prescription, in accordance with state pharmacy regulations.  Citing these efforts,

Walgreens promotes itself as committed to undertaking "a comprehensive national plan announced

earlier this year to address key contributors to the crisis."

166.   CVS likewise claims to be "playing an active role in the search for solutions to the

opioid crisis in a number of ways."

---

[71]     https://www.mckesson.com/about-mckesson/fighting-opioid-abuse/pharmaceutical-supply-chain/

167.    Moreover, in furtherance of their effort to affirmatively conceal their conduct and avoid detection, Defendants, through their trade associations, the HDMA (now HDA) and the NACDS, filed an *amicus* brief in *Masters Pharmaceuticals*, which made the following statements:[72]

    a.    "HDMA and NACDS members not only have statutory and regulatory responsibilities to guard against diversion of controlled prescription drugs, but undertake such efforts as responsible members of society."

    b.    "Distributors take seriously their duty to report suspicious orders, utilizing both computer algorithms and human review to detect suspicious orders based on the generalized information that *is* available to them in the ordering process."

168.    Through the above statements made on their behalf by their trade associations, and other similar statements assuring their continued compliance with their legal obligations, Defendants not only acknowledged that they understood their obligations under the law, but they further affirmed that their conduct was in compliance with those obligations.

169.    These public statements created the false and misleading impression that the Defendants rigorously carried out their duty to report suspicious orders and exercise due diligence to prevent diversion of these dangerous drugs, and also worked voluntarily to prevent diversion as a matter of corporate responsibility to the communities their business practices would necessarily impact.

### C.    BY INCREASING OPIOID PRESCRIPTIONS AND USE, DEFENDANTS COLLECTIVELY FUELED THE OPIOID EPIDEMIC AND SIGNIFICANTLY HARMED THE COUNTY AND ITS RESIDENTS.

170.    Defendants compounded the harms from aggressive marketing that overcame barriers to widespread prescribing of opioids for chronic pain by supplying opioids beyond even

---

[72] Brief for HDMA and NACDS, 2016 WL 1321983, at *3-4, *25.

what this expanded market could bear, and by turning a blind eye to red flags that they were fueling abuse and diversion of these dangerous drugs.

171. By continuing to supply and failing to report suspicious orders of opioids, Defendants have enabled an oversupply of opioids, which allows non-patients to become exposed to opioids, and facilitates access to opioids for both patients who could no longer access or afford prescription opioids and addicts struggling with relapse.

172. Further, people who are addicted to prescription opioid painkillers are 40 times more likely to be addicted to heroin. The CDC identified addiction to prescription pain medication as the strongest risk factor for heroin addiction. Roughly 80% of heroin users previously used prescription opioids. Recently, 3 people died from apparent heroin overdoses in less than a 24 hours in Stark County.

173. Ohio's Prescription Drug Abuse Task Force has found that individuals addicted to prescription opioids often transition to heroin due to its lower cost, ready availability, and similar high. Likewise, a study by the Ohio Substance Abuse Monitoring Network reported on the connection between oxycodone use and heroin addiction, finding that "[y]oung new heroin abusers seeking treatment reported OxyContin abuse prior to becoming addicted to heroin," that several reported resorting to heroin after OxyContin became too expensive or difficult to obtain, and that "[a]buse of OxyContin prior to the abuse of heroin appears to be a common pattern."[73]

---

[73] Ohio Substance Abuse Monitoring Network, OSAM Rapid Response Investigation Reveals Connection Between OxyContin Abuse and Heroin Addiction in Some Individuals, *available* at http://mha.ohio.gov/Portals/Wassets/Learning/OSAMaan02ConnxtsOxy.pdf or

http://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=1&ved=0ahUKEwjIl6n DjZLaAhWSu1MKHXwmCMMQFggnMAA&url=http%3A%2F%2Fmha.ohio.gov%2FPortals %2F0%2Fassets%2FLearning%2FOSAM%2FJan02ConnxtsOxy.pdf&usg=AOvVaw0YQ8A4 YVKePz9xajswyHMJ

174. A relatively recent, even more deadly problem stemming from the prescription opioid epidemic involves fentanyl—a powerful opioid prescribed for cancer pain or in hospital settings that, in synthetic form, has made its way into Ohio communities, including Stark County.

175. Carfentanil, a powerful derivative of fentanyl, has increasingly been found in heroin and fentanyl sold illicitly. Carfentanil is so strong that it is typically used in veterinary medicine to sedate large wild animals such as elephants, and has been researched as a chemical weapon. A dose the size of a grain of salt can rapidly lead to deadly overdose in humans. Because of its potency, the Ohio Attorney General's website recommends that chemists and lab technicians who test for carfentanil use protective gear. As recently as January 2018, $100,000 worth of carfentanil was seized from a Stark County home. Additionally, in March of 2018, a North Canton-area resident was indicted in federal court on allegations tied to bringing them in large amounts of fentanyl and carfentanil, and selling them in Ohio communities.

176. Ohio now "leads the country in drug overdose deaths per capita, a rate that continues to rise, overwhelming families, communities, and local governments across the state."[74] In Ohio, an average of 14 people now die, per day, from fatal drug overdoses. Provisional data from the CDC showed the crisis continuing to explode during the first half of last year, with 5,232 Ohio overdose deaths recorded in the 12 months ending June 31, 2017. Further, even these grim numbers likely understate the number of lives lost due to incomplete reporting.

177. In Stark County, the number of drug-related deaths more than doubled in recent years. In 2012, 42 deaths were attributed to opioids, and another 19 people lost their lives to heroin or fentanyl overdoses. In 2016, the County saw more than a hundred people die of opioid

---

[74] C. William Swank Program in Rural-Urban Policy, Taking Measure of Ohio's Opioid Crisis, The Ohio State University (Oct. 2017) at 1.

overdoses and 83 people died heroin or fentanyl overdoses. In 2017, 144 people died of opiate-related overdoses.

178.    As the crisis unfolds, tragically, more people lost their lives in the County than the morgue had room to hold. In March of 2017, the County coroner's office requested a cold-storage trailer from the Ohio Emergency Management Agency to properly house the bodies. According to an investigator for the County's coroner's office and 40 year veteran of public safety, the opioid and heroin crisis is responsible for the increase in deaths.

179.    Overdose deaths are only one consequence. Opioid addiction and misuse also result in an increase in emergency room visits, emergency responses, and emergency medical technicians' administration of Narcan or naloxone—the antidote to opioid overdose. In 2017, County emergency room reported treating 855 drug overdoses. Further, from January to mid-July of 2018 alone, EMS providers in the County reported administering Narcan 213 times.

180.    Opioid addiction is now the primary reason that Ohioans seek substance abuse treatment. In 2014, 37% of admissions for drug abuse were associated with a primary diagnosis of opioid abuse or dependence. According to a 2015 poll, 3 in 10 Ohio adults have family members or friends who have experienced problems as a result of abusing prescription pain relievers, a steep rise from only a year earlier, and 2 in 10 Ohio adults had family or friends whom they described as experiencing problems from using heroin. Of these Ohioans, 4 in 10 knew someone who had overdosed due to a pain drug, and 6 in 10 knew someone who had overdosed on heroin.

181.    The County has seen a dramatic increase in the number of people seeking addiction treatment due to opioid use. According to Stark County Mental Health and Addiction Recovery, there has been a vast increase in clients treated for opioid use disorder over a ten-year time span.

In 2006, the number of clients who received addiction treatment for opioids was 255. In 2016, this number increased to 1,444 clients—a 505% increase.

182.  Defendants' conduct has significantly harmed veterans. Sixty percent (60%) of veterans returning from deployment suffer from chronic pain, double the national average of thirty percent (30%) of U.S. citizens. Veterans are twice as likely to suffer addiction and to die from opioid abuse than non-veterans according to a 2011 Veterans Administration study. More than 28,000 veterans live in Stark County, which is home to more veterans than any other County in the State.

183.  Opioids have caused injury and illness in Stark County in other respects as well. An increase in Hepatitis C, according to the CDC, is directly tied to intravenous injection of opioids. The number of cases of chronic Hepatitis C in Ohio nearly tripled from 2011-2015, an increase that resulted largely from intravenous use of drugs, including OxyContin and other prescription painkillers, stemming from the opioid epidemic. The co-morbidity is sufficiently high that the Ohio Department of Health recommends that women of childbearing age who have tested positive for drug and dependence also receive screening for Hepatitis C and HIV.

184.  The oversupply of opioids also had a significant detrimental impact on children in Stark County. Young children have access to opioids, nearly all of which were prescribed or supplied to adults in their household. If parents become addicted and turn to illicit opiates, children risk overdose from these drugs as well.

185.  Even infants have not been immune to the impact of opioid abuse. There has been a dramatic rise in the number of infants who are born addicted to opioids due to prenatal exposure and suffer from neonatal abstinence syndrome ("NAS," also known as neonatal opioid withdrawal syndrome, or "NOWS"). These infants painfully withdraw from the drug once they are born, cry

nonstop from the pain and stress of withdrawal, experience convulsions or tremors, have difficulty sleeping and feeding, and suffer from diarrhea, vomiting, and low weight gain, among other serious symptoms. The long-term developmental effects are still unknown, though research in other states has indicated that these children are likely to suffer from continued, serious neurologic and cognitive impacts, including hyperactivity, attention deficit disorder, lack of impulse control, and a higher risk of future addiction. When untreated, NAS can be life-threatening. In 2009, more than 13,000 infants in the United States were born with NAS, or about one every hour.

186. In Ohio, the number of infants born with NAS increased six-fold in from 2004 to 2011. From 2009 to 2014, data from seven regional hospitals showed a greater-than six-fold increased in drug-exposed infants. As a whole, the State has seen an 816% increase in the number of infants born with NAS from 2006 to 2015, with opioids and other illegal narcotics being the most commonly implicated drugs since 2009. In 2015 alone, 2,174 infants were admitted to inpatient settings for this painful condition, an average of six per day. NAS has become so prevalent in Ohio Communities that the state's Department of Health now recommends screening all newborns for this condition.

187. This dramatic rise in NAS may be described as an epidemic within an epidemic. According to the Ohio Perinatal Quality Collaborative, the "NAS epidemic is steadily increasing, overwhelming social service systems and public payers."[75] In 2013, the average inpatient stay and bill for babies suffering from NAS was four times longer and four times higher than for other infants in Ohio. Newborns with NAS spent approximately 26,000 days in Ohio hospitals in 2014, with health care costs totaling $105 million. Ohio's healthcare system alone has contributed more

---

[75] Neonatal Abstinence Syndrome Project, OPQC, Ohio Perinatal Quality Collaborative, *available at* https://opqc.net/projects/NAS.

than $133 million to NAS-related hospital charges in 2015.  From 2011 to 2015, 97 babies were hospitalized for NAS in Stark County.

188.    Further, "[c]hildren of parents addicted to opiates," have been described as the "invisible victims of the epidemic," are "flooding into the state's child protection system."[76] Statewide, the opioid epidemic is largely responsible for the 9% increase in the numbers of children - nearly 1,100 – placed in the care of Ohio child protection agencies between 2011 and 2015. Seventy percent of infants placed in Ohio's foster care system are children of parents with opioid addictions.  Further, these figures do not account for children who are placed in kinship care or who receive public services without being displaced from their homes.

189.    In Stark County, the number of children in foster care has increased.  In December 2016, the number of children in the custody of the Department of Job and Family services was approximately 360.   In December 2017, the number of children in custody increased to 383. Additionally, the Department has experienced an increase in calls alleging abuse or neglect.  In 2017, the Department averaged 628 calls per month, which was 60 calls higher per month than 2016. Approximately one-third of these calls involve allegations of parental drug abuse, however, this number is likely under-reported.  The County is in need of additional foster homes, and the County Children Services Department describes opioids as a huge problem and one that prevents children from remaining in the home.

190.    Children removed from homes with drug abuse tend to stay in foster care longer and to enter foster care having experienced more significant trauma, which makes their care more expensive.  "Many of these kids watched their parents overdose or die," according to the executive

---

[76]    Public     Children     Services     Association     of     Ohio     (PCSAO), http://www.pcsao.org/programs/opiate-epidemic

director of the Public Children Services Association of Ohio ("PCSAO"), a statewide membership organization for county children services agencies.[77]  Children may have gone days without food or supervision, and older children may have functioned as surrogate parents to their younger siblings, reported Ohio's Attorney General.[78]  A statewide report found that increasingly, children entering the foster care system from homes with drug abuse are dealing with significant mental health issues, requiring intensive treatment that may cost as much as $200 to $400 a day, because of what they have seen or experienced.  Ohio has the heaviest reliance on local dollars for child protection services of any state in the nation, with counties shouldering more than half of the costs through local government funds and dedicated levies.

191.    Rising opioid use and abuse have negative social and economic consequences far beyond overdoses in other respects as well.  According to a recent analysis by a Princeton University economist, approximately one out of every three working age men who are not in the labor force take daily prescription pain medication.  The same research finds that opioid prescribing alone accounts for 20% of the overall decline in the labor force participation for this group from 2014-16, and 25% of the decline in labor force participation among women.  Many of those taking painkillers still said they experienced pain daily.  A recent report by The Ohio State University estimated that in Ohio, in 2015 alone, "opioid overdoses resulted in $3.8 billion in lost

---

[77] Chris Stewart, *Foster Care Report: 'Many of these kids watched their parents overdose or die,'* Dayton Daily News, available at https://www.mydaytondailynews.com/news/foster-care-report-many-these-kids-watched-their-parents-overdose-die/X4ytHHs6IlO5D8GseUQclK/; http://www.pcsao.org/programs/opiate-epidemic

[78] *Id.*

lifetime productivity" and "[i]n total, the cost of opioid abuse and dependency ranged from $6.6 billion to $8.8 billion."[79]

192.    The County has also faced increased costs associated with the opioid crisis. According to a study released by Ohio State University, the opioid crisis costs the County up to $499 per resident, regardless of whether they used drugs or not.  The study focused on costs associated with health care and treatment, criminal justice, lost productivity among opioid users, and lost productivity after a fatal overdose.

193.    In 2011, the County created the Opioid Task Force to address the opioid crisis. Members of the task force include law enforcement, medical professionals, treatment providers, community leaders, and parents.  The task force aims to provide resources in the community and help educate on opioid prevention and safe prescribing practices.  The task force also created a fatal overdose review committee, and established a support group for individuals and family members who have been impacted by opioid addiction.

194.    Beginning in 2012, the County also held an Opiate Symposium-Seminar for the State of Ohio to provide education and information on trends in the epidemic.

195.    The County also seeks to reach people in need of help through a new program called Project DAWN (Deaths Avoided with Naloxone).  Project Dawn is an overdose education and naloxone distribution program.  In the program, participants learn how to recognize the symptoms and signs of an opioid overdose, make an emergency 911 call, perform rescue breathing, and administer Narcan.  The program is of no cost and is available to all County residents who are 18

---

[79] C. William Swank Program in Rural-Urban Policy, Taking Measure of Ohio's Opioid Crisis, The Ohio State University (Oct. 2017) at 8.

–years-old and over.  In August 2017, DAWN was awarded $1 million by the Ohio Department of Health to expand the availability of Narcan.

196.    In October of 2017, a new 16-bed detox and recovery unit at the Alliance Community Hospital more than doubled the number of publically funded in-patient detox beds in the County.  The Stark Mental Health and Addiction Recovery (Stark MHAR) supplied $200,000 in start-up costs, and the County also provides subsidies covering a number of patients using the detox center.  In the spring of 2018, the Deliverance House II, a 17-bed facility for women undergoing detox and recovery, opened in the County.  The County supported its services through $181,000 in start-up costs, with an additional $200,000 to provide operating expenses for the first year.

197.    Stark MHAR has also been a hub for resources and treatment in the County.  The agency funds inpatient and outpatient treatment centers, prevention materials, community information festivals, pamphlets, billboards, and training.  Funding this work has cost over $4.46 million since 2015.

198.    Drug take back boxes are now available at 18 locations throughout the County. From 2013 to 2017, the County has collected more than 24,280 pounds of pills.  The boxes fill, and a local steel mill conducts a pill burn, approximately once a month.  The County also conducts a drug take back-day once a year.  Since 2010, it has collected 28,494 pounds of pills and syringes pounds during dedicated Stark County Drug Take Back Days and an additional 18,061 pounds between May 2013 and December 31, 2016 in collection boxes.

199.    The County established a new agency, the Treatment Accountability for Safer Communities Agency (TASC"), which provides peer support to people working to overcome addiction.  The agency offers various services to community members, including transportation

for meetings and appointments, sponsorship through sobriety, and assessments for drug abuse. Most recently, it placed peers in emergency rooms to be prepared to help when an overdose call comes in. This new program cost more than $399,000 from April 2017 to May 2018 and has increased the number of people getting into treatment and connected to additional treatment.

200. The County operates an Opiate Hotline, designed for those in crisis and in need of assistance to recover from addiction. A pilot program in the jail trains individuals to use Narcan kits and provides kits to people considered at risk of overdose following release. Another pilot program connected to the jail provides Vivitrol as a way of helping with withdrawal from opiates and aiding in recovery from addiction.

201. In addition to its own efforts, the County funds the Stark Wide Approach to Prevention ("SWAP"), a needle exchange program used for the prevention of disease and harm reduction, and administered through the Canton City Health Department. The program has served more than 190 people, and made 35 substance use referrals. The County also supports a program helping families combat heroin addiction and abuse, which uses an annual event to fund day camps throughout the summer.

202. The County has expended substantial resources combatting the opioid epidemic, which has placed significant burdens on its social, criminal justice, and emergency response services. Since, 2015, it has spent more than $73,000 on Narcan alone. Further, from January 1, 2011 until January 1, 2018, the County health plan spent $235,441.53 on opioid medications. The County has had to pay for opioid prescriptions, related doctor visits, and opioid addiction treatment services through its self-funded health care and workers compensation programs. Even the County library has been impacted. In response to needles found laying about, the Stark County District Library installed containers for safe disposal.

### D.     STATUTES OF LIMITATIONS ARE TOLLED AND DEFENDANTS ARE ESTOPPED FORM ASSERTING STATUTES OF LIMITATIONS AS DEFENSES.

#### 1.     Continuing Conduct.

203.     The County contends it continues to suffer harm from the unlawful actions by the Defendants.

204.     The continued tortious and unlawful conduct by the Defendants causes a repeated or continuous injury.  The damages have not occurred all at once but have continued to occur and have increased as time progresses.  The tort is not completed nor have all the damages been incurred until the wrongdoing ceases.  The wrongdoing and unlawful activity by Defendants has not ceased.  The public nuisance remains unabated.  The conduct causing the damages remains unabated.

#### 2.     Equitable Estoppel and Fraudulent Concealment

205.     Defendants are equitably estopped from relying upon a statute of limitations defense because they undertook active efforts to deceived Plaintiff and to purposefully conceal their unlawful conduct and fraudulently assure the public, including the State and the County that they were undertaking efforts to comply with their obligations under the state and federal controlled substances laws, all with the goal of protecting their registered distributor status in the State and to continue generating profits.  Notwithstanding the allegations set forth above, the Defendants affirmatively assured the public, including the State and the County, that they are working to curb the opioid epidemic.

206.     Defendants deliberately and successfully concealed from the medical community, patients, and the County facts sufficient to arouse suspicion of the claims that the County now asserts.  The County did not know of the existence or scope of these Defendants' fraud and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

74

207.    Defendants also fraudulently concealed their misconduct.  They have declined to release the ARCOS data which provides detailed tracking information about their shipments.  In addition, as explained above, these Defendants publicly portray themselves as maintaining sophisticated technology as part of a concerted effort to thwart diversion and publically portray themselves as committed to fighting the opioid epidemic.  However, their public pronouncements are at odds with their concealed misconduct.

208.    To the extent that information about Defendants' violations of the federal CSA and its implementing regulations was disclosed through settlement agreements, that information, until McKesson's 2017 settlement, concerned facilities outside Ohio.  Further, such settlement agreements have typically been followed by or coupled with promises to improve compliance.

### E.    FACTS PERTAINING TO CLAIMS UNDER THE OHIO CORRUPT PRACTICES ACT ("OCPA")

209.    Faced with the reality that they will now be held accountable for the consequences of the opioid epidemic they created, members of the industry resort to "a categorical denial of any criminal behavior or intent."[80]  Defendants' actions went far beyond what could be considered ordinary business conduct.  For more than a decade, Defendants AmerisourceBergen, Cardinal, and McKesson (the "Supply Chain Defendants") worked together in an illicit enterprise, engaging in conduct that was not only illegal, but in certain respects anti-competitive, with the common purpose and achievement of vastly increasing their respective profits and revenues by exponentially expanding a market that the law intended to restrict.

210.    As explained above, Ohio statutes and regulations, as well as the federal CSA and its implementing regulations, require that companies who are entrusted with permission to operate

---

[80] http://www.mckesson.com/about-mckesson/fighting-opioid-abuse/60-minutes-response

within the closed system of opioid distribution cannot simply operate as competitive in an "anything goes" profit-maximizing market. Instead, they must watch over themselves and each other with a careful eye for suspicious activity. Driven by greed, Defendants betrayed that trust and subverted the constraints of these laws and the closed system to conduct their own enterprise for evil.

211.    As "registrants" under the CSA, the Supply Chain Defendants are duty bound to identify and report "orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency."[81] Ohio law imposes requirements that are no less stringent.

212.    If morality and the law did not suffice, competition dictates that the Supply Chain Defendants would turn in their rivals when they had reason to suspect suspicious activity. Indeed, if a company could gain market share by reporting a competitor's illegal behavior (causing it to lose a license to operate, or otherwise inhibit its activity), ordinary business conduct dictates that it would do so. Unfortunately, however, that is not what happened. Instead, knowing that investigations into potential diversion would only lead to shrinking markets, Defendants elected to operate in a conspiracy of silence, in violation of both the CSA, Ohio law, including the Ohio Corrupt Practices Act ("OCPA").

213.    The Supply Chain Defendants' scheme required the participation of all. If any one member broke rank, its compliance activities would highlight deficiencies of the others, and the artificially sales they maintained through their scheme would crumble. But, if all the members of the enterprise conducted themselves in the same manner, it would be difficult for the DEA to go after any one of them. Accordingly, through the connections they made as a result of their participation in the Healthcare Distribution Alliance ("HDA"), the Supply Chain Defendants chose

---

[81] 21 C.F.R. 1301.74(b).

to flout the closed system designed to protect the citizens.  Publicly, in 2008, they announced their formulation of "Industry Compliance Guidelines:  Reporting Suspicious Orders and Prevention Diversion of Controlled Substances."  But, privately, Defendants refused to act and through their lobbying efforts, they collectively sought to undermine the impact of the CSA.  Indeed, despite the issuance of these Industry Compliance Guidelines, which recognize these Defendants' duties under the law, as illustrated by the subsequent industry-wide enforcement actions and consent orders issued after that time, none of them complied.  John Gray, President and CEO of the HDA said to Congress in 2014, it is "difficult to find the right balance between proactive anti-diversion efforts while not inadvertently limiting access to appropriately prescribed and dispensed medications."  Yet, the Supply Chain Defendants apparently all found the same profit-maximizing balance -- intentionally remaining silent to ensure the largest possible financial return.

214.    As described above, at all relevant times, the Supply Chain Defendants operated as an association-in-fact enterprise formed for the purpose of unlawfully increasing sales, revenues, and profits by fraudulently increasing sales and collectively benefitting from a greater pool of prescription opioids to distribute.  In support of this common purpose and fraudulent scheme, the Defendants jointly agreed to disregard their statutory duties to identify, investigate, halt and report suspicious orders of opioids and diversion of their drugs into the illicit market so that those orders would not result in a decrease, or prevent an increase in, their sales and profits.

215.    At all relevant times, as described above, the Supply Chain Defendants exerted control over, conducted and/or participated in the Opioid Supply Chain Enterprise by fraudulently claiming that they were complying with their duties under the CSA to identify, investigate and report suspicious orders of opioids in order to prevent diversion of those highly addictive

substances into the illicit market, and to halt such unlawful sales, so as to increase sales and generate unlawful profits, as follows:

216.    The Supply Chain Defendants disseminated false and misleading statements to state and federal regulators claiming that:

       a.  they were complying with their obligations to maintain effective controls against diversion of their prescription opioids;

       b.  they were complying with their obligations to design and operate a system to disclose to the registrant suspicious orders of their prescription opioids;

       c.  they were complying with their obligation to notify the DEA of any suspicious orders or diversion of their prescription opioids; and

       d.  they did not have the capability to identify suspicious orders of controlled substances or were in the midst of a learning curve.

217.    The Defendants applied political and other pressure on the DOJ and DEA to halt prosecutions for failure to report suspicious orders of prescription opioids and lobbied Congress to strip the DEA of its ability to immediately suspend registrations pending investigation by passing the "Ensuring Patient Access and Effective Drug Enforcement Act."[82]

218.    The CSA and the Code of Federal Regulations, require the Supply Chain Defendants to make reports to the DEA of any suspicious orders identified through the design and

---

[82] *See HDMA is now the Healthcare Distribution Alliance*, Pharmaceutical Commerce, (June 13, 2016, updated July 6, 2016), http://pharmaceuticalcommerce.com/business-and-finance/hdma-now-healthcare-distribution-alliance/; Lenny Bernstein & Scott Higham, *Investigation: The DEA Slowed Enforcement While the Opioid Epidemic Grew Out of Control*, Wash. Post, Oct. 22, 2016, https://www.washingtonpost.com/investigations/the-dea-slowed-enforcement-while-the-opioid-epidemic-grew-out-of-control/2016/10/22/aea2bf8e-7f71-11e6-8d13-d7c704ef9fd9_story.html; Lenny Bernstein & Scott Higham, *Investigation: U.S. Senator Calls for Investigation of DEA Enforcement Slowdown Amid Opioid Crisis*, Wash. Post, Mar. 6, 2017, https://www.washingtonpost.com/investigations/us-senator-calls-for-investigation-of-dea-enforcement-slowdown/2017/03/06/5846ee60-028b-11e7-b1e9-a05d3c21f7cf_story.html; Eric Eyre, *DEA Agent: "We Had no Leadership" in WV Amid Flood of Pain Pills*, Charleston Gazette-Mail, Feb. 18, 2017, http://www.wvgazettemail.com/news/20170218/dea-agent-we-had-no-leadership-in-wv-amid-flood-of-pain-pills-.

operation of their system to disclose suspicious orders. The failure to make reports as required by the CSA and Code of Federal Regulations amounts to a criminal violation of the statute.

219. The Supply Chain Defendants knowingly and intentionally furnished false or fraudulent information in their reports to the DEA about suspicious orders, and/or omitted material information from reports, records and other documents required to be filed with the DEA. Specifically, the Supply Chain Defendants were aware of suspicious orders of prescription opioids and the diversion of their prescription opioids into the illicit market, and failed to report this information to the DEA in their mandatory reports.

220. The Supply Chain Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments and material omissions regarding their compliance with their mandatory reporting requirements and the actions necessary to carry out their unlawful goal of selling prescription opioids without reporting suspicious orders or the diversion of opioids into the illicit market.

221. In devising and executing the illegal scheme, the Supply Chain Defendants devised and knowingly carried out a material scheme and/or artifice to defraud by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts.

222. For the purpose of executing the illegal scheme, the Supply Chain Defendants committed incidents of corrupt activity, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal scheme. These incidents of corrupt activity, which included repeated acts of mail fraud, wire fraud, and telecommunications fraud, constituted a pattern of corrupt activity.

223. The Supply Chain Defendants' use of the mail and wires includes, but is not limited to, the transmission, delivery, or shipment of the following by the Distributor Defendants or third parties that were foreseeably caused to be sent as a result of the Defendants' illegal scheme, including but not limited to:

    a.  The prescription opioids themselves;

    b.  Documents and communications that facilitated the purchase and sale of prescription opioids;

    c.  Supply Chain Defendants' DEA registrations and state registrations or licenses;

    d.  Documents and communications that supported and/or facilitated Supply Chain Defendants' DEA registrations and state licenses or registrations;

    e.  Supply Chain Defendants' records and reports that were required to be submitted to the DEA pursuant to 21 U.S.C. § 827;

    f.  Documents and communications related to the Supply Chain Defendants' mandatory DEA reports pursuant to 21 U.S.C. § 823 and 21 C.F.R. § 1301.74;

    g.  Documents intended to facilitate the distribution of Defendants' prescription opioids, including bills of lading, invoices, shipping records, reports and correspondence;

    h.  Documents for processing and receiving payment for prescription opioids;

    i.  Payments to the Supply Chain Defendants' lobbyists through the PCF;

    j.  Payments to the Supply Chain Defendants' trade organizations, like the HDA, for memberships and/or sponsorships;

    k.  Deposits of proceeds from the Supply Chain Defendants' distribution of prescription opioids; and

    l.  Other documents and things, including electronic communications.

224. Each of the Supply Chain Defendants identified shipped, paid for and received payment for the drugs identified above, throughout the United States.

225.    The Supply Chain Defendants used the internet and other electronic facilities to carry out their scheme and conceal the ongoing fraudulent activities.  Specifically, the Supply Chain Defendants made misrepresentations about their compliance with Federal and State laws requiring them to identify, investigate and report suspicious orders of prescription opioids and/or diversion of the same into the illicit market.

226.    At the same time, the Supply Chain Defendants misrepresented the superior safety features of their order monitoring programs, ability to detect suspicious orders, commitment to preventing diversion of prescription opioids, and their compliance with all state and federal regulations regarding the identification and reporting of suspicious orders of prescription opioids.

227.    The Supply Chain Defendants utilized the internet and other electronic resources to exchange communications, to exchange information regarding prescription opioid sales, and to transmit payments and rebates/chargebacks.

228.    The Supply Chain Defendants also communicated by U.S. Mail, by interstate facsimile, and by interstate electronic mail with each other and with various other affiliates, regional offices, regulators, distributors, and other third-party entities in furtherance of the scheme.

229.    The mail and wire transmissions described herein were made in furtherance of the Supply Chain Defendants' scheme and common course of conduct to deceive regulators, the public and the Plaintiffs that these Defendants were complying with their state and federal obligations to identify, halt, and report suspicious orders of prescription opioids all while Defendants were knowingly allowing millions of doses of prescription opioids to divert into the illicit drug market. The Supply Chain Defendants' scheme and common course of conduct was to increase or maintain high sales for their prescription opioids from which they could profit.

230.    Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden by Defendants and cannot be alleged without access to Defendants' books and records. However, the County has described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the scheme, including the things and documents described in the preceding paragraphs.

231.    The Supply Chain Defendants did not undertake the practices described herein in isolation, but as part of a common scheme.

232.    The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from the sale of their highly addictive and dangerous drugs. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

233.    The predicate acts all had the purpose of creating the opioid epidemic that substantially injured Plaintiffs' business and property, while simultaneously generating billion-dollar revenue and profits for the Supply Chain Defendants. The predicate acts were committed or caused to be committed by the Defendants through their participation in the Opioid Supply Chain Enterprise and in furtherance of its fraudulent scheme.

234.    As described above, the Supply Chain Defendants were repeatedly warned, fined, and found to be in violation of applicable law and regulations, and yet they persisted. The sheer volume of enforcement actions against the Supply Chain Defendants supports this conclusion that the Supply Chain Defendants operated through a pattern and practice of willfully and intentionally omitting information from their mandatory reports to the DEA as required by 21 C.F.R. § 1301.74.

235.   Each instance of corrupt activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, Stark County, and its residents. The Supply Chain Defendants calculated and intentionally crafted the diversion scheme to increase and maintain profits from unlawful sales of opioids, without regard to the effect such behavior would have on the County and its residents. The Supply Chain Defendants were aware that the County and its residents rely on these Defendants to maintain a closed system of distribution to protect against the non-medical diversion and use of their dangerously addictive opioid drugs.

236.   By intentionally refusing to report and halt suspicious orders of their prescription opioids, the Supply Chain Defendants engaged in a fraudulent scheme and unlawful course of conduct constituting a pattern of corrupt activity.

## CAUSES OF ACTION

### COUNT I
### Statutory Public Nuisance
### (Against All Defendants)
***(Brought by the County of Stark Board of Commissioners and the State of Ohio ex rel. John D. Ferrero Prosecuting Attorney, each as the Plaintiff in this Count)***

237.   Plaintiff incorporates the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

238.   The Prosecuting Attorney for Stark County, John D. Ferrero, brings this claim in the name of the State of Ohio pursuant to the statutory authority granted under R.C. § 3767.03, to abate a public nuisance and to enjoin further maintenance of the nuisance. R.C. § 3767.03 provides: "Whenever a nuisance exists the attorney general; the village solicitor, city director of law, or other similar chief legal officer of the municipal corporation in which the nuisance exists; the prosecuting attorney of the county in which the nuisance exists; the law director of a township that

has adopted a limited home rule government under Chapter 504. of the Revised Code; or any person who is a citizen of the county in which the nuisance exists may bring an action in equity in the name of the state, upon the relation of the attorney general; the village solicitor, city director of law, or other similar chief legal officer of the municipal corporation; the prosecuting attorney; the township law director; or the person, to abate the nuisance and to perpetually enjoin the person maintaining the nuisance from further maintaining it."

239.   The Prosecuting Attorney for Stark County also brings this claim in the name of the State of Ohio pursuant to the statutory authority granted under O.R.C. § 4729.35 to enjoin a violation of that statute.

240.   Ohio statutory law provides that "[a]s used in all sections of the Revised Code relating to nuisances . . . (C) "Nuisance" means any of the following: . . . (1) [t]hat which is defined and declared by statutes to be a nuisance . . . ." R.C. § 3767.01.

241.   Ohio statutory law "declare[s] to be inimical, harmful, and adverse to the public welfare of the citizens of Ohio and to constitute a public nuisance" "[t]he violation by a pharmacist or other person of any laws of Ohio or of the United States of America or of any rule of the board of pharmacy controlling the distribution of a drug of abuse as defined in section 3719.011 of the Revised Code . . . ." R.C. § 4729.35.

242.   Opioids are "a drug of abuse" as defined in R.C. § 3719.011.

243.   Under R.C. § 3767.02, "Any person, who uses, occupies, establishes, or conducts a nuisance, or aids or abets in the use, occupancy, establishment, or conduct of a nuisance; the owner, agent, or lessee of an interest in any such nuisance; any person who is employed in that nuisance by that owner, agent, or lessee; and any person who is in control of that nuisance is guilty

84

of maintaining a nuisance and shall be enjoined as provided in sections 3767.03 to 3767.11 of the Revised Code."

244.    Defendants are persons who have established or conducted a nuisance, who have aided or abetted in the establishment or conduct of a nuisance, and/or who are in control of a nuisance and guilty of maintaining a nuisance; as defined in R.C. § 3767.02.

245.    Defendants are persons who have violated, and/or who have aided and abetted the violation of the laws of Ohio or of the United States of America or of any rule of the board of pharmacy controlling the distribution of a drug of abuse as defined in R.C. § 3719.011.

246.    In the distribution, dispensing, and sale of opioids in Stark County, Defendants violated and/or aided and abetted the violation of Ohio law, including, but not limited to, R.C. § 4729.01(F), R.C. §§ 4729.51-4729.53, and Ohio Admin. Code ("O.A.C.") §§ 4729-9-12, 4729-9-16, 4729-9-28, 4729-9-05(A), 4729-9-11, 4729-5-20(G), 4729-5-21(A), 4729-5-30(A), and federal law, including, but not limited to, 21 U.S.C.A. § 823 and 21 CFR § 1301.74.

247.    Defendants' unlawful conduct includes violating and/or aiding and abetting the violation of federal and Ohio statutes and regulations, including the controlled substances laws, by, *inter alia*:

    a.    Distributing, dispensing, and/or selling opioids in ways that facilitated and encouraged their flow into the illegal, secondary market;

    b.    Distributing, dispensing, and/or selling opioids without maintaining effective controls against the diversion of opioids;

    c.    Choosing not to stop or suspend shipments of suspicious orders; and

    d.    Distributing, dispensing, and/or selling opioids prescribed by "pill mills" when Defendants knew or should have known the opioids were being prescribed by "pill mills."

248.    In the distribution and sale of opioids in Ohio and Stark County, Defendants violated and/or aided and abetted violations of R.C. § 2925.02(A), which states: "No person shall knowingly do any of the following:

(1) By force, threat, or deception, administer to another or induce or cause another to use a controlled substance; . . . or

(3) By any means, administer or furnish to another or induce or cause another to use a controlled substance, and thereby cause serious physical harm to the other person, or cause the other person to become drug dependent."

249.    The exemption in R.C. § 2925.02 only applies to drug wholesalers, distributors, and pharmacies when their "conduct is in accordance with Chapters RC 3719., 4715., 4723., 4729., 4730., 4731., and 4741." R.C. § 2925.02(B). Defendants are not in compliance with said Chapters and have thereby forfeited the protection provided by the exception.

250.    Defendants' conduct entails a pervasive pattern and practice of violating the statutes and regulations set forth above. Defendants' systemic failure to adhere to Ohio and federal controlled substances statutes and regulations has created an ongoing, significant, unlawful, and unreasonable interference with the public health, welfare, safety, peace, comfort, and convenience in Stark County.

251.    Defendants had control over their conduct in Stark County and that conduct has had an adverse effect on the public right.  Defendants had control over their own shipments of opioids and over their reporting, or lack thereof, of suspicious prescribers and orders. The Chain Pharmacies controlled their dispensing of opioids.  Each of the Defendants controlled the systems they developed to prevent diversion, and whether they filled orders they knew or should have known were likely to be diverted or fuel an illegal market.

252.    The nuisance created by Defendants' conduct is abatable.

253.    Defendants' misconduct alleged in this case is ongoing and persistent.

86

254.     Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur, and is not part of the normal and expected costs of a local government's existence.  The Plaintiff alleges wrongful acts which are neither discrete nor of the sort a local government can reasonably expect.

255.     The Plaintiff has incurred expenditures for special programs over and above its ordinary public services.

256.     The unlawful conduct of each Defendant was a substantial factor in producing harm to the Plaintiff.

257.     The Plaintiff seeks abatement, recovery of abatement costs, injunctive relief, and to prevent injury and annoyance from any nuisance.

258.     The Plaintiff seeks all other equitable relief as allowed by law.

## COUNT II
### Common Law Absolute Public Nuisance
### (Against All Defendants)
### (Brought by the County of Stark Board of Commissioners, the Plaintiff in this Count)

259.     The County incorporates the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

260.     Defendants created and maintained a public nuisance which proximately caused injury to the County.

261.     A public nuisance is an unreasonable interference with a right common to the general public.

262.     Defendants have created and maintained a public nuisance by distributing and selling opioids in ways that unreasonably interfere with the public health, welfare, and safety in Stark County, and the County and its residents have a common right to be free from such conduct

87

and to be free from conduct that creates a disturbance and reasonable apprehension of danger to person and property.

263.    The public nuisance is an *absolute* public nuisance because Defendants' nuisance-creating conduct was intentional and unreasonable and/or violated statutes which established specific legal requirements for the protection of others.

264.    Defendants have created and maintained an absolute public nuisance through their ongoing conduct of distributing and selling opioids, which are dangerously addictive drugs, in a manner which caused prescriptions and sales of opioids to skyrocket in Stark County, flooded Stark County with opioids, and facilitated and encouraged the flow and diversion of opioids into an illegal, secondary market, resulting in devastating consequences to the County and its residents.

265.    Defendants know, and have known, that their intentional, unreasonable, and unlawful conduct will cause, and has caused, opioids to be used and possessed illegally and that their conduct has produced an ongoing nuisance that has had, and will continue to have, a detrimental effect upon the public health, welfare, safety, peace, comfort, and convenience of Stark County and its residents.

266.    Defendants' conduct has created an ongoing, significant, unlawful, and unreasonable interference with rights common to the general public, including the public health, welfare, safety, peace, comfort, and convenience of Stark County and its residents.  *See* Restatement (Second) of Torts § 821B.

267.    The interference is unreasonable because Defendants' nuisance-creating conduct:

      a.    Involves a significant interference with the public health, the public safety, the public peace, the public comfort, and/or the public convenience;

      b.    At all relevant times was and is proscribed by state and federal laws and regulations; and/or

c.      Is of a continuing nature and, as Defendants know, has had and is continuing to have a significant effect upon rights common to the general public, including the public health, the public safety, the public peace, the public comfort, and/or the public convenience.

268.    The significant interference with rights common to the general public is described in detail throughout this Complaint and includes:

a.      The creation and fostering of an illegal, secondary market for prescription opioids;

b.      Easy access to prescription opioids by children and teenagers;

c.      A staggering increase in opioid abuse, addiction, overdose, injuries, and deaths;

d.      Infants being born addicted to opioids due to prenatal exposure, causing severe withdrawal symptoms and lasting developmental impacts;

e.      Employers have lost the value of productive and healthy employees; and

f.      Increased costs and expenses for the County relating to healthcare services, law enforcement, the criminal justice system, social services, and education systems.

269.    Defendants intentionally and unreasonably and/or unlawfully pushed as many opioids onto the market as possible, fueling addiction to and diversion of these powerful narcotics, resulting in increased addiction and abuse, an elevated level of crime, death and injuries to the residents of Stark County, a higher level of fear, discomfort and inconvenience to the residents of Stark County, and direct costs to the County.

270.    Each Defendant is liable for creating the public nuisance because the intentional and unreasonable and/or unlawful conduct of each Defendant was a substantial factor in producing the public nuisance and harm to the County.

271.    A violation of any rule or law controlling the sale and/or distribution of a drug of abuse in Stark County constitutes an absolute public nuisance. *See e.g.* R.C. § 4729.35 ("The

violation by a . . . person of any laws of Ohio or of the United States of America or of any rule of the board of pharmacy controlling the distribution of a drug of abuse . . . constitute[s] a public nuisance[.]").

272.   In the sale, dispensing, and distribution of opioids in Ohio and Stark County, Defendants violated federal law, including, but not limited to, 21 U.S.C.A. § 823 and 21 C.F.R. § 1301.74, and Ohio law, including, but not limited to, R.C. § 4729.01(F), R.C. §§ 4729.51-4729.53, and O.A.C. §§ 4729-912, 4729-9-16, 4729-9-28, 4729-9-28, 4729-9-05(A), 4729-9-11, 4729-5-20(G), 4729-5-21(A), and 4729-5-30(A).

273.   Defendants' unlawful nuisance-creating conduct includes violating federal and Ohio statutes and regulations, including the controlled substances laws, by:

      a.    Distributing, dispensing, and/or selling opioids in ways that facilitated and encouraged their flow into the illegal, secondary market;

      b.    Distributing, dispensing, and/or selling opioids without maintaining effective controls against the diversion of opioids;

      c.    Choosing not to effectively monitor for suspicious orders;

      d.    Choosing not to investigate suspicious orders;

      e.    Choosing not to report suspicious orders;

      f.    Choosing not to stop or suspend shipments of suspicious orders; and

      g.    Distributing, dispensing, and/or selling opioids prescribed by "pill mills" when Defendants knew or should have known the opioids were being prescribed by "pill mills."

274.   Defendants' intentional and unreasonable nuisance-creating conduct, for which the gravity of the harm outweighs the utility of the conduct, includes:

      a.    Distributing, dispensing, and/or selling opioids in ways that facilitated and encouraged their flow into the illegal, secondary market;

      b.    Distributing, dispensing, and/or selling opioids without maintaining effective controls against the diversion of opioids;

c.   Choosing not to effectively monitor for suspicious orders;

d.   Choosing not to investigate suspicious orders;

e.   Choosing not to report suspicious orders;

f.   Choosing not to stop or suspend shipments of suspicious orders; and

g.   Distributing, dispensing, and/or selling opioids prescribed by "pill mills" when Defendants knew or should have known the opioids were being prescribed by "pill mills."

275.   Defendants intentionally and unreasonably distributed and sold opioids that Defendants knew would be diverted into the illegal, secondary market and would be obtained by persons with criminal purposes.

276.   As evidence of addiction and abuse of opioids widened, Defendants were obligated to rein in their supply, prevent diversion, and mitigate the harms from opioid overuse and abuse, but intentionally and unreasonably failed to do so.

277.   In the distribution and sale of opioids in Ohio and Stark County, Defendants violated and/or aided and abetted violations of R.C. § 2925.02(A), which states: "No person shall knowingly do any of the following:

(1) By force, threat, or deception, administer to another or induce or cause another to use a controlled substance; . . . or

(3) By any means, administer or furnish to another or induce or cause another to use a controlled substance, and thereby cause serious physical harm to the other person, or cause the other person to become drug dependent."

278.   Defendants are in the business of selling, dispensing, and/or distributing prescription drugs, including opioids, which are specifically known to Defendants to be dangerous because *inter alia* these drugs are defined under federal and state law as substances posing a high potential for abuse and addiction.

279.     Indeed, opioids are akin to medical grade heroin. Defendants' wrongful conduct of disregarding their obligations to maintain effective controls against diversion and pushing as many opioids onto the market as possible led directly to the public nuisance and harm to the County— exactly as would be expected when medical-grade heroin in the form of prescription opioids are deceptively marketed, flood the community, and are diverted into an illegal, secondary market.

280.     Defendants had control over their conduct in Stark County and that conduct has had an adverse effect on rights common to the general public.  Defendants had control over their own shipments of opioids and over their reporting, or lack thereof, of suspicious prescribers and orders. The Chain Pharmacies controlled their dispensing of opioids.  Each of the Defendants controlled the systems they developed to prevent diversion, including whether they filled orders they knew or should have known were likely to be diverted or fuel an illegal market.

281.     It was reasonably foreseeable that Defendants' actions and omissions would result in the public nuisance and harm to the County described herein.

282.     Because of Defendants' special positions within the closed system of opioid distribution, without Defendants' actions, opioid use would not have become so widespread, and the enormous public health hazard of prescription opioid and heroin overuse, abuse, and addiction that now exists would have been averted.

283.     The public nuisance created by Defendants' actions is substantial and unreasonable. It has caused and continues to cause significant harm to Stark County and the harm inflicted outweighs any offsetting benefit.

284.     The externalized risks associated with Defendants' nuisance-creating conduct as described herein greatly exceed the internalized benefits.

285.    As a direct and proximate result of Defendants' wrongful conduct and the public nuisance created by Defendants, the County has taken proactive measures to abate the public nuisance, and the County seeks to expand these efforts.

286.    The nuisance created by Defendants' conduct is abatable.

287.    Defendants' misconduct alleged in this case is ongoing and persistent.

288.    Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur, and is not part of the normal and expected costs of a local government's existence. The County alleges wrongful acts which are neither discrete nor of the sort a local government can reasonably expect.

289.    In order to abate the public nuisance, the County has incurred expenditures for special programs over and above its ordinary public services.

290.    The County seeks to abate the nuisance created by the Defendants' unreasonable, unlawful, intentional, ongoing, continuing, and persistent actions and omissions and unreasonable interference with rights common to the general public.

291.    The County has suffered, and will continue to suffer, unique harms as described in this Complaint, which are of a different kind and degree than Ohio citizens at large. These are harms that can only be suffered by the County.

292.    The County is asserting its own rights and interests and its claims are not based upon or derivative of the rights of others.

293.    The tortious conduct of each Defendant was a substantial factor in creating the absolute public nuisance.

294.    The tortious conduct of each Defendant was a substantial factor in producing harm to the County.

295.    The County has suffered an indivisible injury as a result of the tortious conduct of Defendants.

296.    Defendants acted with actual malice because Defendants acted with a conscious disregard for the rights and safety of other persons, and said actions had a great probability of causing substantial harm.

297.    The County asserts this Cause of Action as a common law tort claim for absolute public nuisance and not as a "product liability claim" as defined in R.C. § 2307.71. In this Count, the County does not seek damages for death, physical injury to person, emotional distress, or physical damage to property, as defined under the Ohio Product Liability Act.

298.    The County seeks all equitable relief as allowed by law, including *inter alia* injunctive relief, restitution, disgorgement of profits, attorney fees and costs, and pre- and post-judgment interest.

## COUNT III
### Common Law Qualified Public Nuisance
### (Against All Defendants)
### *(Brought by the County of Stark Board of Commissioners, the Plaintiff in this Count)*

299.    The County incorporates the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

300.    The excessive and unreasonable oversupply of Opioids in Stark County constitutes a public nuisance in that it unreasonably interfered with rights common to the general public, including the public health, welfare, safety, peace, comfort, and convenience of Stark County and its residents. *See* Restatement (Second) of Torts § 821B.

301.    The significant interference with rights common to the general public is described in detail throughout this Complaint and includes:

94

a. A staggering increase in opioid abuse, addiction, overdose, injuries, and deaths throughout the County, including infants who are born addicted to opioids due to prenatal exposure;

b. A corresponding increase in abuse, addiction, overdose, injuries and deaths related to the transition from opioid pills to heroin, fentanyl, and carfentanyl;

c. The necessity for governmental intervention from Federal, State and Local governments to provide services for, among other things, healthcare, law enforcement, criminal justice, social services, and education related to the Opioid epidemic;

302. Defendants' conduct in distributing, dispensing, and selling opioids created or contributed to the creation or maintenance of this public nuisance. Defendants' conduct caused prescriptions and sales of opioids to skyrocket in Stark County and flooded the County with opioids, and facilitated and encouraged the flow and diversion of opioids into an illegal, secondary market, resulting in devastating consequences to the County and its residents.

303. All Defendants' created or contributed to the creation and/or maintenance of the public nuisance by:

a. negligently, unreasonably and/or unlawfully distributing, dispensing, and/or selling opioids in ways that facilitated and encouraged their flow into the illegal, secondary market;

b. negligently, unreasonably and/or unlawfully distributing, dispensing, and/or selling opioids without maintaining effective controls against the diversion of opioids;

c. negligently, unreasonably and/or unlawfully failing to effectively monitor for suspicious orders;

d. negligently, unreasonably and/or unlawfully failing to investigate suspicious orders;

e. negligently, unreasonably and/or unlawfully failing to report suspicious orders;

f. negligently, unreasonably and/or unlawfully failing to stop or suspend shipments of suspicious orders; and

95

g. negligently, unreasonably and/or unlawfully distributing, dispensing, and/or selling opioids prescribed by "pill mills" when Defendants knew or should have known the opioids were being prescribed by "pill mills."

304. Defendants know, and should have known, that their unreasonable, and unlawful conduct does cause, has caused, and will continue to cause, excessive availability of opioids in Stark County and that their conduct has produced an ongoing nuisance that has had, and will continue to have, a detrimental effect upon the public health, welfare, safety, peace, comfort, and convenience of Stark County and its residents.

305. Despite this knowledge, Defendants negligently, unreasonably and/or unlawfully pushed as many opioids onto the market as possible, fueling addiction to and diversion of these powerful narcotics.

306. Defendants owed the County legal duties, including:

a. a preexisting duty, to not expose the County and its residents to an unreasonable risk of harm. Defendants' conduct, as detailed herein, breached that duty

b. a duty to exercise reasonable and ordinary care and skill in accordance with applicable standards of conduct in selling, dispensing, and/or distributing opioids

c. a duty not to breach the standard of care established under Ohio law and the federal Controlled Substances Act ("CSA") and their respective implementing regulations to report suspicious prescribing and to maintain systems to detect and report such activity.

307. As evidence of addiction and abuse of opioids widened, Defendants were obligated to rein in their supply, prevent diversion, and mitigate the harms from opioid overuse and abuse, but intentionally and unreasonably failed to do so.

308. The degree of care the law requires is commensurate with the risk of harm the conduct creates. Defendants' conduct in distributing, dispensing, and selling dangerously

addictive drugs requires a high degree of care and places them in a position of great trust and responsibility *vis a vis* the County. Their duty cannot be delegated.

309.   Each Defendant breached its duty to exercise the degree of care, prudence, watchfulness, and vigilance commensurate with the dangers involved in selling dangerous controlled substances.

310.   The County does not only allege that Defendants were negligent for failure to protect from harm. Defendants engaged in affirmative conduct, the foreseeable result of which was to cause harm to the County.

311.   It was reasonably foreseeable that Defendants' actions and omissions would result in the public nuisance and harm to the County described herein. Reasonably prudent manufacturers, distributors, and dispensers of prescription opioids would have anticipated that the conduct alleged herein would create a public nuisance in the County, and that the public nuisance created would unreasonably interfere with the public health, safety, comfort and convenience of the County and its residents.

312.   Defendants had control over their conduct in the County and that conduct has created a public nuisance, unreasonably interfering with rights common to the general public. Defendants had control over their own shipments of opioids and over their reporting, or lack thereof, of suspicious prescribers and orders. Each of the Defendants controlled the systems it developed to prevent diversion, including whether it filled orders it knew or should have known were likely to be diverted or fuel an illegal market.

313.   The public nuisance created by Defendants' actions is substantial and unreasonable. It has caused and continues to cause significant harm to Stark County and the harm inflicted outweighs any offsetting benefit.

314.   As a direct and proximate result of Defendants' tortious conduct and the public nuisance created by Defendants, the County has taken proactive measures to abate the public nuisance, and the County seeks to expand these efforts.

315.   The nuisance created by Defendants' conduct is abatable.

316.   Defendants' misconduct alleged in this case is ongoing and persistent.

317.   Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur, and is not part of the normal and expected costs of a local government's existence. The County alleges wrongful acts which are neither discrete nor of the sort a local government can reasonably expect.

318.   The County has incurred expenditures for special programs over and above its ordinary public services.

319.   The County seeks to abate the nuisance created by the Defendants' unreasonable, unlawful, negligent, ongoing, continuing, and persistent actions and omissions and unreasonable interference with rights common to the general public.

320.   The County's claims are not based upon or derivative of the rights of others.

321.   The tortious conduct of each Defendant was a substantial factor in creating the qualified public nuisance.

322.   The qualified public nuisance was a substantial factor in producing harm to the County.

323.   The County has suffered an indivisible injury as a result of the tortious conduct of Defendants.

324.   Each Defendant is joint and severally liable for creating the public nuisance.

98

325.     The County asserts this Cause of Action as a common law tort claim for qualified public nuisance and not as a "product liability claim" as defined in R.C. § 2307.71.  In this Count, the County does not seek damages for death, physical injury to person, emotional distress, or physical damage to property, as defined under the Ohio Product Liability Act.

326.     The County seeks all equitable relief as allowed by law, including *inter alia* injunctive relief, restitution, disgorgement of profits, attorney fees and costs, and pre- and post-judgment interest.

### COUNT IV
### Violation of The Ohio Corrupt Practices Act
### Ohio Revised Code § 2923.31, *et seq.*
### Against McKesson, Cardinal, and AmerisourceBergen
### (The "Opioid Supply Chain Enterprise")
### (*Brought by The County of Stark Board of Commissioners, the Plaintiff in this Count*)

327.     The County incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges as follows.

328.     The County brings this Claim against Defendants McKesson, Cardinal, and AmerisourceBergen (the "Supply Chain Defendants"), each of whom is a "person" within the meaning of Ohio Rev. Code Ann. § 2923.31(G).

### A.     The Opioid Supply Chain Enterprise and Pattern of Corrupt Activity

329.     The Defendants are "persons" within the meaning of R.C. § 2923.31(G) who conducted the affairs of an enterprise through a pattern of corrupt activity, in violation of R.C. § 2923.31.

330.     The County is a "person," as that term is defined in R.C. § 2923.31, who was injured in its business or property as a result of Defendants' wrongful conduct.

331.     Under R.C. § 2923.32:

99

(A)(1) No person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity or the collection of an unlawful debt.

(2) No person, through a pattern of corrupt activity or the collection of an unlawful debt, shall acquire or maintain, directly or indirectly, any interest in, or control of, any enterprise or real property.

(3) No person, who knowingly has received any proceeds derived, directly or indirectly, from a pattern of corrupt activity or the collection of any unlawful debt, shall use or invest, directly or indirectly, any part of those proceeds, or any proceeds derived from the use or investment of any of those proceeds, in the acquisition of any title to, or any right, interest, or equity in, real property or in the establishment or operation of any enterprise.

332.    Defendants conducted the affairs of an enterprise through a pattern of corrupt activity, hereinafter the "Opioid Supply Chain Enterprise," in violation of R.C. § 2923.32.

333.    Defendants together were members of a legal entity enterprise within the meaning of R.C. § 2923.31(C).  These Defendants formed an association-in-fact enterprise – sometimes referred to in this Complaint as the "Opioid Supply Chain Enterprise." The Opioid Supply Chain Enterprise consists of these Defendants, including their employees and agents.  Along with the Defendants, trade organizations, including the HDA and PCF participated in the enterprise.

334.    Alternatively, each of the above-named Defendants constitutes a single legal entity or associated-in-fact "enterprise" within the meaning of R.C. § 2923.31(C), through which the members of the enterprise conducted a pattern of corrupt activity. The Supply Chain Defendants together formed an association-in-fact enterprise, the Opioid Supply Chain Enterprise, for the purpose of profiting from the increased volume of opioid sales in the United States. The Opioid Supply Chain Enterprise is an association-in-fact enterprise within the meaning of § 1961.  The Opioid Supply Chain Enterprise consists of the Supply Chain Defendants.

335.    The Supply Chain Defendants were members the Healthcare Distribution Alliance (the "HDA").  Each of the Supply Chain Defendants is a member, participant, and/or sponsor of

the HDA, and utilized the HDA to form the interpersonal relationships of the Opioid Supply Chain Enterprise and to assist them in engaging in the pattern of corrupt activity that gives rise to the Count.

336.  At all relevant times, the Opioid Supply Chain Enterprise: (a) had an existence separate and distinct from each of the Supply Chain Defendants; (b) was separate and distinct from the pattern of corrupt activity in which the Supply Chain Defendants engaged; (c) was an ongoing and continuing organization consisting of legal entities, including each of the Supply Chain Defendants; (d) was characterized by interpersonal relationships among the Supply Chain Defendants; (e) had sufficient longevity for the enterprise to pursue its purpose; and (f) functioned as a continuing unit. Each of the Supply Chain Defendants conducted and participated in the conduct of the affairs of this Enterprise through a pattern of "corrupt activities" as defined in Ohio Rev. Code Ann.§ 2923.31(I)(1) and (2).

337.  Corrupt activities as defined in R.C. § 2923.31(I) include, among other things: engaging in, attempting to engage in, conspiring to engage in, or soliciting, coercing, or intimidating another person to engage in any conduct defined as racketeering activity under the Organized Crime Control Act of 1970, 84 Stat. 941, 18 U.S.C. § 1961(1)(B), (1)(C), (1)(D), and (1)(E), as amended; and, any "violation of [R.C.] section . . 2913.05."

338.  A "'pattern of corrupt activity' means two or more incidents of corrupt activity, whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event." R.C. § 2923.31(E).

339.  The Supply Chain Defendants committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of corrupt activity (*i.e.* violations of 18

U.S.C. §§ 1341 and 1343 and R.C. 2913.05) within the past ten years.  The multiple acts of corrupt activity that the Supply Chain Defendants committed, or aided and abetted in the commission of, were related to each other, and posed a threat of continued racketeering activity.  The corrupt activity was made possible by the Supply Chain Defendants' regular use of the facilities, services, distribution channels, and employees of the Opioid Supply Chain Enterprise. The Supply Chain Defendants participated in the scheme to defraud by using mail, telephone and the Internet to transmit mailings and wires in intrastate and/or interstate or foreign commerce.

340.    The Supply Chain Defendants also conducted and participated in the conduct of the affairs of the Opioid Supply Chain Enterprise through a pattern of racketeering activity by the felonious importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substance Act), punishable under any law of the United States.  The Supply Chain Defendants committed crimes that are punishable as felonies under the laws of the United States.  Specifically, 21 U.S.C. § 843(a)(4) makes it unlawful for any person to knowingly or intentionally furnish false or fraudulent information in, or omit any material information from, any application, report, record or other document required to be made, kept or filed under this subchapter.  A violation of § 843(a)(4) is punishable by up to four years in jail, making it a felony. 21 U.S.C. § 843(d)(1).

341.    Each of the Supply Chain Defendants is a registrant as defined in the CSA. Their status as registrants under the CSA requires that they maintain effective controls against diversion of controlled substances in schedule I or II, design and operate a system to disclose to the registrant suspicious orders of controlled substances and inform the DEA of suspicious orders when discovered by the registrant. 21 U.S.C. § 823; 21 C.F.R. § 1301.74(b).

342.    The Supply Chain Defendants' incidents of corrupt activity include, but are not limited to:

Mail Fraud.  The members of the Opioid Supply Chain Enterprise violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, fraudulent materials via U.S. mail or commercial interstate carriers for the purpose of increasing sales and profits.

Wire Fraud:  The members of the Opioid Supply Chain Enterprise violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, fraudulent materials by wire for the purpose of increasing sales and profits.

Telecommunications Fraud:  The members of the Opioid Supply Chain Enterprise violated R.C. § 2913.05 by "knowingly disseminat[ing], transmit[ing], or caus[ing] to be disseminated or transmitted by means of a wire, radio, satellite, telecommunication, telecommunications device, or telecommunications service any writing, data, sign, signal, picture, sound, or image with purpose to execute or otherwise further the scheme to defraud."

Violation of Controlled Substances Act.  The members of the Opioid Supply Chain Enterprise violated 21 U.S.C. § 483(a)(4), which makes it unlawful "for any person to knowingly or intentionally furnish false or fraudulent information in, or omit any material information form, any application, report, record or other document required to be made, kept or filed under this subchapter," and a violation of which is punishable by up to four years in jail, *see* 21 U.S.C. § 483(d)(1), making it a felony.

343.    The Supply Chain Defendants hid from the general public and suppressed and/or ignored warnings from third parties, whistleblowers and governmental entities about the reality of the suspicious orders that the Supply Chain Defendants were filling on a daily basis – leading to the diversion of hundreds of millions of doses of prescriptions opioids into the illicit market.

344.    The Supply Chain Defendants, with knowledge and intent, agreed to the overall objective of their fraudulent scheme and participated in the common course of conduct to commit acts of fraud and indecency in distributing prescription opioids.

345.    Indeed, for the Defendants' fraudulent scheme to work, each of the Defendants had to agree to implement similar tactics regarding distribution of prescription opioids and refusing to report suspicious orders.

103

346.     As described herein, the Supply Chain Defendants engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from the sale of their highly addictive and dangerous drugs. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

347.     The predicate acts all had the purpose of creating the opioid epidemic that substantially injured Plaintiff's business and property, while simultaneously generating billion-dollar revenue and profits for the Supply Chain Defendants. The predicate acts were committed or caused to be committed by the Supply Chain Defendants through their participation in the Opioid Supply Chain Enterprise and in furtherance of its fraudulent scheme.

348.     The pattern of corrupt activity alleged herein and the Opioid Supply Chain Enterprise are separate and distinct from each other. Likewise, the Supply Chain Defendants are distinct from the enterprise.

349.     The pattern of corrupt activity alleged herein is continuing as of the date of this Complaint and, upon information and belief, will continue into the future unless enjoined by this Court.

350.     Many of the precise dates of the Supply Chain Defendants' criminal actions at issue here have been hidden by Defendants and cannot be alleged without access to Defendants' books and records. Indeed, an essential part of the successful operation of the Opioid Supply Chain Enterprise alleged herein depended upon secrecy.

351.    By intentionally refusing to report and halt suspicious orders of their prescription opioids, Defendants engaged in a fraudulent scheme and unlawful course of conduct constituting a pattern of corrupt activity.

352.    As evidence of addiction and abuse of opioids widened, Defendants were obligated to rein in their supply, prevent diversion, and mitigate the harms from opioid overuse and abuse, but intentionally and unreasonably failed to do so.

353.    It was foreseeable to the Supply Chain Defendants that the County would be harmed when they refused to report and halt suspicious orders, because their violation of their duties imposed by statute and regulation allowed the widespread diversion of prescription opioids out of appropriate medical channels and into the illicit drug market – causing the opioid epidemic that the CSA intended to prevent.

354.    The last incident of corrupt activity occurred within five years of the commission of a prior incident of corrupt activity.

355.    For over a decade, the Supply Chain Defendants aggressively sought to bolster their revenue, increase profit, and grow their share of the prescription painkiller market by unlawfully and surreptitiously increasing the volume of opioids they sold. However, the Supply Chain Defendants are not permitted to engage in a limitless expansion of their sales through the unlawful sales of regulated painkillers. As "registrants" under the Controlled Substances Act, 21 U.S.C. § 821, *et seq.* (the "CSA"), the Supply Chain Defendants operated and continue to operate within a "closed-system." The CSA and Ohio law restrict the Supply Chain Defendants' ability to distribute Schedule II substances like opioids, including by requiring them to maintain effective controls against diversion of the controlled substances that they distribute and to design and

operate a system to identify suspicious orders of controlled substances, halt such unlawful sales, and report them to the DEA.

356.    As alleged above, Congress created a closed-system when it enacted the CSA, with the specific intent to protect public safety by reducing or eliminating the diversion of Schedule II drugs, like opioids, from legitimate channels of trade to illicit markets "by controlling the basic ingredients needed for the manufacture of [controlled substances.]"[83]  Each of the Supply Chain Defendants knows and has known for decades that if they do not report, investigate or halt suspicious orders suspicious orders, the likelihood of the DEA learning of these illicit transactions and diversions in a timely manner, or at all, is greatly reduced and, therefore, is likely to contribute to the increase and maintenance of artificially high sales.

357.    As described above, the County's allegations in this Count are based on violations of each of the legal duties, statutes, and regulations described in this Complaint, including the violations of Ohio laws and regulations.

358.    Finding it impossible to legally achieve their ever-increasing sales ambitions, members of the Opioid Supply Chain Enterprise engaged in the common purpose of fraudulently increasing sales and profits from the manufacture and distribution of their prescription opioids. The Supply Chain Defendants formed and pursued their common purpose through the many personal interactions that they had, confidentially, in organizations like the Pain Care Forum and the Healthcare Distribution Alliance.

359.    The Supply Chain Defendants' common purpose and fraudulent scheme to unlawfully increase their sales and profits violated the Corrupt Practices Act in three ways. First,

---

[83] 1970 U.S.C.C.A.N. 4566 at 5490; *see also* Testimony of Joseph T. Rannazzisi before the Caucus on International Narcotics Control, United States Senate, May 5, 2015 (available at https://www.drugcaucus.senate.gov/sites/default/files/Rannazzisi%20Testimony_0.pdf)

the Supply Chain Defendants violated the Corrupt Practices Act because they engaged in the felonious distribution, selling, or otherwise dealing in controlled substances that are punishable by law in the United States. Specifically, the Supply Chain Defendants engaged in the distribution of controlled substances in violation of 21 U.S.C. § 843 because they furnished false or fraudulent material information in, and omitted material information from, applications, reports, records, and other document they were required to make, keep, or file under required to be made, kept, or filed under this subchapter or subchapter II of 21 U.S.C. 801, *et seq.*

360.    Second, the Supply Chain Defendants violated the Corrupt Practices Act by engaging in mail and wire fraud. The Supply Chain Defendants' common purpose and fraudulent scheme was intended to, and did, utilize interstate mail and wire facilities for the commission of their fraud in violation 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud).

361.    Third, the Supply Chain Defendants violated the Corrupt Practices Act by engaging in telecommunications fraud. The Supply Chain Defendants' common purpose and fraudulent scheme was intended to, and did disseminate or transmit writings, data, signs, signals, pictures, sounds or images by means of wire, radio, satellite, telecommunication, telecommunications devices or services in furtherance of the scheme to defraud.

362.    The Supply Chain Defendants' formed an enterprise with the intent to fraudulently increase the sales and distribution of prescription opioids by refusing to identify, report and halt suspicious orders, thereby omitting both the fact and the Supply Chain Defendants' knowledge of widespread diversion of prescription opioids into illegitimate channels.  The Supply Chain Defendants engaged in systematic and fraudulent acts as part of the Opioid Supply Chain Enterprise, that furnished false or fraudulent material information in, and omitted material information from their applications, reports, records and other documents that the Supply Chain

107

Defendants were required to make, keep and/or file. Furthermore, the Supply Chain Defendants engaged in systematic and fraudulent acts as part of the Opioid Supply Chain Enterprise that were intended to and actually did utilize the mail and wire facilities of the United States and Ohio, including refusing to maintain effective controls against diversion of their drugs, to design and operate a system to identify suspicious orders of their drugs, to halt unlawful sales of suspicious orders, and to notify the DEA of suspicious orders.

363.    Through the Supply Chain Defendants' scheme, members of the Opioid Supply Chain Enterprise misrepresented that they were complying with their duties under the CSA, furnished false or fraudulent material information in, and omitted material information from their applications, reports, records and other documents, engaged in unlawful sales of painkillers that resulted in diversion of controlled substances through suspicious orders, and refused to identify or report suspicious orders of controlled substances sales to the DEA. Defendants' refusal to report suspicious orders resulted in artificial and illegal increases in opioid sales and distribution.  The end result of the Supply Chain Defendants' fraudulent scheme and common purpose was continually increasing sales and generating obscene profits and, in turn, fueled an opioid epidemic.

364.    In particular, each of the Supply Chain Defendants were associated with, and conducted or participated in, the affairs of the Opioid Supply Chain Enterprise, whose common purpose was to fraudulently increase sales of prescription opioids so as to increase the quantity they could distribute.

365.    The success of the Supply Chain Defendants' scheme allowed them to unlawfully increase and/or maintain high sales and, as a direct result, allowed them to make billions from the unlawful sale and diversion of opioids.

**B.    Impact of The Opioid Supply Chain Enterprise**

366.    The factual allegations and tragic statistics of injury and damage set forth above apply equally here.

### C.    Injury Caused and Relief Sought

367.    The Supply Chain Defendants' violations of law and their pattern of corrupt activity directly and indirectly caused the County's injury.   Their pattern of corrupt activity logically, substantially and foreseeably caused an opioid epidemic.   The County's injuries, as described below, were not unexpected, unforeseen or independent.    Rather, as the County alleges, Defendants knew that the opioids were going to fuel an ever-increasing illicit prescription market, as well as increasing addiction and death as a result of licit prescriptions of opioids to treat chronic, long-term pain.

368.    It was foreseeable and expected that flooding the illegal market for opioids would lead to a nationwide opioid epidemic. It was also foreseeable and expected that it would lead to increased opioid addiction and overdose. The County's injury was logically, foreseeable, and substantially caused by the opioid epidemic that the Supply Chain Defendants created.

369.    Specifically, the Supply Chain Defendants' pattern of corrupt activity caused the opioid epidemic which has injured the County in the form of substantial losses of money and property that logically, directly and foreseeably arise from the opioid-addiction epidemic.

370.    The County's injuries, as alleged throughout this complaint, and expressly incorporated herein by reference, include:

       a.    Losses caused by the decrease in funding available for the County's public services for which funding was lost because it was diverted to other public services designed to address the opioid epidemic;

       b.    Costs for providing healthcare and medical care, additional therapeutic, and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths;

109

c. Costs of training emergency and/or first responders in the proper treatment of drug overdoses;

d. Costs associated with providing police officers, firefighters, and emergency and/or first responders with Naloxone – an opioid antagonist used to block the deadly effects of opioids in the context of overdose;

e. Costs associated with emergency responses by police officers, firefighters, and emergency and/or first responders to opioid overdoses;

f. Costs for providing mental-health services, treatment, counseling, rehabilitation services, and social services to victims of the opioid epidemic and their families;

g. Costs for providing treatment of infants born with opioid-related medical conditions, or born addicted to opioids due to drug use by mother during pregnancy;

h. Costs associated with law enforcement and public safety relating to the opioid epidemic, including but not limited to attempts to stop the flow of opioids into local communities, to arrest and prosecute street-level dealers, to prevent the current opioid epidemic from spreading and worsening, and to deal with the increased levels of crimes that have directly resulted from the increased homeless and drug-addicted population;

i. Costs associated with increased burden on the County's judicial system, including increased security, increased staff, and the increased cost of adjudicating criminal matters due to the increase in crime directly resulting from opioid addiction;

j. Costs associated with providing care for children whose parents suffer from opioid-related disability or incapacitation;

k. Loss of tax revenue due to the decreased efficiency and size of the working population in Stark County;

l. Losses caused by diminished property values in neighborhoods where the opioid epidemic has taken root; and

m. Losses caused by diminished property values in the form of decreased business investment and tax revenue.

371. The County seeks all legal and equitable relief as allowed by law, including, *inter alia,* actual damages; treble damages; equitable and/or injunctive relief, including corrective

110

statements, information and education, under Ohio Rev. Code § 2923.34(B)(1)-(2), requiring divestiture by, and reasonable restrictions upon, the future activities of the Defendants; forfeiture as deemed proper by the Court; attorney's fees and all costs; expenses of suit; and pre- and post-judgment interest, as the Court deems just and applicable.

**Count V**
**Negligence**
**(Against All Defendants)**
***(Brought by the County of Stark Board of Commissioners, the Plaintiff in this Count)***

372. The County incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges:

373. Defendants owed the County a duty, including a preexisting duty, to not expose Plaintiff to an unreasonable risk of harm.

374. Defendants had a legal duty to exercise reasonable and ordinary care and skill in accordance with applicable standards of conduct in selling, dispensing, and/or distributing opioids.

375. As evidence of addiction and abuse of opioids widened, Defendants were obligated to rein in their supply, prevent diversion, and mitigate the harms from opioid overuse and abuse.

376. As evidence of addiction and abuse of opioids widened, Defendants were obligated to rein in their supply, prevent diversion, and mitigate the harms from opioid overuse and abuse.

377. Defendants had a duty not to breach the standard of care established under Ohio law and the federal Controlled Substances Act ("CSA") and their implementing regulations to report suspicious prescribing and to maintain systems to detect and report such activity.

378. The degree of care the law requires is commensurate with the risk of harm the conduct creates. Defendants' conduct in distributing, dispensing, and selling dangerously addictive drugs requires a high degree of care and places them in a position of great trust and responsibility *vis a vis* the County. Their duty cannot be delegated.

111

379.    Each Defendant breached its duty to exercise the degree of care, prudence, watchfulness, and vigilance commensurate with the dangers involved in selling dangerous controlled substances.

380.    Defendants breached their duty to the County by, *inter alia*:

      a.    Distributing, dispensing, and/or selling opioids in ways that facilitated and encouraged their flow into the illegal, secondary market;

      b.    Distributing, dispensing, and/or selling opioids without maintaining effective controls against the diversion of opioids;

      c.    Choosing not to effectively monitor for suspicious orders;

      d.    Choosing not to investigate suspicious orders;

      e.    Choosing not to report suspicious orders;

      f.    Choosing not to stop or suspend shipments of suspicious orders; and

      g.    Distributing, dispensing, and/or selling opioids prescribed by "pill mills" when Defendants knew or should have known the opioids were being prescribed by "pill mills."

381.    The County does not allege that Defendants were negligent for failure to protect from harm. Rather, Defendants engaged in conduct the foreseeable result of which was to cause harm to the County.

382.    Defendants have engaged in affirmative acts of creating an illegal, secondary prescription opioid market by failing to exercise adequate control over the distribution, dispensing, and/or sale of their prescription opioids.

383.    Defendants were negligent by distributing, dispensing, and/or selling opioids in a way that created and fostered an illegal, secondary prescription opioid market that resulted in a foreseeable and unreasonable risk of harm to the County.

384.   The method by which Defendants created this market was by distributing and selling opioids without regard to the likelihood that the opioids would be placed in the hands of criminals, addicts, juveniles, and others not permitted to use or possess prescription opioids.

385.   A reasonably prudent opioid distributor, or a reasonably prudent pharmacy, should have anticipated an injury to the County as a probable result of distributing, dispensing, and/or selling prescription opioids in this manner.

386.   It was reasonably foreseeable that Defendants' actions and omissions would result in the harm to the County as described herein.

387.   Defendants had control over their conduct in Stark County. Defendants had control over their own shipments of opioids and over their reporting, or lack thereof, of suspicious prescribers and orders.  The Chain Pharmacies controlled their dispensing of opioids.  Each of the Defendants controlled the systems they developed to prevent diversion, including the criteria and process they used to identify suspicious orders, whether and to what extent they trained their employees to report and halt suspicious orders, and whether they filled orders they knew or should have known were likely to be diverted or fuel an illegal market.

388.   Because of each of the Defendants' special positions within the closed system of opioid distribution, without Defendants' actions, opioid use would not have become so widespread, and the enormous public health hazard of prescription opioid and heroin overuse, abuse, and addiction that now exists would have been averted.

389.   Defendants also misleadingly portrayed themselves as cooperating with law enforcement and actively working to combat the opioid epidemic when, in reality, Defendants failed to satisfy even their minimum, legally-required obligations to report suspicious orders.

Defendants voluntarily undertook duties, through their statements to the media, regulators, and the public at large, to take all reasonable precautions to prevent drug diversion.

390.    Defendants are in the business of selling and/or distributing prescription drugs, including opioids, which are specifically known to Defendants to be dangerous because *inter alia* these drugs are defined under federal and state law as substances posing a high potential for abuse and addiction.

391.    Indeed, opioids are akin to medical grade heroin.  Defendants' wrongful conduct of deceptively pushing as many opioids onto the market as possible led directly to the public nuisance and harm to the County – exactly as would be expected when medical grade heroin in the form of prescription opioids flood the community and are diverted into an illegal, secondary market.

392.    Reasonably prudent distributors of prescription opioids, and reasonably prudent pharmacies, would have anticipated that the scourge of opioid addiction would wreak havoc on communities, and the significant costs which would be imposed upon the governmental entities associated with those communities. Indeed, it is a violation of R.C. § 4729.35 and Ohio Administrative Code §§ 4729-9-12, 4729-9-16, and 4729-9-28, as well as a violation of 21 U.S.C. § 823, and 21 C.F.R. § 1301.74 for Defendants not to report suspicious orders and exercise due diligence not to ship such orders unless and until the suspicion has been removed.  In addition, it is a violation of both Ohio and federal law for a pharmacist to shirk the responsibility to assess the legitimacy of a prescription before filling it.  *See* O.A.C. §§ 4729-5-20, 4729-5-21, and 4729-5-30; 21 C.F.R. § 1301.71(a); 21 C.F.R. § 1306.04(a).  The closed system of opioid distribution, whereby wholesale distributors are the gatekeepers between manufacturers and pharmacies, exists for the purpose of controlling dangerous substances such as opioids and preventing diversion and abuse.

393.    Defendants conduct was negligence *per se* in that Defendants violated federal law, including, but not limited to, 21 U.S.C. §§ 823 and 827(d)(1); 21 C.F.R. §§ 1301.71, 1301.74, 1304.21, 1304.22, 1304.33(e), and 1306.04; and Ohio law, including, but not limited to, R.C. § 2925.02(A); and § 4729.01(F), R.C. §§ 4729.51-4729.53, O.A.C. §§ 4729-9-12, 4729-9-16, 4729-9-28, 4729-5-20, 4729-5-21, and 4729-5-30.  The County was a party intended to be protected by such laws and whose injuries said laws were designed to prevent. Defendants' violations of said laws proximately caused injury to the County.

394.    Defendants also violated federal and Ohio statutes and regulations, including the controlled substances laws, by, *inter alia*:

a.  Distributing, dispensing, and/or selling opioids in ways that facilitated and encouraged their flow into the illegal, secondary market;

b.  Distributing, dispensing, and/or selling opioids without maintaining effective controls against the diversion of opioids;

c.  Choosing not to effectively monitor for suspicious orders;

d.  Choosing not to investigate suspicious orders;

e.  Choosing not to report suspicious orders;

f.  Choosing not to stop or suspend shipments of suspicious orders; and

g.  Distributing, dispensing, and/or selling opioids prescribed by "pill mills" when Defendants knew or should have known the opioids were being prescribed by "pill mills."

395.    As a direct and proximate result of Defendants' negligence and/or negligence *per se*, the County has suffered and will continue to suffer economic damages including, but not limited to, significant expenses for police, emergency, health, prosecution, corrections, rehabilitation, and other services.

115

396.     As a direct and proximate result of Defendants' negligence and/or negligence *per se*, the County has suffered and will continue to suffer stigma damage, non-physical property damage, and damage to its proprietary interests.

397.     As a direct and proximate result of Defendants' negligent, willful, wanton, and intentional acts, omissions, misrepresentations and otherwise culpable acts, there is now a national opioid epidemic that has caused enormous harm and injury to the public.

398.     Defendants' misconduct alleged in this case is ongoing and persistent.

399.     Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur, and is not part of the normal and expected costs of a local government's existence.  The County alleges wrongful acts which are neither discrete nor of the sort a local government can reasonably expect.

400.     The County has incurred expenditures for special programs over and above its ordinary public services.

401.     The County has suffered an indivisible injury as a result of the tortious conduct of Defendants.

402.     The tortious conduct of each Defendant was a substantial factor in producing harm to the County.

403.     Defendants acted with actual malice because Defendants acted with a conscious disregard for the rights and safety of other persons, and said actions have a great probability of causing substantial harm.

404.     The County seeks all legal and equitable relief as allowed by law, including *inter alia* injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages,

116

and all damages allowed by law to be paid by the Defendants, attorney fees and costs, and pre- and post-judgment interest.

### Count VI
### Injury Through Criminal Acts
### (R.C. 2307.60)
### (Against All Defendants)
***(Brought by the County of Stark Board of Commissioners, the Plaintiff in this Count)***

405.    The County incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges:

406.    R.C. § 2307.60(A)(1) provides that:

Anyone injured in person or property by a criminal act has, and may recover full damages in, a civil action unless specifically excepted by law, may recover the costs of maintaining the civil action and attorney's fees if authorized by any provision of the Rules of Civil Procedure or another section of the Revised Code or under the common law of this state, and may recover punitive or exemplary damages if authorized by section 2315.21 or another section of the Revised Code.

407.    In the distribution and sale of opioids in Stark County, Defendants violated R.C. § 2925.02(A), which states:

No person shall knowingly do any of the following:

(1) By force, threat, or deception, administer to another or induce or cause another to use a controlled substance; . . . or

(3) By any means, administer or furnish to another or induce or cause another to use a controlled substance, and thereby cause serious physical harm to the other person, or cause the other person to become drug dependent.

408.    Through the Defendants' actions as described in this Complaint, including flooding the market with opioids, and deliberately disregarding their obligations to maintain effective controls against diversion, Defendants furnished to residents of the County or induced or caused residents of Stark County to use a controlled substance, thereby causing serious physical harm to those persons and causing them to become drug dependent, in violation of R.C. §§ 2925.02(A)(3).

409.    The exemption in R.C. § 2925.02 only applies to drug distributors and pharmacies when their "conduct is in accordance with Chapters R.C. § 3719., 4715., 4723., 4729., 4730., 4731., and 4741." R.C. § 2925.02(B). Defendants are not in compliance with said Chapters and have thereby forfeited the protection provided by the exception.

410.    In the distribution and sale of opioids in Ohio and Stark County, Defendants violated R.C. § 2925.02(A)(2), which makes it a crime to: "Prepare for shipment, ship, transport, deliver, prepare for distribution, or distribute a controlled substance or a controlled substance analog, when the offender knows or has reasonable cause to believe that the controlled substance or a controlled substance analog is intended for sale or resale by the offender or another person."

411.    Defendants may claim an exemption to R.C. § 2925.03(A)(2) only if their "conduct is in accordance with Chapters 3719., 4715., 4723., 4729., 4730., 4731., and 4741. of the Revised Code." Defendants are not in compliance with said Chapters and have thereby forfeited the protection provided by the exception.

412.    Defendants have engaged in additional criminal acts detailed in the Ohio Corrupt Practices Act Count above, including acts of criminal wire fraud, mail fraud, telecommunications fraud, unlawful dealing in controlled substances, and violations of the Ohio Corrupt Practices Act.

413.    It was foreseeable to Defendants that their misconduct alleged in this Count would lead to addiction, abuse, misuse, and diversion of opioids, both in Stark County and throughout the United States.

414.    The County was within the zone of interest protected by these criminal laws.

415.    As a direct and proximate result of Defendants' criminal acts as described in this Count, the County suffered injury and damages, for which it is entitled to recover pursuant to R.C. § 2307.60(A)(1).

416. Defendants' misconduct alleged in this case is ongoing and persistent.

417. Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur, and is not part of the normal and expected costs of a local government's existence. The County alleges wrongful acts which are neither discrete nor of the sort a local government can reasonably expect.

418. The County has incurred expenditures for special programs over and above its ordinary public services.

419. Defendants acted with actual malice because Defendants acted with a conscious disregard for the rights and safety of other persons, and said actions had a great probability of causing substantial harm.

420. The County seeks all legal relief to which it may be entitled pursuant to R.C. § 2307.60(A)(1), including *inter alia* compensatory damages, punitive and/or exemplary damages, attorney's fees, and the costs and expenses of suit, including pre- and post-judgment interest.

**Count VII**
**Unjust Enrichment**
**(Against All Defendants)**
***(Brought by the County of Stark Board of Commissioners, the Plaintiff in this Count)***

421. The County incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges:

422. As an expected and intended result of their conscious wrongdoing as set forth in this Complaint, Defendants have profited and benefited from the increase in the distribution and purchase of opioids within the County, including from opioids foreseeably and deliberately diverted within and into Stark County.

423. Unjust enrichment arises not only where an expenditure by one party adds to the property of another, but also where the expenditure saves the other from expense or loss.

119

424.    The County has expended substantial amounts of money in an effort to remedy or mitigate the societal harms caused by Defendants' conduct.

425.    These expenditures include the provision of healthcare services and treatment services to people who use opioids.

426.    These expenditures have helped sustain Defendants' businesses.

427.    The County has conferred a benefit upon Defendants by paying for Defendants' externalities: the cost of the harms caused by Defendants' improper distribution and dispensing practices.

428.    Defendants were aware of these obvious benefits, and their retention of the benefit is unjust.

429.    The County has paid for the cost of Defendants' externalities and Defendants have benefited from those payments because they allowed them to continue providing customers with a high volume of opioid products.

430.    Defendants have unjustly retained benefits to the detriment of the County, and Defendants' retention of such benefits violates the fundamental principles of justice, equity, and good conscience.

431.    Defendants' misconduct alleged in this case is ongoing and persistent.

432.    Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur, and is not part of the normal and expected costs of a local government's existence.  Plaintiff alleges wrongful acts which are neither discrete nor of the sort a local government can reasonably expect.

433.    The County has incurred expenditures for special programs over and above its ordinary public services.

120

434. The County seeks an order compelling Defendants to disgorge all unjust enrichment to Plaintiff; and awarding such other, further, and different relief as this Honorable Court may deem just.

## Count VIII
## Civil Conspiracy
## (Against All Defendants)
### *(Brought by the County of Stark Board of Commissioners, the Plaintiff in this Count)*

435. The County incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges:

436. Defendants engaged in a civil conspiracy in their unlawful distribution and/or dispensing of opioids into Stark County.

437. Defendants unlawfully failed to act to prevent diversion and failed to monitor for, report, and prevent suspicious orders of opioids.

438. Defendants' conspiracy and acts in furtherance thereof are alleged in detail in this Complaint, including, without limitation, the claim under the Ohio Corrupt Practices Act. Such allegations are specifically incorporated herein.

439. Defendants acted with a common understanding or design to commit unlawful acts, as alleged herein, and acted purposely, without a reasonable or lawful excuse, which directly caused the injuries alleged herein.

440. Defendants acted with malice, purposely, intentionally, unlawfully, and without a reasonable or lawful excuse.

441. Defendants conduct in furtherance of the conspiracy described herein was not mere parallel conduct because each Defendant acted directly against their commercial interests in not reporting the unlawful distribution or dispensing practices of their competitors to the authorities. Each Defendant acted against their commercial interests in this regard due to an actual or tacit

agreement between the Defendants that they would not report each other to the authorities so they could all continue engaging in their unlawful conduct.

442.     Defendants' conspiracy, and Defendants' actions and omissions in furtherance thereof, caused the direct and foreseeable losses alleged herein.

443.     Defendants' actions demonstrated both malice and also aggravated and egregious fraud. Defendants engaged in the conduct alleged herein with a conscious disregard for the rights and safety of other persons, even though that conduct had a great probability of causing substantial harm.

444.     Defendants' misconduct alleged in this case is ongoing and persistent.

445.     Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur, and is not part of the normal and expected costs of a local government's existence. The County alleges wrongful acts which are neither discrete nor of the sort a local government can reasonably expect.

446.     The County has incurred expenditures for special programs over and above its ordinary public services.

447.     The County seeks all legal and equitable relief as allowed by law, including *inter alia* injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by the Defendants, attorney fees and costs, and pre-and post-judgment interest.

### PRAYER FOR RELIEF

WHEREFORE, the County requests the following relief:

A.     A finding that, by the acts alleged herein, Defendants have created a public nuisance;

122

B.   An injunction permanently enjoining Defendants from engaging in the acts and practices that caused the public nuisance;

C.   An order directing Defendants to abate the public nuisance;

D.   A finding that, by the acts alleged herein, Defendants violated the Ohio Corrupt Practices Act ("OCPA"), R.C. 2923.31, *et seq.*;

E.   A finding that, by the acts alleged herein, Defendants violated R.C. 2307.60;

F.   An award of three times the County's actual damages under R.C. 2923.31, *et seq.*;

G.   Compensatory damages in an amount in excess of $25,000 sufficient to fairly and completely compensate for all damages alleged herein;

H.   Punitive damages in excess of $25,000;

I.   Disgorgement of Defendants' unjust enrichment, benefits, and ill-gotten gains, plus interest, acquired as a result of the unlawful or wrongful conduct alleged herein;

J.   For costs, filing fees, pre and post judgment interest, and attorney's fees; and

K.   For all other relief at law or in equity, deemed just by this Court.

Dated: November 7, 2018

Respectfully submitted,

John D. Ferrero (Bar No. 0018590)
Stark County Prosecutor
110 Central Plaza South, Suite 510
Canton, Ohio 44702
330.451.7935 telephone
330.451.7225 facsimile
jdferrero@starkcountyohio.gov
Attorney for Plaintiff Stark County

/s/ Stephan P. Babik
Stephan P. Babik (Bar No. 0080165)
Assistant Prosecuting Attorney - Civil Division
Office of the Stark County Prosecutor - John D. Ferrero
110 Central Plaza South, Suite 510
Canton, OH 44702
330.451.7882 telephone
330.451.7225 facsimile
spbabik@starkcountyohio.gov
Attorney for Plaintiff Stark County

MOTLEY RICE, LLC

/s/ Linda Singer
Linda Singer
Elizabeth Smith
Motley Rice LLC
401 9th Street NW
Suite 1001
Washington, DC 20004
(202) 386-9626
lsinger@motleyrice.com
esmith@motleyrice.com
*Pro hac vice to be submitted*

Lisa Saltzburg
Motley Rice LLC
28 Bridgeside Blvd.
Mount Pleasant, South Carolina 29464
(843) 216-9000
lsaltzburg@motleyrice.com
*Pro hac vice to be submitted*

UNITED STATES
POSTAL SERVICE.

Date Produced: 11/26/2018

STARK COUNTY CLERK OF COURTS:

The following is the delivery information for Certified Mail™ item number 7199 9991 7038 5891 1411.
Our records indicate that this item was delivered on 11/19/2018 at 11:49 a.m. in COLUMBUS, OH 43224.
The scanned image of the recipient information is provided below.

Signature of Recipient :

Address of Recipient :

Thank you for selecting the Postal Service for your mailing needs.  If you require additional assistance,
please contact your local post office or Postal Service representative.

Sincerely,
United States Postal Service

The customer reference number shown below is not validated or endorsed by the United States Postal
Service. It is solely for customer use.

Customer Reference Number:        1391627 338613292018CV02231002

Date Produced: 11/26/2018

STARK COUNTY CLERK OF COURTS:

The following is the delivery information for Certified Mail™ item number 7199 9991 7038 5891 1404.
Our records indicate that this item was delivered on 11/20/2018 at 12:49 p.m. in COLUMBUS, OH 43215.
The scanned image of the recipient information is provided below.

Signature of Recipient :

Address of Recipient :

Thank you for selecting the Postal Service for your mailing needs.  If you require additional assistance,
please contact your local post office or Postal Service representative.

Sincerely,
United States Postal Service

The customer reference number shown below is not validated or endorsed by the United States Postal
Service. It is solely for customer use.

Customer Reference Number:        1391627 338613292018CV02231001

**UNITED STATES**
**POSTAL SERVICE** ™

Date Produced: 11/26/2018

STARK COUNTY CLERK OF COURTS:

The following is the delivery information for Certified Mail™ item number 7199 9991 7038 5891 1398.
Our records indicate that this item was delivered on 11/19/2018 at 11:49 a.m. in COLUMBUS, OH 43224.
The scanned image of the recipient information is provided below.

Signature of Recipient :

Address of Recipient :

Thank you for selecting the Postal Service for your mailing needs.  If you require additional assistance,
please contact your local post office or Postal Service representative.

Sincerely,
United States Postal Service

The customer reference number shown below is not validated or endorsed by the United States Postal
Service. It is solely for customer use.

Customer Reference Number:        1391627 338613292018CV02231000



**UNITED STATES POSTAL SERVICE**™

Date Produced: 11/26/2018

STARK COUNTY CLERK OF COURTS:

The following is the delivery information for Certified Mail™ item number 7199 9991 7038 5891 1282. Our records indicate that this item was delivered on 11/19/2018 at 11:49 a.m. in COLUMBUS, OH 43224. The scanned image of the recipient information is provided below.

Signature of Recipient :

Address of Recipient :

Thank you for selecting the Postal Service for your mailing needs.  If you require additional assistance, please contact your local post office or Postal Service representative.

Sincerely,
United States Postal Service

The customer reference number shown below is not validated or endorsed by the United States Postal Service. It is solely for customer use.

Customer Reference Number:        1391627 338613292018CV02231007

**UNITED STATES**
**POSTAL SERVICE**₮₃

Date Produced: 11/26/2018

STARK COUNTY CLERK OF COURTS:

The following is the delivery information for Certified Mail™ item number 7199 9991 7038 5891 1275. Our records indicate that this item was delivered on 11/20/2018 at 07:24 a.m. in WILMINGTON, DE 19801. The scanned image of the recipient information is provided below.

Signature of Recipient :

Address of Recipient :

Thank you for selecting the Postal Service for your mailing needs.  If you require additional assistance, please contact your local post office or Postal Service representative.

Sincerely,
United States Postal Service

The customer reference number shown below is not validated or endorsed by the United States Postal Service. It is solely for customer use.

Customer Reference Number:          1391627 338613292018CV02231004

**UNITED STATES**
**POSTAL SERVICE** ™

Date Produced: 11/26/2018

STARK COUNTY CLERK OF COURTS:

The following is the delivery information for Certified Mail™ item number 7199 9991 7038 5891 1268.
Our records indicate that this item was delivered on 11/20/2018 at 12:49 p.m. in COLUMBUS, OH 43215.
The scanned image of the recipient information is provided below.

Signature of Recipient :

Address of Recipient :

Thank you for selecting the Postal Service for your mailing needs.  If you require additional assistance,
please contact your local post office or Postal Service representative.

Sincerely,
United States Postal Service

The customer reference number shown below is not validated or endorsed by the United States Postal
Service. It is solely for customer use.

Customer Reference Number:          1391627 338613292018CV02231003

CLERK OF COURTS
STARK COUNTY, OHIO

# IN THE COURT OF COMMON PLEAS
## STARK COUNTY, OHIO

2018 NOV 28  PM 3: 02

| | | |
|---|---|---|
| **Stark County, Ohio Board of County Commissioners,** *et al.*, | : | |
| | : | |
| Plaintiffs, | : | Case No. 2018CV02231 |
| | : | |
| v. | : | Judge Taryn L. Heath |
| | : | |
| **Cardinal Health, Inc.,** *et al.*, | : | |
| | : | |
| Defendants. | : | |

## NOTICE OF APPEARANCE OF
## VINCENT I. HOLZHALL AND BRIAN J. LALIBERTE

The Court and parties hereto will take notice that Vincent I. Holzhall and Brian J. Laliberte of Steptoe & Johnson PLLC, 41 South High Street, Suite 2200, Columbus, Ohio 43215, telephone (614) 221-5100, hereby enter their appearance as counsel of record for Defendant McKesson Corporation ("McKesson"). It is respectfully requested that service of all further pleadings, notices, filings, papers, etc. be made upon the undersigned as counsel of record for McKesson.

Vincent I. Holzhall (0074901)
Brian J. Laliberte (0071125)
**STEPTOE & JOHNSON PLLC**
41 South High Street, Suite 2200
Columbus, Ohio 43215
(614) 221-5100 phone; (614) 221-0952 fax
vince.holzhall@steptoe-johnson.com
brian.laliberte@steptoe-johnson.com
*Counsel for Defendant McKesson Corporation*

## CERTIFICATE OF SERVICE

I hereby certify a copy of the foregoing *Notice of Appearance of Vincent I. Holzhall and*

*Brian J. Laliberte* was served this 27th day of November, 2018, by the Court's by regular U.S.

mail to the following:

John D. Ferrero
Stark County Prosecutor
110 Central Plaza South, Ste. 510
Canton, OH 44702

and

Stephan P. Babik
Assistant Prosecuting Attorney – Civil Division
Office of the Stark County Prosecutor
110 Central Plaza South, Ste. 510
Canton, OH 44702

and

Linda Singer
Elizabeth Smith
Motley Rice LLC
401 9th Street NW, Ste. 1001
Washington, DC 20004

and

Lisa Saltzburg
Motley Rice LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464

and

Donald W. Davis, Jr.
Adam D. Fuller
Elizabeth Shively Boatwright
Brennan, Manna & Diamond, LLC
75 East Market Street
Akron, OH 44308
*Counsel for Plaintiffs*

CARDINAL HEALTH, INC.
c/o CT Corporation System
4400 Easton Commons, Ste. 125
Columbus, OH 43219

AMERISOURCEBERGEN CORPORATION
c/o CT Corporation System
4400 Easton Commons, Ste. 125
Columbus, OH 43219

WALGREENS BOOTS ALLIANCE, INC.
d/b/a WALGREEN CO.
The Prentice-Hall Corporation System, Inc.
50 West Broad Street, Ste. 1330
Columbus, OH 43215

CVS HEALTH CORPORATION
The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

CVS INDIANA, LLC
CT Corporation System
150 West Market Street, Ste. 800
Indianapolis, IN 46204

2

OHIO CVS STORES LLC
CT Corporation System
4400 Easton Commons Way, Ste. 125
Columbus, OH 43219

*Vincent I. Holzhall*

Vincent I. Holzhall (0074901)

CLERK OF COURTS
STARK COUNTY, OHIO

**IN THE COURT OF COMMON PLEAS
STARK COUNTY, OHIO**

2018 DEC -4   PM 2: 32

| | | |
|---|---|---|
| **Stark County, Ohio Board of County Commissioners, *et al.*,** | : | |
| | : | |
| Plaintiffs, | : | Case No. 2018CV02231 |
| | : | |
| v. | : | Judge Taryn L. Heath |
| | : | |
| **Cardinal Health, Inc., *et al.*,** | : | |
| | : | |
| Defendants. | : | |

### DISTRIBUTOR DEFENDANTS' CONSENT MOTION FOR EXTENSION OF TIME TO ANSWER COMPLAINT

Pursuant to Local Rule 9.03 and Ohio Rule of Civil Procedure 6, Defendants McKesson Corporation, Cardinal Health, Inc., and AmerisourceBergen Drug Corporation ("Distributor Defendants"), with the consent of Plaintiff Stark County, Ohio, hereby request a sixty (60) day extension of time to answer, move, or otherwise respond to Plaintiff's Complaint until and including February 15, 2019.

Distributor Defendants are working diligently to compile the necessary information to properly respond to Plaintiff's allegations. Distributor Defendants have conferred with Plaintiff regarding this motion, and, as a professional courtesy, Plaintiff's counsel agreed to an extension of time to answer or move to dismiss the Complaint.

Wherefore, Distributor Defendants respectfully request that the Court grant their motion for an extension of time through and including February 15, 2019, to answer or move to dismiss the Complaint. An Agreed Order and Entry providing this extension is attached hereto.



8258162

Dated:  December 3, 2018

Respectfully submitted,

*Vincent I. Holzhall*
Vincent I. Holzhall (0074901)
Brian J. Laliberte (0071125)
**STEPTOE & JOHNSON PLLC**
41 South High Street, Suite 2200
Columbus, Ohio  43215
(614) 221-5100 phone; (614) 221-0952 fax
vince.holzhall@steptoe-johnson.com
brian.laliberte@steptoe-johnson.com
*Counsel for Defendant McKesson Corporation*

*Joseph F. Murray*
(per email authority of 11/30/2018)          by V.I. Holzhall
Joseph F. Murray (0063373)                        #0074901
**MURRAY MURPHY MOUL + BASIL LLP**
1114 Dublin Road
Columbus, Ohio 43215
(614) 488-0400 phone; (614) 488-0401 fax
murray@mmmb.com
*Counsel for Cardinal Health, Inc.*

*Sandra K. Zerrusen*
(per email authority of 11/30/2018)
Mark W. Bernlohr (0038640)          by V. I. Holzhall
Sandra K. Zerrusen (0070883)              #0074901
Aaron E. McQueen (0068753)
Andrew N. Schock (0087998)
**JACKSON KELLY PLLC**
50 South Main Street, Suite 201
Akron, OH 44308
(330) 252-9060 phone; (330) 252-9078 fax
mwbernlohr@jacksonkelly.com
skzerrusen@jacksonkelly.com
aaron.mcqueen@jacksonkelly.com
anschock@jacksonkelly.com
*Counsel for Defendant AmerisourceBergen
Drug Corporation*

2

AGREED TO BY:

*John D. Ferrero*

John D. Ferrero (0018590)
(per email authority of 11/30/2018)   by V. I. Hotzhell
#0074901

John D. Ferrero (0018590)
Stark County Prosecutor
110 Central Plaza South, Ste. 510
Canton, OH 44702

and

Stephan P. Babik (0080165)
Assistant Prosecuting Attorney – Civil
Division
Office of the Stark County Prosecutor
110 Central Plaza South, Ste. 510
Canton, OH 44702

and

Linda Singer
Elizabeth Smith
Motley Rice LLC
401 9th Street NW, Ste. 1001
Washington, DC 20004
*Pro hac vices to be submitted*

and

Lisa Saltzburg
Motley Rice LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
*Pro hac vice to be submitted*

and

Donald W. Davis, Jr.
Adam D. Fuller
Elizabeth Shively Boatwright
Brennan, Manna & Diamond, LLC
75 East Market Street
Akron, OH 44308

8258162

and

**TZANGAS | PLAKAS | MANNOS | LTD**
Lee E. Plakas (0008628)
Joshua E. O'Farrell (0087061)
220 Market Avenue South, 8th Floor
Canton, Ohio 44702
(330) 455-6112 phone; (330) 455-2108 fax
lplakas@lawlion.com
jofarrell@lawlion.com
*Counsel for Plaintiffs*

4

8258162

## CERTIFICATE OF SERVICE

I hereby certify a copy of the foregoing *Distributor Defendants' Consent Motion for Extension of Time to Answer Complaint* was served this 3rd day of December, 2018, by regular U.S. mail to the following:

John D. Ferrero
Stark County Prosecutor
110 Central Plaza South, Ste. 510
Canton, OH 44702

and

Stephan P. Babik
Assistant Prosecuting Attorney – Civil Division
Office of the Stark County Prosecutor
110 Central Plaza South, Ste. 510
Canton, OH 44702

and

Linda Singer
Elizabeth Smith
Motley Rice LLC
401 9th Street NW, Ste. 1001
Washington, DC 20004

and

Lisa Saltzburg
Motley Rice LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464

and

Donald W. Davis, Jr.
Adam D. Fuller
Elizabeth Shively Boatwright
Brennan, Manna & Diamond, LLC
75 East Market Street
Akron, OH 44308
*Counsel for Plaintiffs*

CARDINAL HEALTH, INC.
c/o CT Corporation System
4400 Easton Commons, Ste. 125
Columbus, OH 43219

AMERISOURCEBERGEN CORPORATION
c/o CT Corporation System
4400 Easton Commons, Ste. 125
Columbus, OH 43219

WALGREENS BOOTS ALLIANCE, INC.
d/b/a WALGREEN CO.
The Prentice-Hall Corporation System, Inc.
50 West Broad Street, Ste. 1330
Columbus, OH 43215

CVS HEALTH CORPORATION
The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

CVS INDIANA, LLC
CT Corporation System
150 West Market Street, Ste. 800
Indianapolis, IN 46204

5

8258162

and

**TZANGAS | PLAKAS | MANNOS | LTD**
Lee E. Plakas (0008628)
Joshua E. O'Farrell (0087061)
220 Market Avenue South, 8th Floor
Canton, Ohio 44702
(330) 455-6112 phone; (330) 455-2108 fax
lplakas@lawlion.com
jofarrell@lawlion.com
*Counsel for Plaintiffs*

OHIO CVS STORES LLC
CT Corporation System
4400 Easton Commons Way, Ste. 125
Columbus, OH 43219

_Vincent I. Holzhall_
Vincent I. Holzhall (0074901)

8258162

6

IN THE COURT OF COMMON PLEAS
STARK COUNTY, OHIO

LOUIS GIAVASIS
CLERK OF COURTS
STARK COUNTY, OHIO

2018 DEC -7 PM 4: 01

Stark County, Ohio Board of County
Commissioners, *et al.*,

      Plaintiffs,

v.

Cardinal Health, Inc., *et al.*,

      Defendants.

Case No. 2018CV02231

Judge Taryn L. Heath

## ORDER GRANTING DISTRIBUTOR DEFENDANTS' CONSENT MOTION FOR EXTENSION OF TIME TO ANSWER COMPLAINT

This matter comes before the Court upon the consent motion of Defendants McKesson Corporation, Cardinal Health, Inc., and AmerisourceBergen Drug Corporation ("Distributor Defendants") for an extension of time to answer or move to dismiss Plaintiff's Complaint. Pursuant to Local Rule 9.03, Ohio Rule of Civil Procedure 6, and for good cause shown, the Motion is hereby **GRANTED**.

**IT IS THEREFORE ORDERED** that Distributor Defendants shall have until and including February 15, 2019, to serve their responsive motions or pleadings.

**IT IS SO ORDERED.**

_12/7/18_
Date

_____
JUDGE TARYN L. HEATH

COUNSEL/PARTY WHO PREPARED
THIS ENTRY SHALL PRESENT A
COPY OF THIS ENTRY TO ALL OTHER
COUNSEL/PARTIES OF RECORD
PURSUANT TO LOC. R. 18
JUDGE TARYN L. HEATH

ENTERED BY

8258169

Approved:

*Vincent I. Holzhall*

Vincent I. Holzhall (0074901)
Brian J. Laliberte (0071125)
**STEPTOE & JOHNSON PLLC**
41 South High Street, Suite 2200
Columbus, Ohio 43215
(614) 221-5100 phone; (614) 221-0952 fax
vince.holzhall@steptoe-johnson.com
brian.laliberte@steptoe-johnson.com
*Counsel for Defendant McKesson Corporation*

*Joseph F. Murray*
(per email authority of 11/30/2018)
Joseph F. Murray (0063373)
**MURRAY MURPHY MOUL + BASIL LLP**
1114 Dublin Road
Columbus, Ohio 43215
(614) 488-0400 phone; (614) 488-0401 fax
murray@mmmb.com
*Counsel for Cardinal Health, Inc.*

by V.I. Holzhall
#0074901

*Sandra K. Zerrusen*
(per email authority of 11/30/2018)
Mark W. Bernlohr (0038640)
Sandra K. Zerrusen (0070883)
Aaron E. McQueen (0068753)
Andrew N. Schock (0087998)
**JACKSON KELLY PLLC**
50 South Main Street, Suite 201
Akron, OH 44308
(330) 252-9060 phone; (330) 252-9078 fax
mwbernlohr@jacksonkelly.com
skzerrusen@jacksonkelly.com
aaron.mcqueen@jacksonkelly.com
anschock@jacksonkelly.com
*Counsel for Defendant AmerisourceBergen Drug Corporation*

by V.I. Holzhall
#0074901

2

8258169

*John D. Ferrero*

John D. Ferrero (0018590)
(per email authority of 11/30/2018) by V. l. Holzhall
# 0074901

John D. Ferrero (0018590)
Stark County Prosecutor
110 Central Plaza South, Ste. 510
Canton, OH 44702

and

Stephan P. Babik (0080165)
Assistant Prosecuting Attorney -- Civil
Division
Office of the Stark County Prosecutor
110 Central Plaza South, Ste. 510
Canton, OH 44702

and

Linda Singer
Elizabeth Smith
Motley Rice LLC
401 9th Street NW, Ste. 1001
Washington, DC 20004
*Pro hac vices to be submitted*

and

Lisa Saltzburg
Motley Rice LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
*Pro hac vice to be submitted*

and

Donald W. Davis, Jr.
Adam D. Fuller
Elizabeth Shively Boatwright
Brennan, Manna & Diamond, LLC
75 East Market Street
Akron, OH 44308

8258169

3

and

**TZANGAS | PLAKAS | MANNOS | LTD**
Lee E. Plakas (0008628)
Joshua E. O'Farrell (0087061)
220 Market Avenue South, 8th Floor
Canton, Ohio 44702
(330) 455-6112 phone; (330) 455-2108 fax
lplakas@lawlion.com
jofarrell@lawlion.com
*Counsel for Plaintiffs*

4



CLERK OF COURTS
STARK COUNTY, OHIO

2018 DEC 10  PM 12: 28

# IN THE COURT OF COMMON PLEAS
## STARK COUNTY, OHIO

| | | |
|---|---|---|
| STARK COUNTY COMMISSIONERS, *et al.,* | ) ) ) | CASE NO. 2018 CV 02231 |
| Plaintiffs, | ) ) | JUDGE TARYN L. HEATH |
| v. | ) ) | |
| CARDINAL HEALTH, INC., *et al.,* | ) ) | <u>NOTICE OF APPEARANCE OF COUNSEL</u> |
| Defendants. | ) | |

The Court and parties will please take notice that Brent M. Buckley and Hunter G. Cavell of the law firm Buckley King LPA, 1400 Fifth Third Center, 600 Superior Avenue East, Cleveland, OH 44114, hereby enter their appearance as counsel of record for defendant, Walgreens Boots Alliance*. It is requested that service of all further pleadings, notices, filings, papers, rulings and orders be made upon the undersigned as counsel for Walgreens Boots Alliance.

BRENT M. BUCKLEY (0017010)
buckley@buckleyking.com
HUNTER G. CAVELL (0090567)
cavell@buckleyking.com
BUCKLEY KING LPA
1400 Fifth Third Center
600 Superior Avenue East
Cleveland, OH  44114-2652
Phone: (216) 363-1400 | Fax: (216) 579-1020

*Attorneys for Walgreens Boots Alliance*

*Walgreens Boots Alliance does not concede that it is a proper party to this action or to the jurisdiction of this Court.*

ENTERED BY

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of December, 2018, the foregoing *Notice of Appearance of*

*Counsel* was sent by regular U.S. mail to the following parties:

STEPHAN P. BABIK
Stark County Prosecutors Office
110 Central Plaza S., Suite 510
Canton OH 44702

JOHN D. FERRERO, JR.
110 Central Plaza S., Suite 510
Canton OH 44702
*Attorneys for Plaintiffs*

CARDINAL HEALTH, INC.
c/o CT Corporation System
4400 Easton Commons, Suite 125
Columbus OH 43219

McKESSON CORPORATION
c/o Corporation Service Company
50 West Broad Street, Suite 1330
Columbus OH 43215

AMERISOURCEBERGEN DRUG
CORPORATION
c/o CT Corporation System
4400 Easton Commons, Suite 125
Columbus OH 43219

CVS HEALTH CORPORATION
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington DE 19801

CVS INDIANA, L.L.C.
c/o CT Corporation System
150 West Market Street, Suite 800
Indianapolis IN 46204

CVS PHARMACY, INC.
c/o CT Corp.
1300 East Ninth Street
Cleveland OH 44114

OHIO CVS STORES LLC
c/o CT Corporation Systems
4400 Easton Commons Way, Suite 125
Columbus OH 43219

Brent M. Buckley (0017010)
*Attorney for Walgreens Boots Alliance*



**VASIS**
rk of Courts
**ISION**
21160
44701-1160
9

91 7199 9991 7038 5891 1305



RET'D.

DEC 17 2018

CVS PHARMACY INC
CT CORP
1300 E 9TH ST
CLEVELAND, OH 44114

LOUIS P. GIAVASIS
CLERK OF COURTS
STARK COUNTY OHIO

2018CV02231   TH

441142018CV02231006

WTF



-R-T-S-   441143006-1N        12/13/18

RETURN TO SENDER
UNABLE TO FORWARD
UNABLE TO FORWARD
RETURN TO SENDER

IN THE COURT OF COMMON PLEAS, STARK COUNTY OHIO

# LOUIS P. GIAVASIS
## STARK COUNTY CLERK OF COURTS

**STARK COUNTY BOARD OF COMMISSIONERS ,ET AL**
        PLAINTIFF,

      VS.                CASE NUMBER :    **2018CV02231**

**CARDINAL HEALTH INC ,ET AL**      ASSIGNED JUDGE :    **TARYN L. HEATH**

        DEFENDANT,

# SUMMONS

November 15, 2018

TO THE FOLLOWING NAMED DEFENDANT:
      CVS PHARMACY INC
      CT CORP
      1300 E 9TH ST
      CLEVELAND, OH 44114

YOU HAVE BEEN NAMED A DEFENDANT IN A COMPLAINT FILED IN STARK COUNTY COURT OF COMMON PLEAS, STARK COUNTY COURT HOUSE, CANTON, OHIO 44702 BY:
      STARK COUNTY BOARD OF COMMISSIONERS -
      110 CENTRAL PLAZA SOUTH SUITE 240
      CANTON, OH 44702               PLAINTIFF.

A COPY OF THE COMPLAINT IS ATTACHED HERETO. THE NAME AND ADDRESS OF THE PLAINTIFF'S ATTORNEY IS:
      STEPHAN BABIK
      STARK COUNTY OFFICE BLDG., 510
      110 CENTRAL PLAZA S.
      CANTON, OH 44702

YOU ARE HEREBY SUMMONED AND REQUIRED TO SERVE UPON THE PLAINTIFF'S ATTORNEY, OR UPON THE PLAINTIFF, IF HE HAS NO ATTORNEY OF RECORD, A COPY OF AN ANSWER TO THE COMPLAINT WITHIN TWENTY-EIGHT DAYS AFTER THE SERVICE OF THIS SUMMONS ON YOU, EXCLUSIVE OF THE DAY OF SERVICE. YOUR ANSWER MUST BE FILED WITH THE COURT WITHIN THREE DAYS AFTER THE SERVICE OF A COPY OF THE ANSWER ON THE PLAINTIFF'S ATTORNEY.

IF YOU FAIL TO APPEAR AND DEFEND, JUDGMENT BY DEFAULT WILL BE RENDERED AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.

LOUIS P. GIAVASIS
CLERK OF COURTS
STARK COUNTY, OHIO

S. MARTIN, DEPUTY CLERK



FILED

NOV 14 2018

LOUIS P. GIAVASIS
STARK COUNTY OHIO
CLERK OF COURTS

## IN THE COURT OF COMMON PLEAS
## STARK COUNTY, OHIO

STARK COUNTY, OHIO BOARD OF
COUNTY COMMISSIONERS
110 Central Plaza South, Suite 240,
Canton, Ohio 44702

And

THE STATE OF OHIO *EX REL.*
PROSECUTING ATTORNEY OF STARK
COUNTY, JOHN D. FERRERO, 110
Central Plaza South, Suite 510,
Canton, Ohio 44702,

         Plaintiffs,

    vs.

CARDINAL HEALTH, INC.
c/o CT Corporation System
4400 Easton Commons
Suite 125
Columbus, OH 43219

And

MCKESSON CORPORATION
c/o Corporation Service Company
50 West Broad Street
Suite 1330
Columbus, OH 43215

And

AMERISOURCEBERGEN DRUG
CORPORATION
c/o CT Corporation System
4400 Easton Commons
Suite 125
Columbus, OH 43219

AND

Case No.:   **2018CV02231**

Judge   **Heath**

**Complaint**

**(Jury Demand Endorsed Hereon)**